JENNY L. SHEAFFER (*Pro Hac Vice*)
ANGELA R. GOTT (*Pro Hac Vice*)
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
200 Public Square, Suite 2300
Cleveland, Ohio  44114-2378
Tel: (216) 363-4500
Fax: (216) 363-4588
E-Mail: jsheaffer@beneschlaw.com
        agott@beneschlaw.com

DAVID M. GIVEN (State Bar No. 142375)
FEATHER D. BARON (State Bar No. 252489)
PHILLIPS, ERLEWINE & GIVEN LLP
50 California Street, 35th Floor
San Francisco, CA 94111
Tel: (415) 398-0900
Fax: (415) 398-0911
E-Mail: dmg@phillaw.com
        fdb@phillaw.com

Attorneys for Defendant
HOMAX PRODUCTS, INC.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN FRANCISCO TECHNOLOGY INC., <br><br> Plaintiff, <br><br> v. <br><br> AERO PRODUCTS INTERNATIONAL INC., ET AL. <br><br> Defendants. | Case No. 10 CV-02994-JF <br><br> **INDEX OF SECONDARY SOURCES IN SUPPORT OF DEFENDANT HOMAX PRODUCTS, INC.'S MOTION TO DISMISS PURSUANT TO RULE 12(B)(1)** <br><br> Judge:      Hon. Judge Jeremy Fogel <br> Date:       October 1, 2010 <br> Time:      9:00 a.m. <br> Courtroom:  Courtroom 3, 5th Floor |

1

**SECONDARY SOURCES**

2

3     1.  Myriam E. Gilles, *Representational Standing: U.S. ex rel. Stevens and the*

4         *Future of Public Law Litigation*, 89 Cal. L. Rev. 315 (2001)

5

6     2.  Tara Leigh Grove, *Standing as an Article II Nondelegation Doctrine*, 11 U.

7         Pa. J. Const. L. 781 (2009)

8     Dated: August 25, 2010                    Respectfully submitted,

9

10                                              By: _____/s/_____

11                                                  Jenny L. Sheaffer (*Pro Hac Vice*)
                                                     BENESCH, FRIEDLANDER,
12                                                   COPLAN & ARONOFF LLP

13                                                  David M. Given
                                                     PHILLIPS, ERLEWINE & GIVEN LLP
14

15                                                  Attorneys for Defendant
                                                     HOMAX PRODUCTS, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28                                        2

Index of Secondary Sources in Support of Defendant Homax Products, Inc.'s Motion To Dismiss Pursuant To Rule 12(b)(1) –
Case No. 10 CV-02994-JF

3678494.1

Exhibit 1

89 CALR 315                                                                          Page 1
89 Cal. L. Rev. 315

California Law Review
March, 2001

Article

**\*315** REPRESENTATIONAL STANDING: U.S. EX REL. STEVENS AND THE FUTURE OF PUBLIC LAW
LITIGATION

Myriam E. Gilles [FNd1]

Copyright (c) 2001 California Law Review, Inc. [FNa1]; Myriam E. Gilles

Introduction

The Supreme Court's constitutionalization of standing doctrine [FN1] over the past three decades has drawn widespread and impassioned attention. By locating rules defining standing within the Constitution, the Court has placed unprecedented limitations upon federal legislators who might otherwise wish to vest private individuals with broad standing to enforce various laws. [FN2] In an era where politicians are confronted with demands to shrink the size of government and to draw upon "public-private partnerships" to solve problems in areas ranging from inner-city housing to the environment, the constitutional rules of standing loom large as an impediment to any legislative effort to tap private resources in the enforcement of public laws.

**\*316** The Supreme Court's May 2000 decision in Vermont Agency of Natural Resources v. United States ex rel. Stevens [FN3] marks a radical reconfiguration of the landscape facing legislators seeking to vest private actors with standing to enforce federal laws. In an opinion authored by Justice Scalia, the chief architect of the Court's constitutionalized standing jurisprudence, the Court has effectively provided legislators with a constitutional road map for vesting standing in persons who would not otherwise satisfy the demanding Article III requirements.

In particular, the Court in Stevens endorsed a theory of "representational standing," whereby the United States may, under certain circumstances, confer its standing to enforce federal laws upon a private actor as the "agent" or "assignee" of the government and its claims. [FN4] By carefully considering the emerging doctrine of representational standing, Congress is now free to bring private resources to bear in the enforcement of environmental, civil rights, consumer protection and other statutes. This Article aims to unpack the theories of representational standing suggested in Stevens and to explore their potential for resuscitating public law litigation, the engine which powered the great social reform movements of the 1950s and 1960s, and which has lain dormant in the wake of the Court's constitutionalized standing jurisprudence.

Part I reviews the Supreme Court's modern standing jurisprudence, giving particular attention to the constitutionalization of standing doctrine and the limits imposed upon congressional efforts to broaden the class of private citizens who may bring suit to vindicate public interests. Part II introduces the Stevens case and discusses the bases of the Court's ruling on standing. Part III analyzes the theory of representational standing and attempts to discern the rules that will govern congressional attempts to vest private citizens with standing as

© 2010 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

agents or assignees of the government. Part IV considers potential applications of the Court's newly minted representational standing theory and reflects upon the implications of this theory for the future of public law litigation.

<h1 style="text-align:center">I The Evolution of Standing Doctrine</h1>

Standing is a doctrine of justiciability by which federal courts determine whether a particular "case" [FN5] or "controversy" [FN6] is appropriate for **\*317** federal adjudication. Unlike the other justiciability doctrines, [FN7] standing concentrates on the status of the litigants rather than the issues in dispute, [FN8] and asks whether an individual plaintiff has a sufficient stake in the outcome of a matter to justify his right to litigate the issue in federal court. [FN9]

Over the past three decades, the Supreme Court has used standing doctrine to restrict the ability of private citizens to vindicate broad public rights and, concomitantly, to limit the authority of Congress to vest such power in the citizenry. [FN10] In denying standing to individuals or groups of citizens seeking to remedy environmental wrongs, [FN11] racial discrimination, [FN12] police brutality, [FN13] and First Amendment violations, [FN14] the Court has grounded its standing rules squarely within Article III of the Constitution. [FN15] **\*318** In the process, the Court has promulgated detailed rules and multi-pronged tests designed to evaluate plaintiffs' standing to sue in light of the separation of powers interests embodied in the "case or controversy" requirement, as discussed below. [FN16]

By contrast, prior to the 1970s, the Court resisted the view that the standing requirement implicated separation of powers concerns. Instead, the Court analyzed standing on a case-by-case basis, applying flexible and decidedly sub-constitutional standards. [FN17] Under this approach, Congress's power to vest standing in whomever it deemed appropriate was simply beyond question. As a result, Congress has been able to vest standing in persons whom the Court had previously found to lack standing to sue, as those judicial decisions were not founded upon constitutional rules. [FN18]

**\*319** The shift in the law of standing from flexible normative standards to hard and fast rules anchored in separation of powers doctrine [FN19] has thus raised significant questions over the limits of Congress's authority to vest individuals with standing to bring suit to vindicate broad public rights. [FN20]

## A. The Warren Court: Baker, Flast, and Prudential Limitations on Standing

While the Supreme Court addressed the issue of standing sporadically in its decisions prior to the 1950s and 1960s, [FN21] the standing question came to prominence during the tenure of Chief Justice Earl Warren. [FN22] During this period, the Court employed "an amalgam of standing presumptions drawn **\*320** from the common law of property, contract, or tort," [FN23] which later developed into "prudential standards," [FN24] to determine whether a litigant had standing to sue. [FN25]

For example, in Baker v. Carr, [FN26] the Court articulated a "good fight" standard for determining whether a group of voters had standing to lodge a Fourteenth Amendment challenge to voter redistricting: an individual must plead "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the Court so largely depends for illumination of difficult constitutional questions." [FN27] Finding that the voters had such a "deeply personal stake," the Baker Court granted

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

standing. In doing so, the Court rejected the argument that the grant of standing to citizens whose alleged injury was undifferentiated from that of the public at large violated separation of powers, finding instead that the assurance of a good adversarial presentation was a sufficient basis for standing to sue. [FN28] The Baker Court thus viewed Article III standing not as a protector of separation of powers, but instead as a means of ensuring that federal courts resolved only those issues presented in a clear, adversarial context.

Six years later, in Flast v. Cohen, [FN29] seven taxpayers filed suit to challenge legislation which authorized the use of federal funds for instruction and materials for religious schools as violative of the Establishment Clause. The plaintiffs claimed that they had standing to challenge this legislation based on their status as taxpayers, even though the Supreme Court had previously held in Frothingham that a taxpayer lacked standing to challenge the constitutionality of a federal statute. [FN30] Despite the Frothingham decision, the Court created an exception to uphold taxpayer standing in the Flast case. The Flast Court held that a taxpayer has standing to challenge a particular exercise of the congressional taxing and spending power under a specific constitutional provision, such as the Establishment Clause, reasoning that the "logical nexus" between *321 the taxpayer's status and the challenged legislation assured sufficiently meaningful presentation of the issues to warrant adjudication. [FN31]

Writing for an eight-to-one Flast majority, [FN32] Chief Justice Warren again rejected the government's separation of powers argument, finding that "the question whether a particular person is a proper party to maintain the action does not, by its own force, raise [constitutional] separation of powers problems related to improper judicial interference in areas committed to the other branches of the Federal Government." [FN33] Rather, the Flast majority found that, to establish standing for judicial review, a plaintiff must demonstrate "a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy" and "a logical nexus between the status asserted and the claim sought to be adjudicated." [FN34]

Both Baker and Flast demonstrate the Warren Court's reliance on prudential doctrines to determine standing questions. While acknowledging the constitutional backdrop in both cases, [FN35] the Court rejected separation of powers as an element of the standing determination. Instead, it determined that the core purpose of the standing doctrine was to help "limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." [FN36] The citizens in Baker and the taxpayers in Flast had both, in "an adversary context," alleged injuries that were "capable of resolution through the judicial process." Thus, the Court granted them access to the federal courts, notwithstanding the generalized nature of their grievances or the possibility that the political process might well remedy their injuries.

The liberal views of standing developed under the Warren Court were perhaps part of a larger picture in which "schools were ordered desegregated, the Bill of Rights was made enforceable against the states, First Amendment guarantees were bolstered, a right to privacy was 'discovered,' criminal procedure protections were strengthened, and *322 orchestrated school prayer was made illegal." [FN37] The recognition of these substantive rights required procedural safeguards to "ensure that the guarantee of those rights would be actually realized." [FN38] The flexible standards used to determine standing questions during this era may be properly viewed as part of the Warren Court's installation of procedural mechanisms for the protection of substantive rights. [FN39]

Thus, through the late 1960s, the Court viewed the standing doctrine as a tool designed to improve judicial decision making and conserve judicial resources by narrowing issues. [FN40] In a word, the doctrine was a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

prudential one; rarely, if ever, was the Constitution invoked in the analysis of standing before the 1970s. [FN41]

B. The Burger Court: Constitutionalization of Standing

Under Chief Justice Burger, [FN42] the Supreme Court cut back on the liberal standing doctrine developed under Chief Justice Warren. [FN43] The Court began to redraw the rules of standing and, more significantly, to locate the source of standing doctrine squarely in the Constitution. [FN44] While scholars have long debated the true motivation behind the Burger Court's constitutionalization of standing, [FN45] the effect of the Court's jurisprudence in *323 this area was to limit both the access of litigants seeking to adjudicate matters of broad social concern, and the authority of Congress to vest such power in the citizenry. [FN46]

As the Burger Court moved away from the flexible, case-by-case approach of prudential standing limitations, and towards a constitutionalized view of standing, it developed a new test for determining whether Article III standing had been satisfied. First, in Warth v. Seldin, [FN47] the Court cautioned that, as a matter of constitutional interpretation, courts may not recognize "generalized grievances" [FN48] as a basis for standing, but *324 must require a showing of "distinct and palpable injury." [FN49] Essentially abandoning Flast's "adverseness" standard for a "concrete injury" requirement, the Warth Court held that "concrete injury, whether actual or threatened, is that indispensable element of a dispute which serves in part to cast it in a form traditionally capable of judicial resolution . . . . Only concrete injury presents the factual context within which a court . . . is capable of making decisions." [FN50] Then, in Simon v. Eastern Kentucky Welfare Rights Organization, [FN51] the Court adopted two additional elements to the standing inquiry: a plaintiff must show that his injury was caused or would likely be caused by the conduct of the defendant, and that the injury would be redressed by the relief sought. [FN52] Finally, in Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., [FN53] the Court summarized its standing jurisprudence as a three-pronged test of injury-in-fact, causation, and redressability. [FN54] By the late 1970s, the Court had applied all three of these newly constitutionalized requirements, injury-in-fact, causation, and redressability, to deny plaintiffs standing in a number of contexts. [FN55]

In addition to constructing the three-pronged test for constitutional standing, the Burger Court also began to stress the constitutional nature of standing doctrine and its roots in separation of powers principles. [FN56] In Schlesinger v. Reservists Committee to Stop the War [FN57] and United States v. Richardson, [FN58] decided the same day, the Court connected the injury-in-fact *325 test to the separation of powers doctrine for the first time. In Schlesinger, Chief Justice Burger noted that concrete injury was essential for standing because only Congress is competent to deal with abstract, political questions which affect the citizenry at large. [FN59] In Richardson, the Chief Justice stated that if no individual suffers concrete, particularized harm, the dispute is properly "committed to the surveillance of Congress, and ultimately to the political process," not to the judiciary. [FN60] Taken together, Schlesinger and Richardson reveal the Burger Court's insistence on adjudicating only those cases in which the injuries alleged are personal to the litigants, and on leaving matters of broader social concern to "the political process." As such, the emerging constitutionalized standing doctrine left little room for public law litigation.

The Burger Court also described the newly constitutionalized "concrete injury" requirement as independent of any statutory standing rights created by Congress. [FN61] In Warth, for example, the Court stated that "Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules. Of course, Article III's requirement remains: the plaintiff still must allege a distinct and palpable injury to

himself." [FN62] Under the Burger Court's view of separation of powers, "Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party." [FN63]

Even this brief overview of the Burger Court's standing jurisprudence reveals that the flexible standards used by the Warren Court to provide litigants greater access to federal courts "were used by the Court's successors to constitutionalize new barriers to the developing public litigation model." [FN64] By requiring that federal court plaintiffs satisfy the constitutionalized three-prong standing test, regardless of whether those plaintiffs relied on "the Constitution itself, or a direct congressional grant of standing," [FN65] the Burger Court's decisions in this area had the **\*326** unmistakable effect of proscribing Congress from vesting private actors with the authority to redress injuries suffered by the citizenry at large. [FN66]

## C. The Rehnquist/Scalia Court: Lyons, Lujan, and Limits on Statutory Standing

In the early 1980s, the Supreme Court handed down a number of major standing limitation decisions, [FN67] indicating that the pendular swing towards restricting citizen access to federal adjudication was far from over. [FN68] This increasingly restrictive regime was eventually enforced even against the apparent will of Congress: in its 1984 decision in City of Los Angeles v. Lyons, [FN69] the Court for the first time denied standing to a plaintiff bringing suit pursuant to a specific grant of statutory authority and explicitly questioned the congressional power to vest such power in private litigants. [FN70]

**\*327** In Lyons, Los Angeles police officers applied a chokehold to a black motorist during a routine traffic stop, a department-authorized practice that had resulted in numerous fatalities to minority detainees. [FN71] Suing under 42 U.S.C. Section 1983, which expressly authorizes persons deprived of civil rights to seek injunctive relief against future violations, [FN72] plaintiff Lyons sought to enjoin the Los Angeles Police Department ("LAPD") from employing chokeholds where there was no threat of deadly force. [FN73] The district court found for the plaintiff and enjoined the use of chokeholds by the LAPD "under circumstances which do not threaten death or serious bodily injury." [FN74] The Ninth Circuit affirmed. [FN75]

The Supreme Court reversed, holding that the express availability of injunctive relief under Section 1983 was not dispositive. Drawing on the redressability element of Article III standing analysis and the constitutionalized prohibition against generalized grievances, the Court instead held that Lyons lacked "equitable standing" to seek injunctive relief in the absence of a showing that he himself was "substantially certain" to suffer the same injury again at the hands of the LAPD. [FN76]

The Court's decision in Lyons illustrates graphically the impact of the constitutionalization of standing doctrine upon Congress's ability to vest broad enforcement rights in private citizens. In the wake of Lyons, Congress simply lacks the constitutional authority to vest in private citizens the power to seek injunctive relief against unconstitutional or unlawful practices where these citizens cannot independently meet the Court's stringent, constitutional standing requirements. [FN77] Indeed, a 1991 **\*328** congressional attempt to circumvent the equitable standing doctrine by authorizing victims of police misconduct to enjoin unconstitutional patterns or practices died in committee. [FN78]

The implications of the equitable standing doctrine are immense: many of the landmark constitutional cases and great social reforms of the last half-century were driven by private plaintiffs, such as Brown, [FN79] Roe, [FN80] and Bakke, [FN81] who brought suit under federal civil rights statutes which authorized them to seek injunctive or declaratory relief. In bringing these cases, plaintiffs sought not only redress for themselves for the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

harms that they had personally suffered, but also protection for society at large against those harms. The plaintiffs in these cases and in many others would have lacked standing under the doctrine of Lyons. [FN82]

Eight years after Lyons, in Lujan v. Defenders of Wildlife, [FN83] the Court denied standing to private litigants asserting claims under citizen suit provisions of a federal environmental statute for injunctive and declaratory relief. [FN84] Seeking to establish the requisite injury-in-fact required by the Court's constitutionalized standing jurisprudence, two environmental *329 group members claimed that certain federally-funded projects abroad were a threat to endangered species of particular interest and alleged that the government's actions were a direct cause of their potential injury in being unable to observe or enjoy these species. [FN85]

The Supreme Court, in an opinion authored by Justice Scalia, began by explicitly recognizing its gradual constitutionalization of standing doctrine. [FN86] The Court acknowledged that while "some of [the] elements" of standing doctrine "express merely prudential considerations that are part of judicial self-government, the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." [FN87] Having thus established the constitutional rather than prudential concerns at issue in Lujan, the Court then turned to the now substantive question of citizen suit standing.

In reversing the lower court, [FN88] the Lujan Court applied its constitutionalized standing requirements and held that the plaintiffs' allegations fell short of establishing the requisite injury-in-fact and redressability. First, applying the equitable standing bar of Lyons, the Lujan Court found that "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." [FN89] Thus, the Lujan plaintiffs' assertions of injury based on past experiences with endangered species failed to meet the "imminent injury" standard of Article III standing. [FN90] Second, Justice *330 Scalia rejected the environmental group's various theories of standing based either on injury to the environment or on the members' interest in observing or working with endangered species. [FN91] Characterizing these alleged injuries as "abstract," generalized grievances, the Lujan Court found the litigants had failed the injury-in-fact prong of the Article III standing test. [FN92]

Third, in denying standing to citizen suit plaintiffs, Lujan raised separation of powers concerns regarding legislation authorizing private individuals to vindicate public interests. As the Court explained, "[t]o permit Congress to convert the undifferentiated public interest . . . into an 'individual right' vindicable in the courts is to permit Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed.'" [FN93]

In these three deft movements, the Lujan Court solidified the legitimacy of the constitutionalized standing inquiry, revealed the subjectiveness and malleability of the injury-in-fact analysis and, finally, forged a direct and seemingly immutable link between Article III standing and separation of powers concerns. This latter point is perhaps the most significant aspect of the Lujan decision, as it casts substantial doubt upon the authority of Congress to vest standing in private litigants seeking to vindicate broad public interests. While acknowledging that the citizen suit provision was intended to supplement federal oversight and enforcement of these statutorily created interests, the Court refused to allow private citizen standing based solely on this Congressional mandate. Rejecting the argument that injury-in-fact is satisfied "by congressional conferral upon *331 all persons of an abstract, self-contained . . . 'right,'" the Lujan Court held that constitutional standing is not satisfied where a citizen claims "only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large." [FN94]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

In the wake of Lyons and Lujan, Congressional authority to vest private individuals with standing to bring suit to vindicate broad public interests was questionable. [FN95] Perhaps more importantly, these denials of standing based on constitutional rather than prudential grounds made it impossible for Congress to "legislate around" the Court's decisions in order to increase or improve the private role in police brutality and environmental litigation, as well as in other areas of public law litigation. Although the Court's standing jurisprudence at the end of the twentieth century was inconsistent in denying standing to "private attorneys general" in some cases [FN96] while granting standing in others, [FN97] the general tenor of its decisions revealed a limiting principle at work. [FN98]

   **\*332** Then, in 1999, the Court granted certiorari in Vermont Agency of Natural Resources v. United States ex rel. Stevens, [FN99] a case brought by a private citizen under the qui tam provisions of the False Claims Act, [FN100] which provides for liability against "any person" who presents a false money claim to the federal government. [FN101] Qui tam actions had long been criticized as unconstitutional [FN102] because they authorize a private litigant to bring suit on behalf of the government where they themselves suffer no cognizable injury-in-fact. [FN103] Although the parties and the lower courts had not addressed the standing issue, the Court determined that a threshold question presented by Stevens was whether the private citizen-plaintiff, termed a "relator" under the qui tam statute, had Article III standing to bring suit on behalf of the government. The Court's decision on the standing issue is the focus of the next Part.

II Vermont Agency of Natural Resources v. U.S. ex rel. Stevens: The Question of Relator Standing in Qui Tam Litigation

A. Facts and Procedural History of Stevens

   Jonathan Stevens was employed by the Vermont Agency of Natural Resources ("VANR") from 1993 to 1994. [FN104] During the course of his **\*333** employment, Stevens allegedly discovered that VANR had systematically defrauded the United States government by instructing its employees to prepare documents that falsely certified that those employees had worked on matters funded by certain federal grants administered by the EPA. [FN105] In essence, Stevens, in classic whistleblower fashion, believed that VANR's employee time records constituted false claims to the federal government in violation of the False Claims Act ("FCA") [FN106] and set out to prove as much.

   **\*334** On May 26, 1995, Stevens filed a sealed complaint against the State of Vermont under the qui tam provisions of the FCA. [FN107] These provisions authorize a private person, the relator, to bring a civil action "in the name of the Government," against "[a]ny person" who "knowingly presents . . . to . . . the . . . Government . . . a false or fraudulent claim for repayment," and to receive a portion of the recovery in a successful action. [FN108] After having received Stevens' complaint under seal, the Justice Department elected not to intervene in the FCA action, [FN109] thereby allowing the relator to prosecute the action on his own. [FN110] On November 7, 1996, Stevens, exercising his right under the FCA, served the complaint on the State of Vermont, and began prosecuting the lawsuit he filed. [FN111]

   After the complaint was unsealed and served upon Vermont, the state moved to dismiss on Eleventh Amendment grounds. [FN112] The district court denied the motion, [FN113] and a divided panel of the Second Circuit affirmed. [FN114]  **\*335** The state appealed to the Supreme Court, which granted certiorari to consider the two

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

related issues of whether states were "persons" within the meaning of the FCA, and whether Eleventh Amendment immunity barred a private person from bringing a qui tam action against a state under the statute. [FN115] Vermont's decision to pursue this appeal was well-timed for three reasons: (1) the Court had recently decided a number of Eleventh Amendment cases in favor of state immunity; [FN116] (2) a circuit split on the **336 issue of whether states were "persons" subject to liability under the FCA had begun to form; [FN117] and (3) Vermont had the powerful support of virtually every state, state agency, major industry, health care provider, and other potential qui tam defendant interested in limiting the force of "whistleblower" suits. [FN118] The state seemed destined to prevail on at least one of the two opposing fronts it had raised before the Court.

## B. The Supreme Court's Spontaneous Request

When the case was argued before the Supreme Court in November 1999, [FN119] however, something strange but not altogether unexpected happened. After extensive briefing and argument on the Eleventh Amendment immunity question and on the issue of whether states were persons under the FCA, the Court sua sponte directed the parties to file supplemental briefs addressing the question of whether a private person has standing under Article III to litigate claims of fraud upon the government. [FN120]

This was a remarkable turn for several reasons. First, every lower federal court confronted with this issue had determined that the qui tam relator has standing under Article III. [FN121] While the Fifth Circuit had recently held the qui tam provisions of the FCA unconstitutional, its decision rested on Article II, rather than Article III grounds. [FN122] The consistency with **337 which the federal courts had addressed the Article III standing issue is likely the reason that Vermont never raised the issue of relator standing below. Second, as discussed in Part I, much of the current Court's standing jurisprudence had served to limit access to private citizens seeking to vindicate broader injuries. [FN123] Therefore, the Court's spontaneous request for briefing on this issue caused many observers to wonder whether qui tam relators would be dealt the same Article III blows as the plaintiffs in Lyons and Lujan. [FN124] Finally, standing seemed utterly unrelated to the issues that Vermont and its formidable supporters had been pursuing for two years, namely, whether a state is a "person" within the meaning of the FCA and whether states have Eleventh Amendment immunity under the FCA. Rather than focusing on the sovereign status of the defendant, as the state had urged, the Court's request shifted the focus to the private citizen status of the plaintiff.

## C. The Court's Ruling on Relator Standing

In an unexpected move, the Stevens Court upheld the standing of qui tam relators, announcing a new theory of "representational standing" whereby the standing of the United States to enforce federal laws may, under certain circumstances, be conferred upon a private actor as the "agent" or "assignee" of the government and its claims. [FN125] After reviewing the now-familiar constitutional troika of injury-in-fact, causation, and redressability, the Stevens Court emphasized the injury-in-fact prong and found it "beyond doubt that the [relator's] complaint asserts an injury to the **338 United States." [FN126] Distinguishing between injuries to the government in its sovereign and proprietary capacities, the Court explained that the relator alleged that the government had suffered both a sovereign injury, in that federal law was violated, and a proprietary injury, in that it had made payments on false claims. [FN127] The Court's distinction between sovereign and proprietary injuries suffered by the government is significant because the core concept of representational standing requires an understanding of when and why a private litigant may be allowed to bring suit to remedy one or the other form of governmental injury. [FN128]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Having determined that the United States had suffered the requisite injury to trigger federal jurisdiction, the Court then considered whether the relator had standing to bring suit to remedy that injury. [FN129] First, the Court raised the possibility of relator standing based on an agency theory: "It would perhaps suffice to say that the relator here is simply the statutorily designated agent of the United States, in whose name . . .the suit is brought." [FN130] If the agency theory were valid, the Court posited, the bounty received by a successful relator would be akin to a fee for prosecuting the action. [FN131] The presence of such a fee would suffice to satisfy the Article III standing requirements.

The agency theory was precluded, however, by the Court's determination that the statute "gives the relator himself an interest in the lawsuit, and not merely the right to retain a fee out of the recovery." [FN132] For example, the relator has the right to continue as a party to the action even where the government intervenes; [FN133] the relator is entitled to a hearing before the government may dismiss a qui tam suit; [FN134] and the government may not settle the suit over the relator's objection without a hearing on the fairness and adequacy of the proposed settlement. [FN135] Thus, the specific statutory structure of the qui tam provisions of the FCA, by giving the relator rights **339** independent and perhaps even at odds with the government, precluded the application of an agency theory of standing in this context. According to the Court, "the portion of recovery retained by the relator" required an explanation other than agency on behalf of the government. [FN136]

The Court found such an explanation in "the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor." [FN137] In finding that the FCA "can reasonably be regarded as effecting a partial assignment of the Government's damages claim," the Court noted that although it had "never expressly recognized 'representational standing' on the part of assignees" it had "routinely entertained their suits" in various private law contexts. [FN138] The Court correctly characterized the FCA as creating a partial assignment because under the statute, the government retains the right to intervene in the qui tam action, and may move to dismiss or attempt to settle the suit over the objections of the relator. A full assignment would leave the government no continuing interest in the assigned claim. The Court thus concluded that "the United States' injury in fact suffices to confer standing" on the qui tam relator under an assignment theory. [FN139]

The Court confirmed its conclusion by reciting the long tradition of qui tam actions in Anglo-American law. [FN140] Tracing the ebb and flow of qui tam statutes in England from the thirteenth and fourteenth centuries, [FN141] through to the era of Parliamentary rule, [FN142] the Court noted that the English informer statutes "expressly gave the informer a cause of action, typically by bill, plaint, information, or action of debt." [FN143] Similarly, according to the **340** Court, qui tam provisions appear to have been as prevalent in Early America as in England, as the colonies enacted several informer statutes immediately before the framing of the Constitution. [FN144] Moreover, immediately after the framing, the First Congress enacted a considerable number of informer statutes, [FN145] many of which provided both a bounty and an express cause of action. [FN146] Accordingly, this historical backdrop, "combined with the theoretical justification for relator standing" based on the government's partial assignment of its claim, was "well nigh conclusive" of the standing inquiry presented in Stevens. [FN147]

The standing decision of Stevens holds immense potential for legislators seeking to vest standing in private actors seeking to bring suit to vindicate broad public interests. For the first time since the constitutionalized standing doctrine reached its zenith in Lyons and Lujan, [FN148] the Stevens decision suggests that "the traditional requirement that the plaintiff's alleged injury be a particularized one, which sets him apart from the citizenry at large," [FN149] does not preclude Congress from vesting in individuals "representational standing" to pursue claims they would otherwise lack standing to assert. The next Part, therefore, considers the theory of rep-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

resentational standing, with a view towards the theoretical and practical significance of this new doctrine for the future of public law litigation.

## *341 III An Analysis of "Representational Standing"

Narrowly read, the Stevens Court's recognition of "representational standing" saved the qui tam provisions of the FCA from constitutional infirmity on Article III grounds. However, a broader reading of the case suggests the development of a portentous new doctrine in Article III jurisprudence. Properly understood, the "representational standing" doctrine of Stevens empowers the legislative branch, under appropriate circumstances, to revive the popular forces that powered the great civil rights, environmental and other public law movements of the twentieth century, but which have appeared unavailable in the wake of the Court's constitutionalization of standing doctrine. [FN150]

The key question, therefore, is under what circumstances will representational standing pass constitutional muster? To answer this question, it is necessary to explore the contours of the assignment theory relied upon in Stevens, and the potential of the broader theory of agency that the Court found inapplicable under the facts of that case.

### A. The Assignment Theory

The Stevens Court ultimately held that a qui tam relator is properly considered a partial "assignee" of the government's injuries and claims under the FCA. Thus, the relator need not suffer his own injury, but may be statutorily assigned the government's injury in order to bring suit on a claim under the FCA. The Court's reasoning on the assignment theory raises a number of interesting questions, including: (1) Is assignment available only where the government is acting in its proprietary capacity, as it is in the FCA context? and (2) What are the practical and constitutional implications of partial assignment as opposed to full assignment of a claim by the government?

### 1. The Distinction Between Proprietary and Sovereign Injury

The Court in Stevens observed that in the context of the FCA, the government suffers two distinct types of injury: "the injury to its sovereignty arising from violation of its laws (which suffices to support a criminal lawsuit by the Government) and the proprietary injury resulting from the alleged fraud." [FN151] While the Court did not explore this observation in any depth, careful consideration reveals that the distinction between proprietary and sovereign injuries lies at the very core of the representational standing concept and, indeed, is the primary differentiator between **342** the two sub-species of representational standing articulated in the Stevens decision.

It seems safe to say that assignment may form the basis of representational standing only where the government's claim seeks to vindicate a proprietary injury. [FN152] The explanation lies in the private law heritage of the assignment doctrine that the Stevens Court applied in the public law context. [FN153] In traditional private law applications of assignment, only property rights and the concomitant power to bring suit to enforce those rights are assignable; [FN154] the right to enforce liberty or other non-monetary interests is not. [FN155] Indeed, the traditional rule is that causes of action are assignable **343** only if they would survive the death of the putative assignor. [FN156] Thus, since the time of Pomeroy, assignable claims have been understood to include

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page14 of 103

"all claims arising from contracts express or implied, with certain well-defined exceptions, and those arising from torts to real or personal property, and from frauds, deceits, and other wrongs whereby an estate, real or personal, is injured, diminished, or damaged." [FN157] In modern practice, courts have reduced Pomeroy's formulation to a shorthand, uniformly ruling that claims which are inherently "personal," such as child custody, personal injury, marital, or false imprisonment claims, are not assignable, [FN158] while claims vindicating traditional proprietary interests may be assigned. [FN159]

Upon consideration, it appears that the "personal" vs. "proprietary" fault-line developed in the private law context remains intact when applied to the public law context, dividing the landscape into "sovereign" and *344 "proprietary" interests. [FN160] Just as assignability in the private law context hinges on the diminution of an estate, the government may assign the right to vindicate the proprietary injury it suffers where the federal treasury is diminished. Such claims look to compensate the government for the loss it directly suffers in its capacity as a proprietor, as the keeper of the public fisc and the owner of public property.

Sovereign interests, by contrast, implicate "injury . . . arising from violation of [the government's] laws," the paradigmatic example being criminal law. [FN161] In keeping with the private law analogy, such injuries are "personal" to the government. Claims based on these sovereign injuries do not, in any direct sense, seek to redress diminution of the federal treasury. Even where such claims are directed at monetary damages, they do not directly seek to compensate the government for injury to its property. Under the traditional formulation of assignment, then, claims seeking to vindicate the government's non-proprietary, sovereign interests are not assignable.

Article II of the Constitution and separation of powers principles [FN162] further suggest that claims brought to vindicate the government's proprietary interests may be assigned, while claims based on injury to the government's sovereign interests may not be assigned. Article II, section 3 vests in the President the sole power and duty to "take Care that the laws be faithfully executed." [FN163] Congressional enactments which authorize private citizens to exercise powers exclusively reserved to the Executive in Article II potentially undermine the authority of the coordinate branch, raising serious separation of powers concerns. The government's "sovereign" interest in the enforcement of the federal laws is at the very heart of the Take Care Clause. By contrast, there is no constitutional *345 mandate that the government "take care" to maximize its proprietary interests. [FN164]

2. Partial vs. Full Assignments of Proprietary Claims

Just as assignment in the public law context is limited to claims seeking to vindicate the government's proprietary (as opposed to sovereign) interests, it may well be that only partial (as opposed to full) assignments are permissible under the theory relied on in Stevens. The Stevens Court was very careful to state (albeit without explanation) that the qui tam relator is "a partial assignee of the United States." [FN165] And the Court was correct to characterize the assignment as a partial one: where an assignor fully assigns a claim, he retains no interest in the assigned claim and lacks standing to sue. [FN166] In the context of the FCA, by contrast, the government retains the right to intervene in the qui tam action, and may move to dismiss or attempt to settle the suit over the objections of the relator. [FN167] The assignment in this context is thus classically "partial." [FN168]

The distinction between partial and full assignment is potentially crucial in the public law context because separation of powers principles *346 clearly prohibit Congress from creating a statutory scheme that "disrupts the proper balance between the coordinate branches [by] prevent[ing] the Executive Branch from accomplishing its constitutionally assigned functions." [FN169] It is likely that full assignment of proprietary claims by the

government, under a legislative regime which prohibits the Executive from intervening or exercising any control over assigned claims, would violate separation of powers. [FN170]

While the vindication of the government's proprietary interests lies outside the province of functions that are exclusively committed to the Executive under the Take Care Clause, [FN171] Congress's ability to assign private litigants the power to prosecute these interests is nonetheless subject to separation of powers principles. An extreme example illustrates this proposition: what if Congress purported to vest private litigants with the sole authority to sue under the FCA, such that the government itself, the injured party, [FN172] had no right to vindicate its own proprietary interests? While such an assignment might not violate the Take Care Clause, it would certainly trigger separation of powers concerns about legislation "that undermine[s] the authority and independence of one or another coordinate branch." [FN173]

The constitutionality of a governmental assignment, then, will depend in part upon the level of control retained by the Executive. As the Supreme Court has made clear, [FN174] congressional grants of executive functions to private litigants must preserve executive discretion to initiate, oversee, and terminate litigation. [FN175] Within the universe of assignments, only partial assignments are capable of preserving these executive prerogatives; full **347** assignments, by their very nature, unconstitutionally infringe upon the Executive's discretion over litigation brought on its behalf. [FN176]

Indeed, the only court in the country to declare the qui tam provisions of the FCA unconstitutional did so on separation of powers grounds, interpreting the FCA as effecting a full assignment of the government's claim. [FN177] The Fifth Circuit in Riley v. St. Luke's Episcopal Hospital [FN178] found that qui tam actions in which the government elects not to intervene violate separation of powers doctrine because these provisions "strip" the Executive branch of the power to control the litigation. [FN179] While the Stevens **348** Court did not explicitly address separation of powers issues, it arguably pulled the rug out from under the Fifth Circuit by clarifying that the FCA effects partial, not full, assignment of the government's claims, since it preserves the Executive's right to intervene, move to dismiss or attempt to settle a qui tam action over the objections of the relator. [FN180]

It therefore appears that representational standing may be predicated upon assignment where  (1)  the assigned claim would vindicate the government's proprietary interests; and  (2)  the assignment is a partial one, such that the Executive retains sufficient control over the litigation to satisfy separation of powers principles.

## B. The Agency Theory

Another potential basis for representational standing lies in the concept of agency. In Stevens, the Court considered whether "it would perhaps suffice to say that the relator . . . is simply the statutorily designated agent of the United States." [FN181] Under the particular statutory regime of the FCA, however, the Court found that the qui tam provisions do not create a true agency relationship insofar as they confer upon the relator rights over and above those of the government, including the right to maintain a false claims suit in the face of governmental opposition. [FN182] Because these features of the statutory regime take the FCA outside the concept of agency, the statute does not vest the relator with representational standing on an agency theory.

The Court's rejection of the agency theory in this context does not doom its viability in others; indeed, where a statutory regime does create a true agency relationship, the agency theory may have far greater potential than the assignment theory for representational standing and the reintegration of private litigants into public law litigation. In order to fully comprehend the contours of agency theory and its implications for public law, it is im-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

portant to consider: (1) the constitutional limitations on the ability of Congress or the Executive to designate private citizens as agents authorized to vindicate governmental interests; (2) the contours of a true agency relationship in the public law context; and (3) the significance of the distinction between sovereign and proprietary interests in terms of what governmental interests an agent may vindicate.

**\*349** 1. Constitutional Limitations on Agency in Public Law Enforcement

Before considering the circumstances under which agency principles may properly apply in the public law context, it is first necessary to examine certain threshold constitutional limitations on the government's power to authorize private agents to pursue governmental claims. The first question is whether the creation of an agency relationship to assert governmental claims impinges upon the Executive's duties under the Take Care Clause of Article II. The Court considered this precise question in Morrison v. Olson, [FN183] which concerned the Article II implications of a statute authorizing the appointment of a private citizen as independent counsel to investigate high-ranking government officials suspected of wrong-doing. In particular, the Morrison Court considered whether the appointment of an independent counsel "'impermissibly undermine[s]' the powers of the Executive Branch, or 'disrupts the proper balance between the coordinate branches [by] prevent[ing] the Executive Branch from accomplishing its constitutionally assigned functions.'" [FN184]

In considering this question, the Court found that while it was "undeniable" that the statute "reduces the amount of control or supervision" exercised by the Executive over the "investigation and prosecution of a certain class of alleged criminal activity," [FN185] the Executive nonetheless retained sufficient control over the independent counsel so as to discharge its duties under Article II. [FN186] First, an independent counsel can only be appointed by specific request of the Attorney General. [FN187] Thus the statute "gives the Executive a degree of control over the power to initiate an investigation by the independent counsel." [FN188] Second, once an independent counsel is appointed, he must abide by Justice Department policy and accept his jurisdiction as defined by the Attorney General. [FN189] Finally, the Attorney General retains the power to remove the independent counsel for "good cause," a power the Court found "provides the Executive with substantial ability to ensure that the laws are faithfully executed by an independent counsel." [FN190]

**\*350** The Morrison Court thus examined the three stages of executive involvement in the independent counsel process--initiating the action, conducting the litigation, and terminating the action--to determine whether the Executive retained sufficient control over the investigative and prosecutorial process for purposes of Article II. [FN191] In the wake of Morrison, then, any Congressional conferral of power upon private citizens to pursue governmental claims under an agency theory must be analyzed with a view towards the retention of Executive control over critical stages of litigation brought on its behalf.

Another limitation on the ability of Congress to vest private actors with public enforcement power under an agency theory lies in the injury-in-fact requirement of the Court's Article III standing jurisprudence. As Stevens suggests, representational standing applies only where (1) the private citizen's "complaint asserts an injury to the United States," [FN192] and (2) the particular statutory regime at issue creates either a true assignment or a true agency relationship. [FN193]

The constitutional "injury-in-fact" requirement is not a significant limiting factor in the representational standing context because it will be satisfied so long as the government has suffered injury in its proprietary or sovereign capacity. This is consistent with the concept of representational standing developed in Warth v. Seldin, [FN194] where the Court observed that a private organization has standing to bring suit as a representative of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

its members, even where it alleges no injury to itself. [FN195] As the Court noted in Warth, Article III will be satisfied in the representational standing context where the principal (or assignor, as the case may be) has suffered injury-in-fact:

> the possibility of such representational standing . . . does not eliminate or attenuate the constitutional requirement of a case or controversy. The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. [FN196]

**\*351** A more significant limitation arising out of Article III lies in the requirement that the statutory regime at issue create a true agency relationship. Recall that in Stevens itself, the Court specifically found that the qui tam provisions of the FCA do not create a true agency relationship, and it therefore declined to recognize representational standing based on an agency theory. [FN197] The question is, therefore, under what circumstances will legislation be found to create a true agency relationship such that the injury-in-fact of the principal (or government) may be conferred upon the agent (or private citizen)?

## 2. The Contours of True Agency

The Stevens Court found agency principles inapplicable to the FCA precisely because the statute vests relators with rights distinct from those of the principal. There is no doctrinal reason, however, to doubt that Congress may constitutionally confer private citizens with authority to bring suit on behalf of the government under an agency theory where the agent's authority is limited to that of the government. Put differently, a true agency relationship at public law requires that the private citizen-agent act only to promote the interests of the government-principal. [FN198] Once again, reference to traditional principal-agent doctrines developed in the private law context proves instructive.

An agent is generally defined as "one who acts for or in place of another by authority from him; a substitute, a deputy, appointed by principal with power to do the things which principal may do." [FN199] Under traditional principal-agency law, an agent vested with authority to vindicate the interests of the principal is necessarily subject to the control of the principal, and her authority, therefore, may not conflict with or extend beyond that of the principal. [FN200]

In the private law context, the concern over granting agents broad discretion to vindicate the interests of the principal may be explained in terms of economics. A rational economic actor will not establish an agency relationship where the benefits to be gained are outweighed by agency compliance costs, including the costs of monitoring the agent, and the costs likely to be incurred as a result of agent self-dealing. [FN201] The broader the **\*352** authority vested in the agent, the higher the likelihood that the agent will act without restraint [FN202] and that her actions will diverge from the principal's best interests, thus increasing agency compliance costs. [FN203] This cost-benefit calculus helps explain the common law rules limiting and defining the circumstances under which an agency relationship will be recognized.

Similarly, the creation of a true agency relationship in the public law context requires a statutory regime that (1) ensures the citizen-agent will act only to further the government's interests; and (2) subjects the actions of the citizen-agent to the control of the government-principal. [FN204] As in the private law context, agency compliance costs ratchet upwards in direct correlation with the breadth of discretion vested in the agent. [FN205] At some point, as in Stevens itself, the discretion vested in the private citizen is so broad, as where the citizen is furnished rights and incentives independent of the government, that the relationship is no longer recog-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

nizable as a true agency.

The costs of agency compliance, particularly the costs associated with the divergence of the agent's interests from those of the principal, will vary depending upon the nature of the interests at stake. It may well be, for example, that some areas of governmental activity implicate such high stakes that tolerance for the costs associated with divergence of interests, as *353 between principal and agent, will approach zero. Therefore, in order to understand the limits on the application of agency principles to public law, it is important to consider the types of governmental interests an agent may be authorized to vindicate.

### 3. The Sovereign vs. Proprietary Distinction Revisited

Unlike assignment, which by its nature may provide a basis for representational standing only where the government's proprietary interests are at stake, [FN206] agency principles may be employed to authorize private actors to pursue either the government's proprietary or sovereign interests. [FN207] In pursuit of its proprietary interests, the government may either assign a portion of its claims to a private citizen, as the Stevens Court recognized in the FCA context, [FN208] or it may retain a private citizen as an agent by paying "a fee for prosecuting the action." [FN209] In either event, compliance costs are relatively low where the government's proprietary interests are at stake, as these interests typically do not implicate core executive functions. It is enough, in the context of proprietary claims, that an assignment be a partial one, or that an agency relationship conform to the requirements of a true agency.

In pursuit of its sovereign interests, by contrast, the government must employ principles of agency rather than assignment. The agency concept alone is suited to the pursuit of sovereign interests, [FN210] where there is no *354 "recovery" to assign, and the available remedies are by their nature public, typically in the form of injunctive or declaratory relief, or damages which act essentially as fines payable to the federal treasury. [FN211] The government's sovereign claims, brought to redress "injury . . . arising from violation of [the government's] laws," [FN212] are analogous to private law claims that are "personal" and non-assignable. [FN213]

The vindication of sovereign interests represents the very core of Executive function. The costs of divergence of interest as between agent and principal are thus heightened in this arena, and the retention of ultimate control by the Executive rises to the level of constitutional imperative. [FN214] Morrison gives vent to these concerns, mandating that the Executive must retain control over key stages of litigation brought to vindicate its sovereign interest in the investigation and prosecution of high ranking federal officials. [FN215] In this connection, it is interesting to contrast the standing analysis in Stevens with the holding in Morrison: in upholding the relator's standing to pursue the government's proprietary claims as an assignee, the Court was not troubled by the fact that the requisites of the Morrison executive control test were not met. [FN216] Were the action in Stevens *355 directed towards vindicating the government's sovereign interests, the Court would certainly have required that the Executive keep the relator on a shorter leash.

It therefore appears that representational standing to pursue the government's sovereign interests may be predicated upon agency where the agent's authority is strictly limited and conforms to the mandates of Morrison. [FN217] Indeed, legislation which employs agency principles to support representational standing in the pursuit of sovereign interests holds great promise for the reintegration of private citizens into public law litigation. For the first time since Lyons, Lujan, and the full-scale constitutionalization of standing doctrine, Congress is free to capitalize on the resources of the citizenry, the millions of "eyes on the ground," that drove the public law revolution of the latter half of the twentieth century.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

IV Implications and Applications of Representational Standing

   In the wake of Stevens, legislators now have two portentous new standing theories upon which to draw in drafting legislation aimed at increasing and improving the private role in public law litigation. In areas as diverse as environmental protection, police misconduct, tax collection, and civil forfeitures, the representational standing theories elucidated in Stevens provide a framework for private citizens and the government to work together at solving some of the nation's gravest social ills. [FN218]

   The agency theory, in particular, holds promise for dramatically broadening the role of private actors in public law litigation. Armed with a proper understanding of the agency theory of representational standing, legislators now have the wherewithal, for the first time since the Court's restrictive standing jurisprudence reached its zenith in Lyons and Lujan, [FN219] to resuscitate public law litigation by tapping the experiential, financial, and other resources of private individuals and associations that are willing and competent to tackle important public issues in the federal courts. In the wake of Lyons and Lujan, innumerable commentators have bemoaned the loss of the citizenry as a force in public law litigation. [FN220] The agency theory *356 of representational standing may allow these scholars to stop grieving and, instead, to begin contemplating imaginative applications for the agency theory of standing in a broad spectrum of areas of federal legislation.

   The assignment theory, relating as it does to any area of federal law that implicates the government's proprietary interests, likewise holds promise in an era where "public-private" partnership has become a campaign slogan, [FN221] and where politicians feel pressed to fund governmental activities by means other than straight taxation. As discussed below, the potential implications of this theory for the collection of federal revenues are significant. Nevertheless, before rushing headlong through the opening created in Stevens, it is worth considering the potential secondary effects of any regime that would vest in private hands the power to use the federal courts in enforcing the federal laws.

A. Potential Applications of the Assignment Theory

   The assignment theory of standing can be employed to provide incentives for private citizens to ferret out and prosecute the government's proprietary injuries in areas far beyond false claims. For example, Congress could include provisions in tax collection legislation, effecting partial assignments to private citizens of claims directed at the recovery of delinquent taxes, as well as in more exotic areas of the law, such as civil forfeiture.

1. Delinquent Tax Collection Suits

   On this model, tax collection might be optimized by assigning private citizens a portion of the delinquent taxes that they are able to recover for the government. [FN222] One commentator has noted that, "[a]s financial burdens *357 on local governments increase, the fiscal impact of a 3%, or 10%, delinquency rate in tax collections becomes dramatic." [FN223] Not surprisingly, state and local governments have already begun to use private entities to assist in the collection of property taxes in an effort to improve tax collection. [FN224] For example, some municipalities in Texas pay private lawyers contingent fees to collect taxes, [FN225] and other jurisdictions use private bill collectors to collect taxes after the state has determined a tax is due. [FN226]

   Congress could include provisions in the tax code which assign to private citizens a percentage of delinquent taxes recovered; such provisions would enable assignees to bring actions to recover overdue taxes or force an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

audit to determine whether the tax is due. The legislation might be modeled on the qui tam provisions of the FCA, which would allow the Executive, through the Internal Revenue Service, to have the "first bite at the apple" in determining whether to pursue an action initiated by a private citizen for collection of delinquent taxes. Alternatively, private firms may be contractually engaged as partial assignees to pursue these claims. Either way, where the Executive chooses to allow the private actor to prosecute the delinquency claim, the assignee would receive a portion of the recovery, and the remainder would go to the federal treasury. Such an assignment would supplement the ability of Internal Revenue Service to **358** ferret out tax dodgers and would have the potential to add millions, or even billions, in revenues to the federal government. [FN227]

In the wake of Stevens, the constitutionality of such a regime appears beyond doubt. The authorizing legislation would effect a classic partial assignment of proprietary governmental claims. Separation of powers principles and Article II concerns are avoided because the assignment is a partial one. In addition, the Court's Article III standing jurisprudence poses no obstacles, because the government's injury-in-fact is transferred to the assignee, as in Stevens itself. [FN228]

To say that a statutory regime is constitutional, however, is not necessarily to say that it makes for sound public policy. Legislation authorizing private citizens to assist the government in the recovery of delinquent debt may have troubling implications. [FN229] For example, one might reasonably fear that such a regime would amplify the power of "Big Brother" by empowering a million "little brothers" to pry into private matters and generate an atmosphere of societal mistrust. Clearly, in considering any such legislation, prudent lawmakers would want to study potential safeguards, such as governmental vetting procedures [FN230] and cost-shifting provisions. [FN231]

### **359** 2. Civil Forfeiture Actions

The application of the assignment theory in the civil forfeiture context may create another fairly troubling scenario. [FN232] The Supreme Court has held that civil forfeitures of drug related assets are in fact remedial, and not punitive, measures insofar as they seek to compensate the government for the costs of its war on drugs. [FN233] The government, according to this legal fiction, is acting in its proprietary capacity, seeking the recovery of lost assets. As a result, there is no constitutional impediment under current law to legislation assigning to private citizens a portion of the government's claim to drug-related assets.

The policy implications of permitting the assignment of civil forfeiture claims to private actors are nonetheless disturbing. One might well question whether the government ought to provide monetary incentives to individuals likely to have information concerning the proceeds of narcotics activity, as such a regime would likely attract individuals who are themselves involved in drug trafficking. And even where the putative assignee is not involved with criminal activity, the extension of the assignment theory into the criminal realm invites a form of vigilantism that might well outweigh the benefits to the federal treasury. [FN234]

**360** While the application of the assignment theory of standing is necessarily limited to areas in which the federal government's proprietary interests are at stake, it is possible to imagine the usefulness of such a theory beyond false claims. Taxation and civil forfeitures provide some insight, however, into the importance of carefully calibrating the social costs and benefits of applying the assignment theory. Nevertheless, these examples also make clear that the potential limitations of this theory for the collection of federal revenues are significant, and that further investigation is clearly warranted.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

B. Potential Applications of the Agency Theory

The agency theory has potentially far broader application than the assignment theory, if only because the government suffers sovereign injury in many more diverse ways than it suffers proprietary injury. However, legislation seeking to predicate representational standing upon an agency theory requires careful drafting to ensure constitutional operation. In particular, it requires the establishment of a true agency relationship and a careful balancing of the constitutional imperative that the Executive retain ultimate control of the litigation against the prudential imperative that citizen-agents be vested with sufficient discretion to allow the legislative regime to achieve its intended purpose.

1. Environmental Citizen Suits

An instructive illustration lies in the citizen suit provisions of the federal environmental laws, [FN235] which fail to establish the sort of true agency relationship required for the conferral of representational standing and, *361 thus, are plagued by latent constitutional infirmities requiring case-by-case determination under the constitutionalized standing inquiry. [FN236] Citizen suit provisions allow private citizens to bring suit against violators of environmental laws, as well as against the regulatory agencies charged with environmental protection. [FN237] Available remedies include civil fines, injunctions, and declaratory judgments, with all penalties and damage awards going to the federal fisc; the citizen suit plaintiff recovers only attorney's fees and costs. [FN238]

By purporting to grant a private right of action to "persons having an interest which is or may be adversely affected" by polluting activity, [FN239] the citizen suit provisions betray a measure of schizophrenia. On the one hand, the provisions are clearly intended to empower "private attorneys general" [FN240] to enforce broadly held rights and to assert generalized grievances. Those persons who suffer direct environmental injury may seek compensation under state tort law or other legislation, [FN241] whereas the citizen suit provision is for persons without compensable claims. On the other hand, as the Court's recent denials of standing to citizen suit plaintiffs *362 show, [FN242] the language of the provisions invites an inquiry into whether the individual "person[ ] having an interest" has herself suffered a concrete, particularized injury-in-fact. As a result, the current statutory regime has produced a predictably bizarre body of case law concerned with such issues as the circumstances under which a plaintiff's "aesthetic interest" in observing a species of crocodile may rise to the level of cognizable rights protected by Article III. [FN243]

One prescription for curing these infirmities in citizen suits would be to rely on the agency theory of representational standing. Congress could amend the provisions to provide expressly that citizen suit plaintiffs may bring suit to vindicate injury suffered by the government in its sovereign capacity. Far from being an "end-run" around the Court's constitutionalized standing rules, such an amendment would give vent to the true animating forces that underlie the citizen suit provisions, the empowerment of private actors to enforce public environmental laws. [FN244]

Beyond merely affirming that citizen suits vindicate sovereign interests, however, any legislation designed to place the citizen suit provisions within the representational standing mold would have to create a true agency relationship where none currently exists. To be sure, the current citizen suit scheme does share many of the characteristics of a true agency: damages go to the federal treasury, [FN245] plaintiffs receive only a "fee" for prosecuting the action, [FN246] and the real rights being vindicated are *363 those belonging to the public at large. [FN247] However, the citizen suit provisions, as currently constructed, fail the test of a true agency on two

counts.

First, the authority of citizen suit plaintiffs is not limited to serving the interests of the government; indeed, the provisions allow private litigants to sue the government itself. Under traditional doctrine, the agency relationship is destroyed, in its intended purpose, when the agent sues the principal. [FN248] In the public law context, the ability of citizen suit litigants to bring actions against the EPA or other governmental entities dooms the applicability of the agency theory. Second, the agency theory requires that the government retain control over key aspects of litigation brought to vindicate its sovereign interests. [FN249] Citizen suit litigation, as it currently exists, allows no such control, as plaintiffs may bring actions with which the Executive disagrees or which are inconsistent with national environmental protection strategies. [FN250]

Congress could, however, amend citizen suit provisions to effect a true agency relationship by (1) limiting the authority of citizen suit plaintiffs; [FN251] and (2) prohibiting these citizens from suing the government or its administrative agencies. Such amendments may, however, carry significant costs that must be carefully weighed against the potential benefits of broadening representational standing.

First, in limiting the authority of citizen suit plaintiffs, legislators would have to consider the relative burdens placed on the EPA. On the one *364 hand, the constitutional imperatives of the agency theory would require the EPA to triage all citizen suit complaints to determine whether these litigants are bringing suit to advance the sovereign interests of the government. [FN252] The EPA would also be required to continue to exercise sufficient control over the conduct of the ensuing litigation. [FN253] On the other hand, the enforcement burdens currently borne by the EPA would be significantly lightened by allowing private citizens and organizations to "take the laboring oar" in prosecuting actions against private violators.

Second, an amendment which prohibits citizens from suing the government for environmental violations or the failure to promulgate regulations would likewise require consideration of the relative costs and benefits. On the one hand, such an amendment would enable representational standing based upon the agency theory, resulting in fewer denials of citizen suit standing and more effective inclusion of private citizens in environmental enforcement efforts. On the other hand, Congress may determine that a prohibition upon citizen suits against the government would be "throwing the baby out with the bath water," to the extent that the beneficial impact of suits against the EPA outweighs the marginal increase in enforcement efforts against private polluters that would result from granting private citizens representational standing under the agency theory. [FN254]

In the end, a representational standing-based regime provides a potentially attractive alternative to the problem-ridden citizen suit provisions.

## 2. Police Misconduct Litigation

The agency theory of representational standing may also be applied to reintegrate private citizens in the government's efforts to reduce instances of police misconduct. Recall that, under the equitable standing bar of Lyons, victims of police brutality must show to a "substantial certainty" that they themselves will suffer future injury in order to establish standing *365 to enjoin ongoing unconstitutional police practices. [FN255] Because this equitable standing doctrine is rooted in the Constitution, Congress is powerless to vest private citizens with authority to seek forward-looking relief against offending law enforcement organizations. Indeed, the most Congress could do in the wake of Lyons was to enact a statute, 42 U.S.C. Section 14141, which empowers the Attorney General to uncover and sue to enjoin unconstitutional police "patterns and practices." [FN256] The victims

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

of police misconduct and community leaders are thus left on the legal sidelines, relegated to approaching the U.S. Department of Justice, hat in hand, and requesting that federal officials bring actions against police departments engaged in unconstitutional "patterns and practices."

Six years after its inception, it is fair to say Section 14141 has proven ineffective, as the government has failed to muster the political will or requisite resources to address systemic police misconduct in a meaningful way. [FN257] As I have argued elsewhere, Congress may overcome both the ineffectiveness of the current Section 14141 regime and the equitable standing bar of Lyons by creating true agency relationships with private citizens, which I termed "deputations" prior to Stevens, [FN258] to aid the government in its efforts to enjoin unconstitutional police practices. Specifically, Congress could amend Section 14141 to add a provision which allows the Justice Department, in appropriate circumstances, to authorize private citizens to bring suits for injunctive relief against **366** unconstitutional police "patterns or practices" where the government, for whatever reason, declines to do so itself. [FN259]

Such an amendment would conform to the constitutional mandates of the representational standing doctrine so long as the authority of private citizen-agents to bring "pattern or practice" suits is subject to executive control. In particular, on a model I have suggested, victims of unconstitutional police "patterns or practices" [FN260] could file a petition with the Justice Department, seeking authority to bring a Section 14141 suit on behalf of the government to vindicate the sovereign injury to the government. [FN261] After investigating the underlying allegations in the petition, the Justice Department could decide to (1) bring a Section 14141 injunctive action against the offending police department; [FN262] (2) authorize the private citizen-agent to prosecute the Section 14141 action, subject to the Executive's right to intervene and assume control of the action at any point; or (3) quash the petition, thereby denying the private citizen the authority to bring the action. [FN263] This scheme clearly retains the executive control demanded by Article II and separation of powers doctrine, while satisfying the demands of Article III by establishing a true agency relationship whereby the citizen-agent is authorized to vindicate the injury-in-fact suffered by the government in its sovereign capacity.

There are also, in my view, strong policy reasons for creating these sorts of agency relationships with private actors. As in so many other areas of the law, the government's enforcement efforts in the police misconduct **367** field are hampered by budgetary and political obstacles. [FN264] A regime of plaintiff-driven reform transcends governmental budgetary limitations by tapping the immense resources of the public at large, or, more accurately, those members of the public most affected by unconstitutional patterns and practices, and the community-based groups that represent their interests. Relatedly, the massive governmental expenditures required to detect and investigate misconduct are no match for the millions of "eyes on the ground" that bear witness to constitutional violations. And of course, private litigants are generally impervious to the political constraints that have impeded the meaningful enforcement of Section 14141. [FN265]

## Conclusion

Justice Scalia's discussion of Article III standing in Vermont Agency of Natural Resources v. United States ex rel. Stevens paves the way for nothing less than a wholesale revival of public law litigation. As this Article demonstrates, the theory of "representational standing" announced in Stevens provides legislators with a blueprint for constitutionally vesting in private citizens the authority to vindicate important public interests in the federal courts. While Congress has often expressed great interest in tapping private resources to aid in the enforcement of public laws, in, for example, enacting citizen suit provisions of federal environmental statutes and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

other "private attorneys general" legislation, its efforts up to this point have been hindered by the Court's restrictive constitutionalized standing doctrine. Armed with the knowledge gleaned from Stevens, however, legislators may now consider the creation of partial assignments or true agency relationships between the Executive charged with enforcing its laws, and the individuals and community groups that are directly affected by these laws. Through wide application of the agency theory of representational standing articulated in Stevens, the government may be able to tap the private resources, personal experiences, and community-based incentives that have engineered the great reform movements of our time, and which have lain dormant in the wake of the Supreme Court's constitutionalized standing doctrine. Under this portentous theory of representational standing, public law litigation may yet have a future in keeping with its storied past.

[FNd1]. Assistant Professor of Law, Benjamin N. Cardozo School of Law, Yeshiva University. B.A., Harvard-Radcliffe Colleges, 1993; J.D., Yale Law School, 1996. I'd like to thank Gary Friedman, David Gray Carlson, Michael Herz, Melanie Leslie, John Parry, Peter Schuck, and Stewart Sterk for their helpful comments on an earlier draft. I am also grateful for the summer stipend provided by Cardozo Law School. Katherine Richardson provided helpful research assistance.

[FNa1]. California Law Review, Inc. (CLR) is a California nonprofit corporation. CLR and the authors are solely responsible for the content of their publications.

[FN1]. The phrase "constitutionalization of standing doctrine" is used throughout this Article to refer to the Supreme Court's use of the standing doctrine to restrict the ability of private citizens to vindicate broad public rights and limit the authority of Congress to vest such power in the citizenry. Specifically, I argue here that, over the past three decades, the Court has increasingly viewed standing as grounded in Article III of the Constitution and separation of powers doctrine. This "constitutionalization" process thus stands in stark contrast to prior Courts, which viewed standing doctrine as comprised of prudential, subconstitutional concerns regarding judicial self-governance and the presentation of issues in an adversarial context. Infra Part I.

[FN2]. As I have argued in a related context, the landmark constitutional cases of the last century, such as Brown v. Board of Education, 349 U.S. 294 (1955), Roe v. Wade, 410 U.S. 113 (1973), Regents of the University of California v. Bakke, 438 U.S. 265 (1978), were driven by private plaintiffs who sought not only redress for the harms that they had personally suffered, but also protection for society at large against those harms. The Court's constitutionalized standing doctrine has effectively neutered the popular force that powered these reformative enterprises. Myriam E. Gilles, Reinventing Structural Reform Litigation: Deputizing Private Citizens in the Enforcement of Civil Rights, 100 Colum. L. Rev. 1384, 1386-88 (2000).

[FN3]. 120 S. Ct. 1858 (2000).

[FN4]. Id. at 1862-63.

[FN5]. U.S. Const. art. III, § 2 ("The judicial Power shall extend to all cases...arising under this Constitution, the Law of the United States, and Treaties made, or which shall be made, under their Authority; to all Cases affecting Ambassadors, other public Ministers and Consuls; to all Cases of admiralty and maritime Jurisdiction ....").

[FN6]. Id. ("The judicial Power shall extend to...Controversies to which the United States shall be a Party; to Controversies between two or more States; between a State and Citizens of another State; between Citizens of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

different States; between Citizens of the same State claiming Lands under the Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.").

[FN7]. The other justiciability doctrines prohibit advisory opinions, collusive suits, and determinations of political questions. In addition, the justiciability doctrines of ripeness and mootness seek to ensure that cases or controversies are appropriate for judicial review. See, e.g., 13 C. Wright et al., Federal Practice and Procedure § 3529, at 146 (1975); see also Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 346-48 (1936) (Brandeis, J., concurring).

[FN8]. See, e.g., Flast v. Cohen, 392 U.S. 83, 99-100 (1968) (finding that "when standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable").

[FN9]. See Erwin Chemerinsky, Federal Jurisdiction 15 (3d ed. 1999) (noting that, through the doctrine of standing, federal courts ask the question "What's it to you?").

[FN10]. For an alternative (though related) telling of the tale, see Cass R. Sunstein, What's Standing After Lujan? Of Citizen Suits, "Injuries," and Article III, 91 Mich. L. Rev. 163, 170-97 (1992) (discussing the five stages of standing law and the political policies influencing the development of standing jurisprudence). Professor Sunstein's explanation of the evolution of standing law operates from the perspective of the growth of administrative agencies. For example, Professor Sunstein explains that Congress passed the Administrative Procedure Act to allow people "to have causes of action, and hence standing, even if their interests were not entitled to consideration by the relevant agency." Id. at 182. During the 1960s and 1970s, courts allowed many people affected by government actions, regulatory beneficiaries, to file suit to bring agencies into conformity with law. See id. at 183. Sunstein then posits that the contemporary law of standing reflects a judicial reluctance to supervise agency inaction based upon separation of powers concerns. Id. at 196-97.

[FN11]. See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998) (denying standing to citizen suit plaintiffs seeking to enjoin alleged violations of federal environmental statute); Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) (same).

[FN12]. See, e.g., Allen v. Wright, 468 U.S. 737, 760 (1984) (denying standing to parents of African-American public school students who alleged that the tax-exempt status granted to private schools resulted in race discrimination; the Court reiterated that a "federal court...is not the proper forum to press general complaints about the way in which government goes about its business" (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 111-12 (1983))).

[FN13]. See, e.g., City of Los Angeles v. Lyons, 461 U.S. 95 (1983) (denying standing to victim of police chokehold who sought equitable relief against future use of the chokehold by police officers in non-deadly threat situations).

[FN14]. See, e.g., Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 473 (1982) (holding that plaintiffs challenging government conveyance of property to religious college lacked standing because they were unable to show "injury in fact").

[FN15]. Justice Scalia, for example, has argued that "the judicial doctrine of standing is a crucial and inseparable element of [separation of powers], whose disregard will inevitably produce--as it has during the past few

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

decades--an overjudicialization of the processes of self governance." Antonin Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 881 (1983). Other modern jurists have agreed; for example, Judge Robert Bork stated: "the entire concept of Article III standing rests on separation of powers." Haitian Refugee Ctr. v. Gracey, 809 F.2d 794, 804 (D.C. Cir. 1987); see also William A. Fletcher, The Structure of Standing, 98 Yale L.J. 221, 233 (1988) ("In significant part, a debate over what constitutes 'injury in fact' sufficient for Article III is thus a debate about separation of powers and the respective responsibilities of Congress and the Court.").

[FN16]. Separation of powers is the fundamental concept of a tripartite system of shared power among the branches of government. See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 557 (1992) (noting that while separation of powers is not an explicit constitutional requirement, it is a function of the Constitution's basic structure, which "divides all power conferred upon the Federal Government into 'legislative Powers,' '[t]he executive Power,' and '[t] he judicial Power'") (internal citations omitted); Immigration & Naturalization Serv. v. Chadha, 462 U.S. 919, 946 (1983) ("The very structure of the articles delegating and separating powers under Arts. I, II, and III exemplify the concept of separation of powers.").

[FN17]. In particular, prior Courts applied sub-constitutional "prudential" limitations on standing, which rested on "concern[s] about the proper--and properly limited--role of the courts in a democratic society," rather than constitutional interpretation. Warth v. Seldin, 422 U.S. 490, 498 (1975). These prudential limits include prohibitions against (1) raising a third party's legal rights, (2) pressing generalized grievances that one should address to the legislative or executive branch, and (3) litigating an issue that falls outside the "zone of interests" protected by the law in question. See Valley Forge Christian Coll., 454 U.S. at 474-75.

        While much has been written about the admittedly fuzzy line between "prudential" standards and "constitutional" rules governing standing, see, e.g., Marla Mansfield, Standing and Ripeness Revisited: The Supreme Court's "Hypothetical" Barriers, 68 N.D. L. Rev. 1, 66 (1992), it is clear that judge-made prudential limitations on standing allow courts to engage in self-governance and self-restraint. See Lujan, 504 U.S. at 560 (characterizing prudential limitations on standing as "part of judicial self-government"). Prudential standing limitations embody "self-imposed restraints on the exercise of judicial power," United States Parole Comm'n v. Geraghty, 445 U.S. 388, 410 (1980), the content of which is "shaped by the decisions of the courts as a matter of sound judicial policy." Asarco Inc. v. Kadish, 490 U.S. 605, 613 (1989). Thus, prudential limitations on standing tend to be flexible standards based on policy and fairness rather than rigid rules of constitutional construction based on separation of powers.

[FN18]. See, e.g., Fed. Election Comm'n v. Akins, 524 U.S. 11 (1998) (finding that Congress had eliminated prudential standing limitations in a category of cases); Raines v. Byrd, 521 U.S. 811, 811, 820 n.3 (1997) (noting that Congress possesses power to "eliminate any prudential standing limitations" on federal courts' exercise of the judicial power, simply by creating a cause of action); Bennett v. Spear, 520 U.S. 154, 162 (1997) (concluding unanimously that Congress had eliminated prudential standing limitations in the citizen-suit provisions of the Endangered Species Act, and stating explicitly that prudential standing limitations "can be modified or abrogated by Congress").

[FN19]. See Patricia M. Wald, Environmental Postcards from the Edge: The Year That Was and the Year That Might Be, 26 Envtl. L. Rep. 10182, 10184 (1996) (noting a transformation in the early 1990s, Judge Wald stated that "in my own court--encouraged in large part by the Supreme Court--we saw a retreat from the more generous notions of standing in the 1970's to one that increasingly required highly individualized and particularized allegations of imminent or existent injury that action of the court can substantially rectify").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page27 of 103

[FN20]. See Bennett, 520 U.S. at 162 ("[T]hese 'judicially self-imposed limits [prudential standing rules] on the exercise of federal jurisdiction'... are 'founded in concern about the proper--and properly limited--role of the courts in a democratic society,'... but unlike their constitutional counterparts, they can be modified or abrogated by Congress ...." (citations omitted)).

[FN21]. Frothingham v. Mellon, 262 U.S. 447 (1923), was perhaps the most famous "standing" case of the early twentieth century. There, the Supreme Court denied standing to citizens seeking to challenge an increase in taxes. The Frothingham Court characterized the federal taxpayer's interest as a generalized one: "minute," "indeterminable," and "so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity." Id. at 487. However, even this early formulation of standing was not firmly grounded in constitutional norms. While finding that the question of additional taxation was "essentially a matter of public and not of individual concern," the Court vaguely couched the question of standing as whether a legal question had "assume[d] such a form that the judicial power is capable of acting on it." Id.

   Prior to Frothingham, the Court had reached the merits on at least four cases brought by taxpayers in their capacity as taxpayers. See Hawke v. Smith, 253 U.S. 221, 227 (1920) (challenging the printing of federal ballots for the referendum on the ratification of the eighteenth amendment); Wilson v. Shaw, 204 U.S. 24, 31 (1907) (granting injunction against unconstitutional payments for the completion of the Panama Canal); Millard v. Roberts, 202 U.S. 429, 438 (1906) (challenging District of Columbia expenditures for private railroad improvements); Bradfield v. Roberts, 175 U.S. 291, 295 (1899) (enjoining, as a violation of the Establishment Clause, federal payments pursuant to a contract with a District of Columbia hospital run by Catholic nuns).

   The briefs in these cases underscore the degree to which the questions of "standing" in the early twentieth century were seen as nonconstitutional. In Wilson, for example, the government argued that "a private citizen has not the necessary interest in the subject-matter of the controversy" and urged the Court to find that a plaintiff must show "some direct and personal injury to himself above that suffered by others." Brief for the United States at 2, Wilson, (No. 43). The plaintiff, in response, relied on the shareholder model as support: "Private citizens under such circumstances occupy exactly the position of stockholders in private corporations." Brief for Appellant at 6, Wilson, (No. 43). The Court declined to rule on the sufficiency of Mr. Wilson's interest in maintaining the suit, instead ruling against him on the basis of familiar equity doctrines. It observed that the plaintiff's interest was insufficient to justify the issuance of an injunction to stop work on the Panama Canal, given the balance of hardships. Wilson, 204 U.S. at 31.

[FN22]. See The Oxford Companion to the Supreme Court of the United States 48 (Kermit L. Hall et al. eds., 1992) (contrasting the Warren Court's liberal interpretation of the standing doctrine with the Burger and Rehnquist Courts' conservative applications).

[FN23]. Maxwell L. Stearns, Standing and Social Choice: Historical Evidence, 144 U. Pa. L. Rev. 309, 394 (1995).

[FN24]. See supra text accompanying notes 17-20 (discussing prudential limitations on standing).

[FN25]. See, e.g., Mansfield, supra note 17, at 66.

[FN26]. 369 U.S. 186 (1962) (permitting voters to challenge legislative districting on the ground that disparities in the number of voters violate their rights to equal protection).

[FN27]. Id. at 204. Chief Justice Warren considered Baker to be the most important achievement in his fifteen years on the Court. The Oxford Companion to the Supreme Court of the United States, supra note 22, at 17.

[FN28]. Baker, 369 U.S. at 199; see also Kenneth M. Casebeer, The Empty State and Nobody's Market: The Political Economy of Non-Responsibility and the Judicial Disappearing of the Civil Rights Movement, 54 U. Miami L. Rev. 247, 278-79 (2000).

[FN29]. 392 U.S. 83 (1968) (granting standing to federal taxpayers to challenge government aid to religious schools on Establishment Clause grounds).

[FN30]. Frothingham v. Mellon, 262 U.S. 447 (1923).

[FN31]. Flast, 392 U.S. at 103. Justice Stewart and Justice Fortas wrote concurring opinions in which they interpreted the Court's decision as only holding that taxpayers had standing to challenge federal expenditures that allegedly violated the Establishment Clause. See id. at 114-15.

[FN32]. Justice Harlan dissented in Flast. See id. at 116-33.

[FN33]. Id. at 100.

[FN34]. Id. at 102. Professor Tribe observed that in Flast, the Warren Court opined that standing was premised on the principle of ensuring adverseness, rather than upon concerns with potential separation of powers issues. Laurence H. Tribe, American Constitutional Law § 3-14, at 108-09 (2d ed. 1988); see also Flast, 392 U.S. at 100-01 (stating that when separation of powers issues arise, they come from the substantive issues the plaintiffs seek to adjudicate rather than the threshold issue of justiciability, of which standing is but one inquiry).

[FN35]. Flast, 392 U.S. at 94 (noting that standing helps to "define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government").

[FN36]. Id.

[FN37]. Gene R. Nichol, Is There a Law of Federal Courts?, 96 W. Va. L. Rev. 147, 148-49 (1993) (internal citations omitted).

[FN38]. Id. at 149.

[FN39]. See id. at 149-51. Professor Nichol notes that other procedural mechanisms were also introduced during the Warren Court era, including criminal procedural safeguards and the provision of a federal forum for First Amendment actions against state actors. Id.

[FN40]. See generally Chemerinsky, supra note 9, at 57-58.

[FN41]. This is not to say that the Warren Court did not recognize a relationship between the standing inquiry and Article III's case or controversy requirement. Rather, standing during this period was viewed as a prudential tool that served the purpose of ensuring that matters were presented to courts in the form of focused, narrowly drawn "cases and controversies." Flast, 392 U.S. at 94-95.

[FN42]. Chief Justice Burger was confirmed by the Senate on June 9, 1969 and served as Chief Justice until he resigned at the end of the 1985 Term.

[FN43]. See Albert W. Alschuler, Failed Pragmatism: Reflections on the Burger Court, 100 Harv. L. Rev. 1436,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1442 (concluding that "the Burger Court waged a prolonged and rather bloody campaign of guerrilla warfare" which "typically left the facade of Warren Court decisions standing while it attacked these decisions from the sides and underneath"); see also Gene R. Nichol, Jr., Injury and the Disintegration of Article III, 74 Colum. L. Rev. 1915, 1923 (1986).

[FN44]. Nichol, supra note 43, at 1915 (noting that in reaction to both "a burgeoning federal docket and to perceived dangers from the aggrandizement of judicial power, the Supreme Court has attempted to pour content into Article III by constitutionalizing a variety of jurisdictional inquiries, including standing doctrine").

[FN45]. For example, Professor Richard Pierce argues that politics were at the root of the Burger Court's restrictive standing jurisprudence:

At the time, the federal judiciary again included a large number of activist judges--albeit liberal activists rather than the conservative activists who concerned Brandeis and Frankfurter. Given the opportunity to do so, many of the federal judges who sat during the 1970's and 1980's would devise creative interpretations of the Constitution. They would then rely on these interpretations as the basis to wrest control of foreign policy from the politically accountable branches, to exercise plenary power over many important governmental institutions such as schools and prisons, and to force executive branch agencies to reallocate their scarce resources in ways the judges preferred. The circumstances in which the Burger Court applied its expanded version of standing strongly suggest that the Burger Court was trying once more to insulate the politically accountable branches of government from the constant assaults of activist judges. An expanded version of standing law was only one of many tools the Burger Court used in an effort to accomplish this policy goal during the 1970's and 1980's.
Richard J. Pierce, Jr., Is Standing Law or Politics?, 77 N.C. L. Rev. 1721, 1768-69 (1999). Other scholars have been even more cynical about the Burger Court's standing jurisprudence. See, e.g., Stearns, supra note 23, at 385 ("In the Burger and Rehnquist Courts, standing became a necessary vehicle to prevent the irrationality of the Court's own creation. Even an institution that could not agree either on how to define or resolve divisive issues could agree on one principle: Better not to decide, or to let lower federal courts decide, the most difficult issues presented than to condone outcomes no more predictable than a roll of the dice.").

[FN46]. Interestingly, Warren Burger's tenure as Chief Justice began with a few very liberal standing opinions. For example, in Association of Data Processing Service Organizations v. Camp, 397 U.S. 150 (1970), an association of data processors brought suit to challenge a rule permitting national banks to provide data processing services to bank customers and other banks. The association claimed that its members had suffered an Article III injury as a result of the increased competition. Id. at 151-52. The issue before the Court was whether the association was "aggrieved by agency action within the meaning of a relevant statute" pursuant to the Administrative Procedure Act. Id. at 153. In an opinion written by Justice William O. Douglas, the Court replaced the previous test for standing, which called for determining whether the plaintiff had a legally protected interest in the matter, with a factual inquiry into the existence of harm. The Court held that the question of standing required inquiry into whether the interest sought to be protected by the complainant is "arguably within the zone of interests" to be "protected or regulated by the statute or constitutional guarantee in question....That interest, at times, may reflect 'aesthetic, conservational, and recreational' as well as economic values." Id. at 153-54. Data Processing therefore represented the Court's first extended discussion of "injury-in-fact" as an element of standing, as well as the force of legislative authority on the question of standing. See also United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 675-76, 690 (1973) (recognizing that law students had standing when they alleged that a railroad freight rate increase would encourage the use of nonrecyclable products, thereby creating more waste and fewer natural resources and causing the students to suffer economic, recreational, and aesthetic injuries). These decisions have been recognized as perhaps the "all-time high in judicial liberal-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ity on a question of standing." 4 Kenneth C. Davis, Administrative Law Treatise § 24:18, at 283 (2d ed. 1983); see also Gene R. Nichol, Jr., Abusing Standing: A Comment on Allen v. Wright, 133 U. Pa. L. Rev. 635, 635 (1985) ("The Burger Court's treatment of standing requirement has been, at best, erratic. Access has, on occasion, been liberally granted. More often, the doctrine has been employed without consistent rationale to fence out disfavored federal claims. This vacillation has created a body of Article III decisions that ranks among the most uniformly criticized of the entire Burger Court legacy.").

[FN47]. 422 U.S. 490 (1975).

[FN48]. Compare Flast v. Cohen, 392 U.S. 83, 93-97 (1968), where the Court stated that the prudential ban on "generalized grievances" was compelled by "policy considerations" such as preserving judicial resources, rather than the mandates of the Constitution. See also Chemerinsky, supra note 9, at 89-90.

[FN49]. Warth, 422 U.S. at 499-501, 507 (denying standing to litigants challenging local zoning ordinances as having the purpose and effect of excluding low and moderate income individuals; finding that petitioners had failed to allege injury as a consequence of the defendant's actions because none of the petitioners had "a present interest" in any property in the area, and that petitioners had failed to demonstrate redressability because they "rely on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise, and might improve were the court to afford relief"); see also Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99-100 (1979) (finding that questions of "broad social import where no individual rights would be vindicated" do not satisfy standing requirement).

[FN50]. Warth, 422 U.S. at 501.

[FN51]. 426 U.S. 26 (1976).

[FN52]. Id. at 38 (denying standing to indigents challenging IRS regulations allowing hospitals which refuse to treat indigents to maintain tax-exempt status; finding that petitioners had failed to demonstrate that the IRS's actions caused the hospitals to deny treatment).

[FN53]. 454 U.S. 404 (1982).

[FN54]. Id. at 472.

[FN55]. See Stearns, supra note 23, at 387 (noting that the Burger Court "effectively metamorphosed three common law tort analogies--injury-in-fact, causation, and redressability--to the level of quasi-constitutional doctrine").

[FN56]. Tribe, supra note 34, at 108 (observing that the Burger Court changed standing inquiry to incorporate separation of powers concerns).

[FN57]. 418 U.S. 208, 220 (1974) (denying standing, where group claimed standing based on its members' status as taxpayers and citizens, on grounds that "standing to sue may not be predicated upon an interest of the kind... which is held in common by all members of the public").

[FN58]. 418 U.S. 166, 175 (1974) (denying taxpayer standing on grounds that respondent lacked a personal stake in the outcome of the litigation and that the alleged injury was one held in common by the citizenry).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN59]. Schlesinger, 418 U.S. at 221 n.10 ("The legislative function is inherently general rather than particular and is not intended to be responsive to adversaries asserting specific claims or interests peculiar to themselves.").

[FN60]. Richardson, 418 U.S. at 179.

[FN61]. See Gene R. Nichol, Standing on the Constitution: The Supreme Court and Valley Forge, 61 N.C. L. Rev. 798, 809 (noting that Schlesinger and Richardson "teach quite clearly that standing cannot be predicated merely upon the 'harm' a citizen sustains as the result of the government's failure to comply with the Constitution").

[FN62]. Warth v. Seldin, 422 U.S.490, 501 (1975); see also Allen v. Wright, 468 U.S. 737, 754 (1984) (stating that "an asserted right to have the Government act in accordance with law" is by itself insufficient to confer jurisdiction in federal court).

[FN63]. Warth, 422 U.S. at 499.

[FN64]. Nichol, supra note 37, at 153.

[FN65]. Stearns, supra note 23, at 389-90.

[FN66]. See Craig R. Gottlieb, Comment, How Standing Has Fallen: The Need To Separate Constitutional And Prudential Concerns, 142 U. Pa. L. Rev. 1063, 1082 (1994); Stearns, supra note 23, at 392 (noting that "by superimposing standing's injury-in-fact requirement onto cases in which plaintiffs rely upon federal statutes, the Court has signaled a serious intrusion into Congress's power to define new judicially cognizable injuries").

[FN67]. See, e.g., Allen, 468 U.S. at 737; City of Los Angeles v. Lyons, 461 U.S. 95 (1983) (denying constitutional standing to seek injunctive relief to victim of police chokehold on ground that likelihood of repetition as to him posed insufficient threat to establish required injury); Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464 (1982).

[FN68]. But see Abram Chayes, The Supreme Court, 1981 Term--Foreword: Public Law Litigation and the Burger Court, 96 Harv. L. Rev. 4 (1982) ("[T]he great standing expansion of the 1960's remains relatively untouched; in the vast majority of public law cases, it has been possible to turn up a plaintiff who has suffered the requisite injury in fact."). Professor Chayes wrote these words, however, prior to the Court's decisions in Allen and Lyons.

[FN69]. 461 U.S. 95 (1983).

[FN70]. The Court first began to articulate a nascent equitable standing requirement in the mid-1970s. See O'Shea v. Littleton, 414 U.S. 488 (1974); Rizzo v. Goode, 423 U.S. 362 (1976). O'Shea was a class action alleging that a county magistrate and associate judge had deprived minorities of constitutional rights through a continuing pattern of illegal bond setting, discriminatory sentencing and jury fee practices. 414 U.S. at 490-91. The O'Shea plaintiffs sought no damages, but requested the unconstitutional practices be enjoined. Id. at 492. The Court, in a six to three decision, found that plaintiffs lacked standing to seek federal equitable relief because they had failed to allege injury, either past or threatened, sufficient to warrant judicial intrusion into the state criminal justice system. Id. at 493-94. The Court further noted that even if plaintiffs had suffered past injury due to these alleged practices, "past exposure to illegal conduct does not in itself show a present case or controversy

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

regarding injunctive relief... if unaccompanied by any continuing, present adverse effects." Id. at 495-96.

       Similarly, the plaintiffs in Rizzo, who had at trial proven systemic, widespread constitutional violations by the Philadelphia Police Department, 423 U.S. at 366-69, obtained a district court injunctive order requiring the department to create "a comprehensive program for improving the handling of citizen complaints alleging police misconduct." Id. at 365. Relying on its decision in O'Shea, the Court found that plaintiffs had not proven that the injuries they suffered in the past were likely to recur because their claim to "real and immediate" injury did not lie "upon what the named petitioners might do to them in the future." Id. at 372. The Court therefore reversed the grant of injunctive relief for lack of standing to seek such relief. Id. at 381.

[FN71]. Lyons, 461 U.S. at 115-16 (Marshall, J., dissenting). When the plaintiff, Adolph Lyons, exited his car after being pulled over for a burned-out taillight, he encountered two LAPD officers with drawn revolvers who directed him to face the vehicle, place his hands behind his head and spread his legs. Their pat-down search revealed no weapons, but when Lyons began to lower his arms, one of the officers applied a chokehold which rendered him unconscious and permanently damaged his larynx. When Lyons regained consciousness, he was on the ground spitting up blood and had urinated and defecated. He could not speak due to the damage to his larynx. The officers then gave him a ticket for the burned-out taillight, and let him go. Id. at 114-15 (Marshall, J., dissenting).

[FN72]. 42 U.S.C. § 1983 (1994).

[FN73]. Lyons, 461 U.S. at 98.

[FN74]. Id. at 99-100. The district court also required an improved police training program on the proper use of the chokehold, as well as regular reporting and record keeping of incidents involving the application of chokeholds by the police. Id. at 100.

[FN75]. Lyons v. City of Los Angeles, 615 F.2d 1243, 1246-47 (9th Cir. 1980), rev'd, 461 U.S. 95 (1983). The per curiam opinion found that there was a sufficient likelihood that Lyons would again be stopped and subjected to the unlawful use of force to confer standing and to warrant the issuance of an injunction. Id.

[FN76]. Lyons, 461 U.S. at 111. The Lyons Court relied, in part, on its earlier decisions in O'Shea v. Littleton, 414 U.S. 488 (1974), and Rizzo v. Goode, 423 U.S. 362 (1976). See Lyons, 461 U.S. at 103-10; see also supra note 70.

[FN77]. See Richard H. Fallon, Of Justiciability, Remedies and Public Law Litigation: Notes on the Jurisprudence of Lyons, 59 N.Y.U. L. Rev. 1, 23 (1984) (noting that the "constitutionalization of remedial standing" defies "implicit policies of emerging public law," and also "diminishes the power of the courts, and potentially the capacity of Congress to protect federal rights and to provide remedies for their violation").

[FN78]. In 1991, House Democrats introduced the Police Accountability Act, H.R. 2972, 102d Cong. (1991), which prohibited police officers from engaging in a "pattern or practice" of conduct violative of civil rights and authorized the Attorney General and victims of such conduct to "obtain appropriate equitable and declaratory relief to eliminate the pattern or practice." Constitutional and political pressures threatened the viability of the provision and the Conference Committee eventually compromised by eliminating the citizen suit provision. See Terence Moran & Daniel Klaidman, Police Brutality Poses Quandary for Justice Department, Legal Times, May 4, 1992, at 1 (discussing political opposition from the Bush Justice Department and police advocacy groups that led to the demise of the Act). Three years later, Congress enacted a statute, the Violent Crime Control and Law

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Enforcement Act, 42 U.S.C. § 14141 (1994 & Supp. 1998), which specifically empowers the Attorney General to uncover and sue to enjoin unconstitutional police practices, but which grants victims of such practices no enforcement role. See Gilles, supra note 2, at 1404-08 (discussing the efficacy of § 14141); see also infra text accompanying notes 255-265 (considering the implications of the representational standing doctrine in police misconduct litigation).

[FN79]. Brown v. Bd. of Educ., 349 U.S. 294 (1955).

[FN80]. Roe v. Wade, 410 U.S. 113 (1973).

[FN81]. Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265 (1978).

[FN82]. For example, Professor Tribe argues that, under a literal interpretation of Lyons, the Bakke case would not have been justiciable because the plaintiff, a white male who had been denied admission to medical school because of a policy requiring that a set number of minority applicants be admitted, would not have been able to demonstrate with certainty that he would be admitted to a future class but for the admission policy. Tribe, supra note 34, at 117. Similarly, the plaintiff in Roe v. Wade could not have demonstrated that she would again be pregnant and seek an abortion. Id. at 118; see also Gilles, supra note 2, at 1386 ("We have lost, in the post-Lyons world, the powerful force of the citizenry as a direct agent in effecting meaningful social change through America's courts.").

[FN83]. 504 U.S. 555 (1992).

[FN84]. Lujan involved a challenge by an environmental group to a 1986 Department of Interior revision of regulations in the Endangered Species Act concerning consultation processes where federally funded projects threaten endangered species. Specifically, the group claimed that the lack of consultation concerning federally funded activities "increases the rate of extinction of endangered species," causing injury to its members. Id. at 562.

[FN85]. Amy Skilbred, a member of the Defenders of Wildlife, alleged that federal funding of the Mahaweli project in Sri Lanka "will seriously reduce endangered, threatened, and endemic species habitat including areas that I visited..., [which] may severely shorten the future of these species." Id. at 563. That threat, she averred, caused her direct harm because she "intend[s] to return to Sri Lanka in the future and hope[s] to be more fortunate in spotting at least the endangered elephant and leopard." Id. In a subsequent deposition, she reiterated her intention to return to Sri Lanka, but confessed she had no current plans. Id. at 563-64. Joyce Kelly, another Defenders member, alleged that she had "observed the traditional habitat" of the Nile crocodile and "intend[s] to do so again"; she further alleged that she would "suffer harm in fact as the result of [the] American role in overseeing the rehabilitation of the Aswan High Dam on the Nile and in developing Egypt's Master Water Plan," as these projects would result in further endangering the traditional habitat of the Nile crocodile. Id. at 563 (internal quotations omitted).

[FN86]. "Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements...," injury-in-fact, causation, and redressability. Id. at 560-61.

[FN87]. Id. at 560 (citing Allen v. Wright, 468 U.S. 737, 751 (1984)).

[FN88]. The Eighth Circuit had granted plaintiffs standing based on the citizen suit provisions of the En-

dangered Species Act, which made clear that "any person may commence" a civil suit on his own behalf "to en-join [the] violation of any...provision of the [Act]." Defenders of Wildlife v. Lujan, 911 F.2d 117, 121 (8th Cir. 1990), rev'd, 504 U.S. 555 (1992).

[FN89]. Lujan, 504 U.S. at 564 (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983)) (internal quotations omitted).

[FN90]. Justice Scalia found that the fact that the affiants "had visited" the areas allegedly threatened by federally funded projects "proves nothing." "The...profession of an 'intent' to return to the places they had visited before...without any description of concrete plans, or indeed even any specification of when the some day will be-do[es] not support a finding of the 'actual or imminent' injury that our cases require." Id.

[FN91]. Id. at 565. The group argued, for example, that it suffered injury as "part of a contiguous ecosystem adversely affected by a funded activity." Id. The Lujan Court rejected this "ecosystem nexus" theory, finding that a plaintiff claiming injury from environmental damage "must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it." Id. at 566. Respondents also alleged injury based on their interest in studying or seeing the endangered animals threatened by funded activity. Id. Again, the Court rejected the "animal nexus" and "vocational nexus" theories of standing, finding that under these theories, "anyone who goes to see Asian elephants in the Bronx Zoo, and anyone who is a keeper of Asian elephants in the Bronx Zoo, has standing." Id. According to the Court, "it goes beyond the limit...and into pure speculation and fantasy to say that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection." Id. at 567.

[FN92]. Id. at 570-72.

[FN93]. Id. at 577 (citing U.S. Const. art. II, § 3). Numerous scholars have been critical of the Lujan decision. See, e.g., Keith Werhan, Delegalizing Administrative Law, 1996 U. Ill. L. Rev. 423, 455 (1996) (noting that the Lujan Court constitutionalized the generalized grievance principle and subjected statutory standing provisions to judicial review); Patti A. Meeks, Justice Scalia and the Demise of Environmental Law Standing, 8 J. Land Use & Envtl. L. 343, 364 (1993) ("Scalia has apparently used Lujan as a stepping stone towards constitutionalizing the generalized grievance standing limitation."); Gene R. Nichol, Jr., Justice Scalia, Standing and Public Law Litigation, 42 Duke L.J. 1141, 1167-68 (1993) (reasoning that Justice Scalia's approach to standing threatens plaintiffs' ability to bring "public law litigation" generally and "threatens to constitutionalize an unbalanced scheme of regulatory review").

[FN94]. 504 U.S. at 573-74.

[FN95]. Patricia M. Wald, The Cinematic Supreme Court: 1991-92 Term, 7 Admin. L. J. Am. U. 238, 239-40 (1993) (noting that "by constitutionalizing standing to the degree that it does--some might even say 'trivializing' it to the minutiae of asking if you have your return ticket to Sri Lanka--the Court [[in Lujan] prevents Congress from broadening the standard").

[FN96]. For example, in Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998), the Court held that an environmental group lacked standing to bring a citizen suit based on past violations of an environmental statute. Focusing on the redressability prong of standing analysis, the Court held that in the absence of ongoing violations, "[n]one of the specific items of relief sought, and none that we can envision as 'appropriate' under the

general request, would serve to reimburse respondent for losses caused by the late reporting, or to eliminate any effects of that late reporting upon respondent." Id. at 1018. Again, the decision in Steel Co. represents the constitutionalization of a traditionally prudential doctrine, making it impossible for Congress to "fix" the result by making clear its intent that citizens be able to bring suit for even wholly past violations. See Craig N. Johnston, 1998--The Year In Review, 29 Envtl. L. 69, 76 (1999).

[FN97]. The same term that Steel Co. was decided, the Court also ruled in Federal Election Commission v. Akins, 524 U.S. 11 (1998), that a group of voters had standing to bring suit under the Federal Election Campaign Act of 1971 to challenge the Federal Election Commission's refusal to compel a lobbying organization to disclose information. And two terms later in Friends of the Earth, Inc. v. Laidlaw Environmental Services, 528 U.S. 167 (2000), the Court held that an environmental group had standing to bring a citizen suit seeking both civil penalties and injunctive relief against a violator of the Clean Water Act. These two decisions, standing in stark contradiction to recent precedent, have led commentators to wonder whether the Court is returning to a more liberalized view of standing doctrine. See, e.g., Cass R. Sunstein, Informational Regulation and Informational Standing: Akins and Beyond, 147 U. Pa. L. Rev. 613 (1999) (arguing that Akins Court appears to have held, in contradiction to recent precedent, that any citizen has standing to sue under FECA; that Congress is permitted to grant standing to all or many citizens, even if they are seeking to redress a "generalized grievance"; that the key question, in cases involving information or anything else, is what the relevant source of law actually says; and that Article III is no barrier to suits brought by citizens whose interests are not substantially different from those of the citizenry as a whole). A close reading of Akins and Laidlaw reveals, however, that these grants of standing were based on factual distinctions rather than true constitutional interpretation.

[FN98]. Of course, focusing solely on the Court's standing jurisprudence tends to distort the full panoply of its decisions over the last thirty years. So, for example, the Burger Court did not engage in the major, anticipated "counter-revolution" against Warren Court decisions in areas such as desegregation or school prayer; indeed, the Burger Court even found new arenas for judicial activism. The Burger Court embraced equal protection as grounds for the discrimination claims of women, and unceremoniously scrapped the nation's anti-abortion laws in Roe v. Wade. See generally Vince Blasi, The Burger Court: The Counter-Revolution That Wasn't (1983).

[FN99]. 120 S. Ct. 1858, 1861 (2000). For the grant of certiorari, see 527 U.S. 1034 (1999).

[FN100]. 31 U.S.C. §§ 3729-3733 (1994).

[FN101]. Stevens, 120 S. Ct. at 1858, 1860 (citing 31 U.S.C. § 3729).

[FN102]. See, e.g., Sean Hamer, Lincoln's Law: Constitutional and Policy Issues Posed by the Qui Tam Provisions of the False Claims Act, 6 Kan. J.L. & Pub. Pol'y 89 (1997); James T. Blanch, Note, The Constitutionality of the False Claims Act's Qui Tam Provision, 16 Harv. J.L. & Pub. Pol'y 701 (1993); Frank A. Edgar, Jr., Comment, "Missing the Analytical Boat": The Unconstitutionality of the Qui Tam Provisions of the False Claims Act, 27 Idaho L. Rev. 319 (1990); Robert E. Johnston, Note, 1001 Attorneys General: Executive-Employee Qui Tam Suits and the Constitution, 62 Geo. Wash. L. Rev. 609 (1994); Ara Lovitt, Note, Fight for Your Right to Litigate: Qui Tam, Article II, and the President, 49 Stan. L. Rev. 853 (1997); John P. Robertson, Comment, The False Claims Act, 26 Ariz. St. L.J. 899 (1994).

[FN103]. See, e.g., James T. Blanch et al., Citizen Suits and Qui Tam Actions: Private Enforcement of Public Policy (1996); Gretchen L. Forney, Qui Tam Suits: Defining the Rights and Roles of the Government and the Relator Under the False Claims Act, 82 Minn. L. Rev. 1357 (1998); Thomas R. Lee, Comment, The Standing of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Qui Tam Relators Under the False Claims Act, 57 U. Chi. L. Rev. 543 (1990).

[FN104]. Stevens, 120 S. Ct. at 1863. VANR is the state agency responsible for the implementation, administration and enforcement of various federal and state environmental laws, including the Clean Water Act, 33 U.S.C. § 1251 (1994), and Safe Drinking Water Act, 42 U.S.C. § 300f (1994), in addition to various state laws that implement these federal statutes. See, e.g., Vt. Stat. Ann. tit. 10. VANR works in partnership with the Environmental Protection Agency ("EPA") through a system of grants and reporting. See, e.g., 33 U.S.C. § 1329(a), (b).

[FN105]. Stevens, 120 S. Ct. 1861.

[FN106]. Id. at 1861; see also False Claims Act, 31 U.S.C. § 3729-3733. The Act provides that anyone who presents a false money claim to the federal government shall be liable for double or treble damages and civil penalties of up to $10,000 per false claim. § 3729. The FCA, which authorizes the government to bring civil actions against those who defraud it, contains a qui tam enforcement provision, whereby private citizens with independent knowledge of fraud perpetrated against the government may sue to recover the fruits of the fraud. § 3730(b)(1). Under the qui tam provisions of the FCA, any person may bring a civil action "for the person and for the United States Government" to recover damages and penalties. § 3730(b)(1). Qui tam is short for the Latin phrase, "qui tam pro domino rege, quam pro se ipso in hac parte sequitur," which literally means "who prosecutes this suit as well for the king as for himself." William Blackstone, Commentaries on the Law of England 161 (1768).

Congress enacted the original FCA in 1863 "to assist in ferreting out unscrupulous defense contractors who committed fraud against the Union army by delivering bullets loaded with sawdust." Joan R. Bullock, The Pebble In the Shoe: Making the Case For the Government Employee, 60 Tenn. L. Rev. 365, 368-69 (1993); see also S. Rep. No. 99-345, at 8, reprinted in 1986 U.S.C.C.A.N. 5266, 5269; Lovitt, supra note 102, at 856. The provision was intended to "supplement the nascent prosecutorial capabilities of the Attorney General." Id. (noting that when Congress enacted the FCA in 1863, the Attorney General's office was still in its infancy and the Department of Justice did not yet exist; see also John T. Boese, When Angry Patients Become Angry Prosecutors: Medical Necessity Determinations, Quality of Care and the Qui Tam Law, 43 St. Louis U. L.J. 53, 60 (1999) (noting that the qui tam provision of the original FCA was a response to "the absence of effective government resources to investigate and prosecute fraud against the government").

Congress amended the statute in 1943 to limit the circumstances under which a private individual could bring suit. See 89 Cong. Rec. 7606 (Sept. 17, 1943). Underlying the 1943 amendment was the government's belief that it could discover and prosecute fraud on its own, without the aid of private individuals. Gilles, supra note 2, at 1422. From 1943 to 1986, actions under the FCA became increasingly rare, as the limitations on qui tam actions and a lack of interest on the part of the Justice Department drove the Act "into a period of desuetude." Evan Caminker, The Constitutionality of Qui Tam Actions, 99 Yale L.J. 341, 343 (1989); see also Elletta Sangrey Callahan & Terry Morehead Dworkin, Do Good and Get Rich: Financial Incentives for Whistleblowing and the False Claims Act, 37 Vill. L. Rev. 273, 318 (1992) (noting that, from 1943 to 1986, qui tam actions averaged about six per year and actions by the Attorney General averaged about ten per year); Pamela H. Bucy, Where to Turn in a Post-Punitive Damages World: The Qui Tam Provisions of the False Claims Act, 58 Ala. L.J. 356 (1997) (noting that "[f]or a variety of reasons, the FCA was not particularly effective until 1986").

Finally, in the midst of federal budget deficits and high-profile reports of fraud against the government, Congress amended the FCA in 1986. Gilles, supra note 2, at 1423; see also Michael Waldman, Time to Blow the Whistle? Qui Tam Lawsuits Are a Double-Edged Sword: They Encourage Disclosure of Fraud But Can Poison Workplace Relations, Nat'l L.J., Mar. 25, 1991, at 13 (noting that "[f]aced with well-publicized reports of $400 hammers and $600 toilet seats, Congress in 1986 turned to the whistleblower lawsuit as its chief weapon for

fighting fraud"). The 1986 Amendments gave qui tam relators more power to initiate and prosecute suits, enhanced financial incentives, and provided protection against employer retaliation. See generally §§ 3731(c), 3729(a)(7), 3730(d)(1)-(2). The 1986 Amendments also expanded the rights and role of the qui tam relator, increasing the relator's share of the recovery to fifteen to twenty-five percent of the recovery if the government intervenes, and to twenty-five to thirty percent if it does not. § 3730; see also Steve France, The Private War on Pentagon Fraud, 76 A.B.A. J. 46, 47 (Mar. 1990). Finally, the 1986 Amendments increased the maximum damage award possible to three times the government damage (treble damages), and provided that attorney's fees could be required from the losing defendant. See Marc S. Raspanti & David M. Laigaie, Current Practice and Procedure Under the Whistleblowing Provisions of the Federal False Claims Act, 71 Temp. L. Rev. 23, 27 (1998).

[FN107]. United States ex rel. Stevens v. Vt. Agency of Natural Res., 162 F.3d 195, 199 (2d Cir. 1998), rev'd, 120 S. Ct. 1858 (2000).

[FN108]. § 3729(a).

[FN109]. Stevens, 120 S. Ct. at 1861. The qui tam relator is required to file his complaint in camera and under seal, and to serve these first on the Attorney General and on the local U. S. Attorney. § 3730(b)(2). The complaint must remain under seal for at least 60 days, a period that may be extended by leave of the court, while government attorneys investigate the complaint's allegations. § 3730(b)(2), (3). By the end of that sixty-day period (and any extensions) the Attorney General must inform the district court whether government attorneys will take over the action. § 3730(4).
      In Stevens, the Attorney General elected not to take over prosecution of the action; however, she also chose not to intervene, as was her statutory right, to terminate the suit. Instead, she expressly reserved her statutory right to intervene against the State at a later time as the case proceeded. 162 F.3d at 199.

[FN110]. See § 3730(b)(4)(B). If government attorneys do take over the case, they "have the primary responsibility for prosecuting the action," and they may, subject to court approval, dismiss it altogether "notwithstanding the objections of the [relator]." § 3730(c)(1), (2). If the Attorney General elects not to take over the case, on the other hand, the relator may prosecute the action in the name of the United States, but he must do so at his own expense and may become liable for the defendant's attorney's fees and expenses if the suit later is found by the court to be frivolous or vexatious. § 3730(c)(3), (d)(4), (f). Moreover, the Attorney General still retains the right to intervene and litigate the action upon "a showing of good cause." § 3730(c)(3). A portion of any recovery by the United States, whether or not the Attorney General elected to take over the litigation, must be shared with the relator. § 3730(d).

[FN111]. Stevens, 120 S. Ct. at 1861.

[FN112]. The State argued in its motion that it was not a "person" within the meaning of the FCA, such that the imposition of FCA liability on the States would violate the Eleventh Amendment. The Eleventh Amendment provides that the "Judicial Power of the United States shall not...extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State...." U.S. Const. amend. XI.

[FN113]. United States ex rel. Stevens v. Vt. Agency of Natural Res., No. 1:95-CV-161S (D. Vt. May 9, 1997) (order denying motion to dismiss). The district court rejected the state's contention that the FCA does not make states "person[s]" who are subject to liability under the Act. Id. In particular, the court noted that States have long considered themselves "persons" within the meaning of the Act in order to bring suits as qui tam plaintiffs.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page38 of 103

The court also rejected the state's claim of Eleventh Amendment immunity on the ground that the Amendment does not bar suits against the states by the United States itself, finding that the United States "is the real party in interest and ultimately the primary beneficiary of a successful qui tam action." Id.

[FN114]. United States ex rel. Stevens v. Vt. Agency of Natural Res., 162 F.3d 195 (2d Cir. 1998), rev'd, 120 S. Ct. 1858 (2000). The court of appeals, after a careful review of the provisions of the FCA, found that the United States retains sufficient control over qui tam litigation to be considered the "real party of interest." For example, the court noted that the FCA provides that a qui tam action may be brought "for the person and for the United States Government. The action shall be brought in the name of the Government." § 3730(b)(1). Further, the United States is given an opportunity to intervene and take control of any qui tam action at the outset of litigation. § 3730(b)(2). Even if the government elects not to intervene at the outset, it may intervene upon a showing of good cause at any time thereafter. § 3730(c)(3). The court also noted that where the government intervenes, it takes control of the suit and has "primary responsibility for prosecuting the action." § 3730(c)(1). In this scenario, the qui tam relator is allowed to continue to participate in the action, though the government may seek to severely limit the relator's role. § 3730(c)(2)(C), (D). Moreover, the government has substantial authority to terminate the suit, even over the objection of the qui tam relator. § 3730(c)(2)(B). Finally, the court considered situations in which the government chooses not to intervene, so that the relator has "the right to conduct the action." § 3730(b)(4)(B). The court found that even there, the government retains significant control over the action. For example, no other person may intervene in the action. § 3730(b)(5). The government is entitled to monitor the proceedings; it is entitled to have discovery stayed if discovery would interfere with its investigation or prosecution of a criminal or civil suit arising out of the same facts; it retains the right to intervene at any time for good cause, and the qui tam "action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." § 3730(b)(1), (c)(3), (4). Most persuasively, any recovery in a qui tam action, whether or not the government intervenes, belongs principally to the United States, with the relator taking a percentage depending on various factors. § 3730(d)(1). Therefore, the court found that the Eleventh Amendment was no bar to liability in litigation brought on behalf of the federal government. Stevens, 162 F.3d at 201-03.

Judge Jack Weinstein, U.S. District Judge for the Eastern District of New York, sitting by designation, dissented. Id. at 208-33.

[FN115]. Vt. Agency of Natural Res. v. United States ex rel. Stevens, 527 U.S. 1034 (1999).

[FN116]. See, e.g., Seminole Tribe v. Florida, 517 U.S. 44 (1996) (holding that Congress does not have the power under the Indian Commerce Clause to abrogate states' Eleventh Amendment immunity); Idaho v. Coeur d'Alene Tribe, 521 U.S. 261 (1997) (holding that an Indian tribe is barred by the Eleventh Amendment from seeking injunctive relief in federal court in a suit to establish title to land); Coll. Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 627 (1999) (holding that the federal Patent and Plant Variety Protection Remedy Clarification Act does not abrogate the protection of the Eleventh Amendment); Alden v. Maine, 527 U.S. 706 (1999) (holding that Congress does not have any greater power to subject a state to suit under federal law in state court than in federal court, and that the Eleventh Amendment bars suit in state court under the Fair Labor Standards Act); Kimel v. Fla. Bd. of Regents, 120 S. Ct. 631 (2000) (holding that the Age Discrimination in Employment Act of 1967 is not "appropriate legislation" under Section 5 of the Fourteenth Amendment, and thus Congress cannot abrogate states' Eleventh Amendment Immunity under the Act).

[FN117]. United States ex rel. Long v. SCS Bus. & Technical Inst., 173 F.3d 870, 882 (D.C. Cir. 1999) (finding that states are not "persons" under the FCA); United States ex rel. Foulds v. Tex. Tech. Univ., 171 F.3d 279, 281

(5th Cir. 1999) (holding that the Eleventh Amendment bars qui tam actions against states); Zissler v. Regents of Univ. of Minn., 154 F.3d 870, 874 (8th Cir. 1998) (finding that states are "persons" under the FCA); United States ex rel. Graber v. City of New York, 8 F. Supp. 2d 343, 351 (S.D.N.Y. 1998) (finding that states are not "persons" under the FCA).

[FN118]. For example, amicus briefs were filed on behalf of the state by the American Medical Association, Brief of Amici Curiae American Medical Association, Stevens, (No. 98-1828); the Aerospace Industries Association of America, Brief of Amici Curiae Aerospace Industries Association of America Stevens, (No. 98-1828); and the United States Chamber of Commerce, Brief of Amici Curiae United States Chamber of Commerce, Stevens, (No. 98-1828).

[FN119]. False Claims Act: Qui Tam Provisions in False Claims Act Under Scrutiny, U.S. L.Wk. Daily Edition, Dec. 3, 1999 (reporting on oral argument of case before Supreme Court).

[FN120]. Journal of Proceedings: November 1, 1999 Through November 29, 1999, U.S. L. Wk. Daily Edition, Dec. 1, 1999 (reporting that on November 19, 1999, the Supreme Court issued an order in Stevens, directing the parties to "file supplemental briefs addressing the following question: 'Does a private person have standing under Article III to litigate claims of fraud upon the government?'").

[FN121]. See, e.g., United States ex rel. Rodgers v. Arkansas, 154 F.3d 865, 868 (8th Cir. 1998); United States ex rel. Berge v. Bd. of Trs. of the Univ. of Alabama, 104 F.3d 1453, 1458 (4th Cir. 1997); United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co., 41 F.3d 1032, 1041 (6th Cir. 1994); United States ex rel. Kelly v. Boeing Co., 119 F.3d 743, 748 (9th Cir. 1993); United States ex rel. Kreindler & Kreindler v. United Tech. Corp., 985 F.2d 1148, 1155 (2d Cir. 1993); United States ex rel. Chandler v. Hektoen Med. Research, 35 F. Supp. 2d 1078, 1079-81 (N.D. Ill. 1999); United States ex rel. Truong v. Northrop Corp., 728 F. Supp. 615, 621-22 (C.D. Cal. 1989); United States ex rel. Stillwell v. Hughes Helicopters, Inc., 714 F. Supp. 1084, 1090-92 (C.D. Cal. 1989).

[FN122]. In Riley v. St. Luke's Episcopal Hospital, 196 F.3d 514, 523-24 (5th Cir. 1998), defendants argued that qui tam actions in which the government elects not to intervene violate the Take Care Clause and the separation of powers doctrine because these provisions "stripped" the executive branch of its prosecutorial power. The Fifth Circuit agreed with the defendants that the qui tam provisions reduced the executive branch's control over litigation brought in the government's name, and further found that qui tam actions in which the government does not intervene encroach upon "the prosecutorial discretion that is at the heart of the President's power to execute the laws." Id. at 525-26. Specifically, it found that the qui tam provisions did not give the Attorney General the power to remove the relator, control the decision to bring suit, determine the scope of the suit once initiated, and that the relator was not bound to follow Department of Justice guidelines. Id. at 528. The Fifth Circuit was particularly concerned by qui tam actions in which the government elected not to intervene, explaining that where "the sole injury--the only ticket into court--belongs to the government, the Executive's prosecutorial discretion must include the power to decide whether to bring suit." Id. at 526. Thus, according to the court, an individual's suit on behalf of the government that is permitted to proceed despite the government's decision not to intervene encroaches on the executive's discretion over whether to prosecute a claim in violation of the constitution. Id.

[FN123]. See supra text accompanying notes 67-98 (discussing the current Court's constitutionalization of standing doctrine).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN124]. See Charles Tiefer, Surprise Order in Qui Tam Case May Foretell a Scalia Surprise, Legal Times, Nov. 29, 1999, at 52. In addition, the Court had refused to address the constitutionality of the qui tam provisions in Hughes Aircraft Co. v. United States ex rel. Schumer, 517 U.S. 1218 (1996). In Schumer, the Court went so far as to invite the Solicitor General to file a brief expressing the United States' views on qui tam. However, when the Court finally decided to hear Schumer, it declined certiorari on the constitutional issues in the case. Id.

[FN125]. Vermont Agency of Natural Res. v. United States ex rel. Stevens, 120 S. Ct. 1858, 1863 (2000).

[FN126]. Id. at 1861-62.

[FN127]. Id. at 1862.

[FN128]. See infra Part IV (discussing the role of private litigants as either assignees or agents of governmental authority).

[FN129]. Stevens, 120 S. Ct. at 1862-63. Interestingly, rather than applying its strict, constitutional standing analysis, the Stevens Court appeared to return to the more liberal standing inquiry of the Warren Court era. For example, rather than asking whether the relator had suffered the requisite "imminent" injury-in-fact, the Court instead noted that "the bounty [[the relator] will receive if the suit is successful," establishes that a qui tam relator has a "concrete private interest in the outcome of [the] suit." Id. at 1862 (citing Lujan v. Defenders of Wildlife, 505 U.S. 555, 573 (1992)). The "concrete private interest" standard is strikingly similar to the Baker/Flast "adverseness" standard. See supra text accompanying notes 21-41 (discussing the Warren Court's application of flexible, prudential standards in determining standing of citizen-voters and taxpayers).

[FN130]. Stevens, 120 S. Ct. at 1862.

[FN131]. Id.

[FN132]. Id.

[FN133]. Id. (citing 31 U.S.C. § 3730(c)(1) (1994)).

[FN134]. Id. (citing § 3730(c)(2)(A)).

[FN135]. Id. (citing § 3730(c)(2)(B)).

[FN136]. Id.

[FN137]. Id. at 1863. The Court's acceptance of the assignment theory confirms the decisions of various lower federal courts upholding relator standing on similar grounds. See, e.g., United States ex rel. Kelly v. Boeing Co., 119 F.3d 743, 748 (9th Cir. 1993); United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr., 961 F.2d 46, 49 (4th Cir. 1992).

[FN138]. Stevens, 120 S. Ct. at 1863 (citing Poller v. Columbia Broad. Sys., Inc., 368 U.S. 464, 465 (1962); Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 829 (1950); Hubbard v. Tod, 171 U.S. 474, 475 (1898)).

[FN139]. Id. at 1863.

[FN140]. Id. at 1863-65. Of course, the Court's recitation of the historical pedigree of qui tam actions may itself have been the driving force behind the grant of standing in this case. In other words, even Justice Scalia may have cringed at the thought of overturning six centuries of jurisprudence upholding the right of relators to bring suit on behalf of the government. See, e.g., United States of America ex rel. Rudd v. Gen. Contractors, Inc., Nos. C-89-397-RJM, C-89-821-RJM (E.D. Wash. Dec. 4, 1990) (order denying motion to dismiss) (citing Martin v. Trout, 199 U.S. 212, 225 (1905)) ("[T]he concept of qui tam is so deeply rooted in the nation's history that it is most improbable that any court today could divine some infirmity of constitutional magnitude which would not have been equally apparent many decades, if not centuries, ago.").

[FN141]. Stevens, 120 S.Ct. at 1863, citing Prior of Lewes v. De Holt (1300), reprinted in 48 Selden Society 198 (1931); 2 W. Hawkins, Pleas of the Crown 369 (8th ed. 1824).

[FN142]. Id., citing Statute Providing a Remedy for Him Who Is Wrongfully Pursued in the Court of Admiralty, 1400, 2 Hen. 4, c. 11 (Eng.), Statute Prohibiting the Sale of Wares After the Close of Fair, 1331, 5 Edw. 3, c. 5 (Eng.).

[FN143]. Id. at 1864.

[FN144]. Id., citing Act for the Restraining and Punishing of Privateers and Pirates, 1st Assemb., 4th Sess. (N.Y. 1692), reprinted in 1 Colonial Laws of New York 279, 281 (1894) (allowing informers to sue for, and receive share of, fine imposed upon officers who neglect their duty to pursue privateers and pirates).

[FN145]. Id. at 1864 n.5 (noting that the First Congress also passed one statute allowing injured parties to sue for damages on both their own and the United States' behalf. See Act of May 31, 1790, ch. 15, § 2, 1 Stat. 124, 124-25 (repealed 1802) (allowing author or proprietor to sue for and receive half of penalty for violation of copyright)); cf. Act of Mar. 1, 1790, ch. 2, § 6, 1 Stat. 101, 103 (repealed 1795) (allowing census taker to sue for and receive half of penalty for failure to cooperate in census); Act of July 5, 1790, ch. 25, § 1, 1 Stat. 129 (obsolete) (extending same to Rhode Island)).

[FN146]. Id. at 1864 n.6, citing Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. 101, 102 (repealed 1795) (allowing informer to sue for, and receive half of fine for, failure to file census return); Act of July 5, 1790, ch. 25, § 1, 1 Stat. 129 (obsolete) (extending same to Rhode Island); Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. 131, 133 (allowing private individual to sue for, and receive half of fine for, carriage of seamen without contract or illegal harboring of runaway seamen); Act of July 22, 1790, ch. 33, § 3, 1 Stat. 137, 138 (repealed 1793) (allowing private individual to sue for, and receive half of goods forfeited for, unlicensed trading with Indian tribes); Act of Mar. 3, 1791, ch. 15, § 44, 1 Stat. 209 (allowing person who discovers violation of spirits duties, or officer who seizes contraband spirits, to sue for and receive half of penalty and forfeiture, along with costs, in action of debt); cf. Act of Apr. 30, 1790, ch. 9, §§ 16, 17, 1 Stat. 116 (allowing informer to conduct prosecution, and receive half of fine, for criminal larceny or receipt of stolen goods).

[FN147]. Id. at 1865.

[FN148]. See supra text accompanying notes 69-94 (discussing the application of the Court's increasingly restrictive constitutional standing rules in Lyons and Lujan).

[FN149]. Scalia, supra note 15, at 881-82.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN150]. See infra Part IV (discussing potential applications of assignment and agency theories of representational standing).

[FN151]. Stevens, 120 S. Ct. at 1862.

[FN152]. The government can only suffer such injuries when it is acting in a non-governmental capacity; in other words, when the government suffers a proprietary injury, it is acting more as a private actor than as a governmental entity. In these circumstances, Congress may partially assign to a private citizen the right to pursue the claim, with payment to be carved out of any successful recovery. Thus, rather than bring an action itself to recover financial loss, the government, acting more like a private entity, may assign a portion of its claim to a party willing to undertake the effort and expense to recover the assigned portion of the proceeds. But see Caminker, supra note 106, at 349-50 (arguing that the qui tam provisions of the FCA reflect "the understanding that the United States, as 'sovereign,' represents the interests of the public at large. Through litigation, the United States attempts to redress the public injuries created by false claims practices, both by recouping siphoned treasury funds and by deterring future threats to economic and national security.").

[FN153]. Indeed, the cases cited by the Stevens Court in support of the assignment theory of relator standing all involve private, contractual assignments of propertied or proprietary claims. See Poller v. Columbia Broad. Sys., Inc., 368 U.S. 464 (1962); Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827 (1950); Hubbard v. Tod, 171 U.S. 474 (1898); see also John M. Limbaugh, The Sacrificial Attorney: Assignment of Legal Malpractice Claims, 65 Mo. L. Rev. 279, 281 (2000) (noting that while "at early common law, no cause of action or chose in action was assignable," equity courts gradually allowed "assignment of choses in action arising out of contract," and "the assignment of choses in action arising out of torts to real or personal property").

[FN154]. Of course, property is not limited to the category of tangible things; individuals may also possess property rights in their ideas and other intangible assets. Thus, patents, trademarks and copyrights, and the concomitant right to sue for the enforcement of those interests, are generally assignable. See 35 U.S.C. § 261 (providing that patents have the attributes of personal property, and can be assigned, mortgaged, and devised like any other personal property, so long as the assignment is in writing); see also Kristine Boylan, The Corporate Right of Publicity in Federal Dilution Legislation, 82 J. Pat. & Trademark Off. Soc'y 5, 9 (2000) (noting that courts have stated that there "might be protection of property in trademark law, and consequently, permitted assignments of trademarks just as an ownership interest in a piece of real or personal property would be assigned").

[FN155]. See, e.g., In re Magness, 972 F.2d 689, 695-96 (6th Cir. 1992) (denying assignment of country club membership because of personal nature of interest); Haelan Labs., Inc. v. Topps Chewing Gum, Inc., 202 F.2d 866, 868 (2d Cir. 1953) (observing that baseball player who granted to chewing gum manufacturer right to use his photograph in sales materials has right of privacy, "i.e., a personal and non-assignable right not to have [one's] feelings hurt"); In re Taylor Mfg., 6 B.R. 370, 372 (Bankr. N.D. Ga. 1980) (providing example of inequity created in assignment of personal services contract by forcing promoter to accept performance from assignee rather than opera singer with whom he contracted); Archer v. Archer, 493 A.2d 1074, 1080 (Md. Ct. App. 1985) (finding that a medical degree or license does not constitute marital property within the ambit of its equitable distribution statute because it was "but an intellectual attainment...not a present property interest. It is personal to the holder; it cannot be sold, transferred, pledged or inherited. It does not have an assignable value nor does it represent a guarantee of receipt of a set of monetary amount in the future, such as pension benefits").

Indeed, even in the private law context, contracts may expressly state that certain proprietary claims are to be considered "personal" and thus not assignable. So, for example, a landlord may draft a lease in which an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

option to extend the term of a lease is personal to the original tenant and therefore not available to an assignee or subtenant. While the option is clearly a proprietary element, the landlord is permitted to characterize it as personal so as to limit obligations to third parties.

[FN156]. See, e.g., Beall v. Farmers' Exch. Bank, 76 S.W.2d 1098, 1099 (Mo. 1934); Prop. Exch. & Sales, Inc. v. Bozarth, 778 S.W.2d 1, 2 n.1 (Mo. Ct. App. 1989). An exception to this general rule is that while personal injury actions survive, they are not assignable. See Beall, 76 S.W.2d at 1099; Bozarth, 778 S.W.2d at 2 n.1; Forsthove v. Hardware Dealers Mut. Fire Ins. Co., 416 S.W.2d 208, 217 (Mo. Ct. App. 1967); see also Eastern Atl. Transp. & Mech. Eng'g, Inc. v. Dingman, 727 S.W.2d 418, 423 (Mo. Ct. App. 1987) (holding that a tort claim is assignable to the extent that it provides the basis for an award of exemplary damages in an otherwise assignable action for breach of contract); Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. KPMG Peat Marwick, 742 So. 2d 328 (Fla. Dist. Ct. App. 1999) (holding that, under Florida law, the prohibition against assignment of personal claims did not bar a fidelity insurer's claim, either as assignee or subrogee, against its insured's independent auditors).

[FN157]. 3 John Norton Pomeroy, Equity Jurisprudence § 1275 (Spencer Symons ed., 5th ed. 1941); see also Atl. & N.C. R.R. Co. v. Atl. & N.C. Co., 61 S.E. 185 (N.C. 1908).

[FN158]. See Francis M. Dougherty, Assignability of Claims for Legal Malpractice, 40 A.L.R. 4th 684 (1995) (stating that the only causes of action which are non-assignable "are those for torts for personal injuries and for wrongs done to the person, the reputation, or the feelings of an injured party, and those for breach of contract of a purely personal nature, such as promises of marriages"); see also 6 Am. Jur. 2d Assignments § 39 (1963) (stating that "[i]n some jurisdictions it is held that a right of action for personal injuries is not assignable"); David M. Kono, Unraveling the Lining of ERISA Health Insurer Pockets--A Vote for National Federal Common Law Adoption of the Make Whole Doctrine, 2000 B.Y.U. L. Rev. 427, 429 (2000) (discussing cases disfavoring the assignment of personal injury claims and the judicial efficiency policy of prohibiting the division of a cause of action).

[FN159]. Interestingly, however, some courts have accepted the assignment of legal or medical malpractice claims. See, e.g., Hedlund Mfg. Co. v. Weiser, Stapler & Spivak, 539 A.2d 357 (Pa. 1988); Ammon v. McCloskey, 655 A.2d 549 (Pa. Super. Ct. 1995) (finding that a personal injury claimant's malpractice claim may be assigned to an adversary as part of a resolution of the personal injury lawsuit). While such claims appear personal rather than proprietary, one commentator has noted that where "a legal malpractice claim may be transferred by assignment or subrogation, its value to a client is enhanced because a client may realize benefit from the malpractice without taking the risk, time and expense of litigating that claim." Jeffrey Albert, A Consumer-Eye View of Pennsylvania Legal Practice: Learning from Our Mistakes, 71 Pa. B. Ass'n Q. 70, 77 (2000). But see Dougherty, supra note 158, at 684 (arguing that the legal malpractice claim should be non-assignable "because of the personal relationship which exists between an attorney and his client...[which] likened an action for legal malpractice to actions for torts involving personal injuries or wrongs done to the person").

[FN160]. By the same token, courts have analogized from the traditional formulation of Pomeroy to hold that a corporation's claims are assignable where they would survive the dissolution of the corporate entity. See, e.g., Zimmerman v. Kyte, 765 P.2d 905 (Wash. Ct. App. 1988) (where a dissolved corporation assigned its right to sue its shareholders, and the shareholders filed suit against former employees of the corporation, shareholders have standing based on assignment).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN161]. Vermont Agency of Natural Res. v. United States ex rel. Stevens, 120 S. Ct. 1858, 1862 (2000).

[FN162]. Separation of powers is a function of the Constitution's basic structure, which "divides all power conferred upon the Federal Government into 'legislative Powers,' '[t]he executive Power,' and '[t]he judicial Power.'" Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992).

[FN163]. U.S. Const. art. II, § 3; see also U.S. Const. art. II, § 1, cl. 1 ("The executive Power shall be vested in a President of the United States of America."). The President delegates authority in most of the civil and criminal suits brought on behalf of the federal government to the Attorney General, and "all such suits, so far as the interests of the United States are concerned, are subject to the direction, and are within the control of, the Attorney General." Buckley v. Valeo, 424 U.S. 1, 139 (1976); see also United States v. San Jacinto Tin Co., 125 U.S. 273, 279 (1888) (stating that the Attorney General is "undoubtedly the officer who has charge of the institution and conduct of the pleas of the United States, and of the litigation which is necessary to establish the rights of the government"); Springer v. Philippine Islands, 277 U.S. 189, 202 (1928) (stating that the Take Care Clause "gives the Executive the power to enforce the laws").

[FN164]. See, e.g., United States ex rel. Truong v. Northrop Corp., 728 F. Supp. 615, 620 (C.D. Cal. 1989) ("In a False Claims action, the judicial branch is not called upon to create causes of action or make any policy determinations. There is a concrete, identifiable claim for fraud against the government, the prosecution of which Congress, pursuant to its policymaking authority, has placed under the direction of the qui tam relator.").

[FN165]. Stevens, 120 S. Ct. at 1863 n 4.

[FN166]. See, e.g., Lans v. Gateway 2000, Inc., 84 F. Supp. 2d 112, 123 (D.D.C. 1999) (holding that an assignor lacked standing to sue for infringement); Procter & Gamble Co. v. Paragon Trade Brands, Inc., 917 F. Supp. 305, 312 n.11 (D. Del. 1995) (holding that assignors were not proper parties to a patent action because "[w]hen rights to a patent are effectively assigned, the assignor retains no further rights in that which was assigned and as a result has no stake in the outcome of the litigation"); Hertel v. Home Ins. Co., 604 P.2d 269 (Ariz. Ct. App. 1979) (holding that when the employee's claim was assigned to the carrier, no interest remained in the employee).

[FN167]. See supra note 114 and accompanying text.

[FN168]. As Thomas Lee has noted, objections lodged against partial assignments are generally concerned with preventing multiple suits on a single right of action. Lee, supra note 103, at 570. Lee argues, however, that these objections fail to recognize two unique aspects of the assignment at issue in the FCA context:

    The first is that the FCA preserves a single cause of action. Under the FCA, the Justice Department is entitled to intervene, and the federal government is entitled to share in the recovery, but the suit filed by the relator precludes a separate action by the government or anyone else. In this sense, the FCA's assignment is not partial. Rather, the government's right to intervene and share in the recovery are properly characterized as its 'fee' for the full assignment of the right of action.

Id. at 565. The second aspect of the FCA's assignment is that it is         part of an Act of Congress. Even if some state laws forbid this kind of assignment, the FCA is federal law and therefore trumps state law under the Supremacy Clause. Congress clearly meant to confer standing on qui tam plaintiffs; it is indisputably the intent and effect of the FCA to assign the government's cause of action, contingent on the qui tam relator's filing the suit.

Id.; see also 3 Blackstone, supra note 106, at 162 (noting that the result in a qui tam suit "is a bar to all others,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

and [is] conclusive even to the king himself").

[FN169]. Morrison v. Olson, 487 U.S. 654, 695 (1988) (quoting Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 443 (1977)).

[FN170]. This is not to suggest that the Executive may not effect a full assignment of its proprietary claims. The Take Care Clause has consistently been interpreted to limit only legislative efforts to divest the Executive of enforcement powers. See id.

[FN171]. See infra text accompanying notes 151-164 (discussing the proprietary vs. sovereign distinction).

[FN172]. See Vermont Agency of Natural Res. v. United States ex rel. Stevens, 120 S. Ct. 1858, 1862 (2000). (noting that, in the false claims context, the government has suffered both proprietary and sovereign injury).

[FN173]. Mistretta v. United States, 488 U.S. 361, 382 (1989).

[FN174]. See generally Morrison, 487 U.S. 654.

[FN175]. For example, the Morrison Court found that an independent counsel can only be appointed by specific request of the Attorney General. Id. at 695. The Attorney General's decision not to request appointment if she finds "no reasonable grounds to believe that further investigation is warranted" is unreviewable. Thus the Act "gives the Executive a degree of control over the power to initiate an investigation by the independent counsel." Id. at 696. The Court also found that once an independent counsel is appointed, he must abide by Justice Department policy and have his jurisdiction defined by the Attorney General. Id. Finally, the Morrison Court reasoned that the Attorney General retains the power to remove the independent counsel for "good cause," a power the Court found "provides the Executive with substantial ability to ensure that the laws are 'faithfully executed' by an independent counsel." Id.

[FN176]. The other Article II question raised by Congressional assignment involves the Appointments Clause, which requires that principal "Officers of the United States" be appointed by the President with the advice and consent of the Senate, and that inferior officers may, by congressional authorization, be appointed by the President, heads of departments or the judiciary. U.S. Const. art. II, § 2, cl. 2; see also Buckley v. Valeo, 424 U.S. 1, 132 (1976) ("[P]rincipal officers are selected by the President with the advice and consent of the Senate. Inferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary."). Here again, a set of determining criteria is supplied by Morrison, where the Court concluded that the independent counsel was an inferior officer within the meaning of the Appointments Clause. 487 U.S. at 670-77. Applying a similar test for the Appointments Clause challenge as for the "take care" challenge, the Morrison Court first noted that the independent counsel is subject to removal by a higher executive branch official, which indicates that she is "to some degree 'inferior' in rank and authority." Id. at 671. Second, the Court found that the independent counsel's job is limited to the investigation and possible prosecution of certain federal crimes. Id. Finally, the Court noted that the independent counsel's job is a temporary one: "an independent counsel is appointed essentially to accomplish a single task, and when that task is over the office is terminated." Id. at 672. Lower federal courts have relied on the Morrison inquiry to determine whether qui tam relators are principal or inferior officers. These courts have uniformly reasoned that qui tam relators are "inferior" or "subordinate" officers because they have a length of service that is generally limited to a single case, a relatively limited scope of authority, and are not vested with the "primary responsibility" for enforcing the FCA. See, e.g., United States ex rel. Truong v. Northrop Corp., 728 F. Supp. 615, 621-22 (C.D. Cal. 1989); United States ex rel. Stillwell v. Hughes Helicopters, Inc., 714 F. Supp. 1084, 1090-92 (C.D. Cal. 1989). Thus, as the assignment theory does not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

change this analysis, the Appointments Clause does not present a significant challenge.

[FN177]. Indeed, most lower federal courts confronted with this issue had determined that the qui tam provisions of the FCA did not violate Article II. See, e.g., United States ex rel. Newsham v. Lockheed Missiles & Space Co., 772 F. Supp. 607, 615 (N.D. Cal. 1989) ("The qui tam provisions do not violate the separation of powers doctrine. The executive Branch retains sufficient control over the qui tam litigation so as to ensure that the President is able to perform his constitutionally assigned duties.").

[FN178]. 196 F.3d 514, 523 (5th Cir. 1999). The Fifth Circuit has granted an en banc rehearing in Riley, but a decision has not been rendered yet. 196 F.3d 1561 (5th Cir. 1999).

[FN179]. Riley, 196 F.3d at 525-26. Specifically, the defendants in Riley argued that the executive lacks control at the very initial stages of litigation because a qui tam relator can file a false claims action without the consent of the Attorney General. Id. at 523; see also 31 U.S.C. § 3730(b)(1) (1994). Similarly, in the actual prosecution of the litigation, the government's "control"--for Morrison purposes--is undercut by the fact that a qui tam relator remains, by operation of law, a party in interest, irrespective of whether the Justice Department elects to take over the lawsuit during the sixty-day sealing period. § 3730(b)(4)(A). Finally, the Justice Department may not settle or otherwise terminate the litigation without the consent of the relator, unless it can prove to a court that the proposed settlement is "fair, adequate and reasonable under all the circumstances." § 3730(c)(2)(B). The Fifth Circuit agreed with the defendants that the qui tam provisions reduced the executive branch's control over litigation brought in the government's name, and further found that qui tam actions in which the government does not intervene encroach upon "the prosecutorial discretion that is at the heart of the President's power to execute the laws." Riley, 196 F.3d at 523.

[FN180]. See Vermont Agency of Natural Res. v. United States ex rel. Stevens, 120 S. Ct. 1858, 1862 (2000).

[FN181]. Id.

[FN182]. Id. The Court found, for example, that the qui tam provisions of the FCA give the relator "the right to continue as a party to the action," even where the Government has intervened to prosecute the claim, entitle the relator "to a hearing before the Government's voluntary dismissal of the suit," and prohibit the Government from "settling the suit over the relator's objections without a judicial determination" of the fairness of the proposed settlement. Id.

[FN183]. 487 U.S. 654 (1988). Morrison dealt with the independent counsel provision of the Ethics in Government Act. See id.

[FN184]. Id. at 695 (quoting Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 443 (1997)).

[FN185]. Id. For example, the Attorney General may not appoint the Independent Counsel of her choice and has limited powers of removal. Id. at 695-96.

[FN186]. Id. at 696. The Court found that the "Act does give the Attorney General several means of supervising or controlling the prosecutorial powers that may be wielded by an independent counsel." Id.

[FN187]. Id. The Attorney General's decision not to request appointment if she finds "no reasonable grounds to believe that further investigation is warranted" is unreviewable. Id.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page47 of 103

[FN188]. Id.

[FN189]. Id.

[FN190]. Id.

[FN191]. Id. at 650-51, 691-96.

[FN192]. Vermont Agency of Natural Res. v. United States ex rel. Stevens, 120 S. Ct. 1858, 1862 (2000).

[FN193]. Id. at 1862-63.

[FN194]. 422 U.S. 490, 511 (1975).

[FN195]. See, e.g., Don't Waste Ariz., Inc. v. McLane Foods, Inc., 950 F. Supp. 972 (D. Ariz. 1997) (discussing the elements of representational standing); 13 Charles A. Wright et al., Federal Practice and Procedure § 3531.9 (2d ed. 1995 & Supp. 1999) ("In a variety of circumstances, both traditional and modern, a party is permitted to appear in court as a formal representative of other interests. Trustees, guardians and personal representatives are familiar examples."); see also Fed. R. Civ. P. 17(a) (allowing parties to sue "without joining the party for whose benefit the action is brought").

[FN196]. Warth, 422 U.S. at 511 (citations omitted).

[FN197]. Stevens, 120 S. Ct. at 1862.

[FN198]. Nor can it be seriously doubted that the government may establish agency relationships with private citizens. See, e.g., Morrison v. Olson, 487 U.S. 654, (1988). The specific question addressed here is what limitations are required to ensure that such agency relationships pass constitutional muster.

[FN199]. Black's Law Dictionary 41 (6th ed. 1991); see also Restatement (Second) of Agency § 1 (1957) ("(1) Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act; (2) The one for whom action is to be taken is the principal; (3) The one who is to act is the agent.").

[FN200]. Restatement (Second) of Agency § 1 (1957).

[FN201]. According to one commentator,
  [a]gency costs are all the costs that arise where the agent acts, and the principal expects him to act, out of the agent's self-interest in the secure knowledge that: (1) the principal cannot be fully aware of everything that the agent does and fails to do; and (2) that the principal cannot make the agent pay the full cost of his failure to faithfully serve the principal. The central and most prominent agency cost is shirking, i.e., merely not being as attentive to one's task as one would if one were serving one's own interests rather than the principal's.
Lloyd R. Cohen, The Public Trust Doctrine: An Economic Perspective, 29 Cal. W. L. Rev. 229, 265 (1993).

[FN202]. See, e.g., Mark A. Pollack, Delegation, Agency, and Agenda Setting in the European Community, 51 Int'l Org. 99 (1997).

[FN203]. See Daryl Levinson, Making Government Pay: Markets, Politics, and the Allocation of Constitutional Costs, 67 U. Chi. L. Rev. 345, 383 (2000) (noting that "[t]he extent to which agency actions are aligned with the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

preferences of their legislative and executive principals depends on how successful these principals are at monitoring agencies to detect noncompliance").

[FN204]. See Daniel Meltzer, Congress, Courts and Constitutional Remedies, 86 Geo. L.J. 2537, 2552 (1998) (noting "that duties expressly imposed exclusively on a principal generally leave its agents free to act in violation of those duties, on the theory that any actions by the agents that would cause the principal to be in violation cannot be attributed to the principal").

[FN205]. Professor Levinson disagrees that private law agency principles can be used to accurately predict governmental behavior. See generally Levinson, supra note 203. In particular, Professor Levinson has argued that "certain characteristics of government bureaucracy may impede efforts to structure incentives by limiting the carrots and sticks" at the disposal of the government to control the actions of its agents. Id. at 385. Private principals, on the other hand, freely respond to market signals and "have far greater latitude to structure the incentives" of their agents. Id. These observations lead Professor Levinson to conclude that for government, significantly more so than for private firms, the behavior of agents may diverge from the policy preferences of high-level decision-maker principals. Id. But see Myriam Gilles, In Defense of Making Government Pay: The Deterrent Effect of Constitutional Tort Remedies, 35 Ga. L. Rev. (forthcoming 2001) (arguing that agency compliance costs are no greater in the public sector than in the private sector).

[FN206]. Supra text accompanying notes 151-164 (discussing applicability of assignment theory of standing where the government suffers injury in its proprietary capacity).

[FN207]. The "sovereign" is the "supreme authority in the body politic," as exemplified by its control over "territory and the persons living there, immunity against challenges to authority, and legitimation of leadership." H. Jefferson Powell & Benjamin J. Priester, Convenient Shorthand: The Supreme Court and the Language of State Sovereignty, 71 U. Colo. L. Rev. 645, 648 (2000). The sovereign draws its authority from the people, who ratify the government and legitimize the power of the sovereign: "[T]he people of a State may, by the form of government they adopt, confer on their public servants and representatives all the powers and rights of sovereignty which they themselves possess; or may restrict them within such limits as may be deemed best and safest for the public interest." Ohio Life Ins. & Trust Co. v. DeBolt, 57 U.S. (16 How.) 416, 428-29 (1853); see also Chisolm v. Georgia, 2 U.S. 419 (2 Dall.) 454 (1798) ("[T]here is but one place where [the term 'sovereign'] could have been used with propriety--in conjunction with the term the 'people of the United States.'").

It could also be argued that agents may be authorized to pursue quasi-sovereign interests, which "are not sovereign interests, proprietary interests, or private interests pursued by the state as a nominal party," but consist instead of "a set of interests that the State has in the well-being of its populace." Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 602 (1982). For purposes of this discussion, however, the distinction between sovereign and quasi-sovereign interests is insignificant.

[FN208]. Supra text accompanying notes 165-180 (discussing the partial assignment of the government's proprietary claims to private citizens).

[FN209]. Vermont Agency of Natural Res. v. United States ex rel. Stevens, 120 S. Ct. 1858, 1861 (2000).

[FN210]. Considered in this light, the agency theory articulated in Stevens may more precisely be termed a reverse-agency theory. As many scholars have asserted, the central idea of popular sovereignty is that "the people are the one and only sovereign in civil society," and the people may "cede governing authority to a constituted government," which is charged with the duty to pursue public-regarding policies. Carlos E. Gonzalez, Reinter-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

preting Statutory Interpretation, 74 N.C. L. Rev. 585, 636 (1996) ( "[T]he essence of popular sovereignty is a principal-agent relationship between a principal/people and their constituted agent/government, under which a sovereign people grant governing power and authority to a government that acts as a trustee over the people's sovereignty."); see also Richard Pierce, The Role of the Judiciary in Implementing an Agency Theory of Government, 64 N.Y.U. L. Rev. 1239, 1239 (1989) ("The Constitution is premised on the belief that government should act as the agent of the people."). In Professor Akhil Amar's words, "[t]rue sovereignty reside[s] in the People themselves.... Government officials [are] 'representatives,' 'agents,' 'delegates,' 'deputies, and 'servants' of the People....As sovereign, the People need not wield day-to-day power themselves, but could act through agents on whom they conferred limited powers." Akhil R. Amar, Of Sovereignty and Federalism, 96 Yale L.J. 1425, 1466 (1987). Thus, the concept of government authorizing the People to act as agents is a reversal or reinvestment of the power ceded to the government by the People.

[FN211]. Federal law fines are paid to the federal treasury. See, e.g., United States Dep't of Energy v. Ohio, 503 U.S. 607, 613 n.1 (1992); see also Elizabeth Kundinger Hocking, Federal Facility Violations of the Resource Conservation and Recovery Act and the Questionable Role of Sovereign Immunity, 5 Admin. L.J. 203, 213 (1991) (discussing the importance of the fines for purposes of deterrence and suggesting that "the value of fines lies in their motivational potential rather than the revenues they generate").

[FN212]. Stevens, 120 S. Ct. at 1862.

[FN213]. Supra text accompanying notes 152-160 (discussing the non-assignability of "personal" claims).

[FN214]. By contrast, the executive control test of Morrison arguably does not apply in the proprietary context, thereby ameliorating the constitutional agency compliance concerns that are present where sovereign interests are in play. Supra text accompanying notes 169-176 (discussing the inapplicability of the Morrison executive control test in the enforcement of proprietary governmental interests).

[FN215]. Morrison v. Olson, 487 U.S. 654, 660-61, 691-96 (1988).

[FN216]. See Stevens, 120 S. Ct. at 1865, 1865 n.8. Arguably, a statutory regime might create a true agency relationship without satisfying the demanding dictates of Morrison. I would submit that such an agency relationship would be a sufficient basis for representational standing to pursue the government's proprietary interests, while it may not suffice where the government's sovereign interests are at stake.

[FN217]. See supra text accompanying notes 183-197.

[FN218]. Private enforcement could be critical to achieving various civil and criminal law enforcement goals. See, e.g., Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 263 (1975) (acknowledging that, in many instances, "Congress has opted to rely heavily on private enforcement to implement public policy"); see also S. Rep. No. 94-1011, at 2, reprinted in 1976 U.S.C.C.A.N. 5908, (recognizing that "[a]ll of these civil rights laws depend heavily upon private enforcement").

[FN219]. See supra text accompanying notes 69-94 (discussing the constitutionalized standing rules applied in Lyons and Lujan).

[FN220]. See, e.g., Patti A. Meeks, Justice Scalia and the Demise of Environmental Law Standing, 8 J. Land Use & Envtl. L. 343, 364 (1993) ("Scalia has apparently used Lujan as a stepping stone towards constitutionaliz-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing the generalized grievance standing limitation."); Nichol, supra note 93, at 1167-68 (reasoning that Justice Scalia's approach to standing threatens plaintiffs' ability to bring "public law litigation" generally and "threatens to constitutionalize an unbalanced scheme of regulatory review"); Sunstein, supra note 10, at 166 (stating that Article III appears to forbid Congress from granting standing to "citizens" qua citizens); Keith Werhan, Delegalizing Administrative Law, 1996 U. Ill. L. Rev. 423, 455 (1996) (noting that the Lujan Court constitutionalized the generalized grievance principle and subjected statutory standing provisions to judicial review).

[FN221]. For example, in accepting their parties' nominations, both Al Gore and George W. Bush characterized private enterprise as the "engine" that runs the American economy and both "promised" to find new and creative ways for government to partner with the private sector to improve the delivery of services. David Corn, Down to the Wire, The Nation, Nov. 13, 2000.

[FN222]. Such provisions would resemble the medieval practice of "tax farming," whereby the king would "sell" to his subjects the right to collect traditional taxes. Typically, tax farmers were held liable for the total expected tax revenue, meaning that every dollar not collected was another dollar lost by the tax farmer. As a result, tax farmers often resorted to torture and terror to recover taxes, and the tax-farming system was abolished as brutal. See Frank S. Alexander, Tax Liens, Tax Sales and Due Process, 75 Ind. L.J. 747, 751 (2000) (noting that the use of "private entities to assist in the collection of property taxes," represents "a return in some ways to the Roman era of 'tax farming' or the nineteenth-century reliance on 'tax ferrets' or 'tax scavengers'"); Adam Melita, Note, Much Ado About $26 Million: Implications of Privatizing the Collection of Delinquent Federal Taxes, 16 Va. Tax. Rev. 699, 701 (1997) (noting that under the tax-farming system, "the power to collect the taxes was implicitly assigned from the state to the tax farmer").

[FN223]. Alexander, supra note 222, at 747.

[FN224]. For example, Mississippi, Vermont and Virginia have enacted legislation authorizing localities and municipalities to enlist the aid of private collection agencies or attorneys in tax collection efforts. See Miss. Code Ann. § 21-17-1 (1996); Vt. Stat. Ann. tit. 13, § 5240(c) (1995); Va. Code Ann. § 19.2-349(B) (Michie 1996).

[FN225]. The Texas Property Code authorizes municipal taxing units to "contract with any competent attorney" to collect delinquent taxes and to pay the attorney "20 percent of the amount of delinquent tax, penalty, and interest collected." Tex. Tax Code Ann. § 6.30(c) (West 1997).

[FN226]. At the local level, private attorneys or bill collectors are generally not authorized to bring court actions on behalf of the government, or to force an audit to determine whether the tax is due. South Carolina, however, has proposed an ordinance that authorizes the bill collector association to assess the tax due, audit the tax, and bring an action "in the name of the Municipality without further approval by the Municipality." Municipal Association of South Carolina, Model Ordinance MASC-50, 98-002. The proposed ordinance provides, in relevant part, that the bill collector association is "designed as the exclusive agent of the Municipality for assessment and collection of the said business license taxes and penalties utilizing all procedures and actions authorized by ordinance or State law, and such procedures and actions may be invoked in the name of the Municipality without further approval by the Municipality." Id. The association retains 4% of all funds collected under this proposal. Id.; see also In re Phillip Morris U.S.A., 436 S.E.2d 828 (N.C. 1993) (upholding a statute that authorized a private party to receive a contingent fee of 35% of taxes discovered). But see Sears, Roebuck & Co. v. Parsons, 401 S.E.2d 4, 5 (Ga. 1991) (finding a contingent fee contract void as against public policy, noting that

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page51 of 103

"[f]airness and impartiality are threatened where a private organization has a financial stake in the amount of tax [assessed]" and that "[t]he people's entitlement to fair and impartial tax assessments lies at the heart of our system, and, indeed, was a basic principle upon which this country was founded").

[FN227]. Congress has tried, but thus far failed, to create such an assignment for the collection of delinquent taxes. In 1996, Congress approved an IRS budget which included $13 million dollars for a special pilot program designed to award contracts to private law firms and debt collection agencies to collect delinquent taxes. Treasury, Postal Service, and General Government Appropriations Act of 1996, Pub. L. No. 104-52, 109 Stat. 468, 473-74. In 1997, funding for the program was doubled to $26 million in the 1997 Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208, 110 Stat. 3009. However, the pilot program fails to create an assignment for two reasons. First, the program operates on a flat fee structure rather than a percentage of the recovery. See Herman P. Ayayo, ABA Tax Section Meeting, As Richardson Heads to Exit, ABA Considers IRS Restructuring, 74 Tax Notes 266, 266 (1997). In other words, collectors are paid a flat fee for collecting delinquent taxes, without regard to the amount of the delinquency. In order to create a true assignment, collectors would have to be paid a percentage of any successful recovery of delinquent taxes. Second, private collectors are only permitted to contact the taxpayer regarding the delinquency and to notify the taxpayer of repayment options; collectors have no enforcement authority, but may only refer the debtor back to the IRS. So, rather than let private collectors "run with the ball" after failed IRS attempts to collect the delinquent tax, the program keeps the collectors on a short leash; indeed, they are not "collectors" at all, since any substantive processing requires IRS intervention. See Melita, supra note 222, at 700.

[FN228]. So, for example, if Congress were to assign private citizens a portion of tax delinquencies successfully recovered, one might argue that this would violate the Court's prohibition on taxpayer standing. See, e.g., Frothingham v. Mellon, 262 U.S. 447 (1923). However, an assignee bringing an action to recover taxes due to the government need not rely on his status as a taxpayer, but rather, need only point to the government's proprietary injury as the basis for his standing to bring suit.

[FN229]. See Melita, supra note 222, at 721-26 (discussing potential implications of privatizing tax collection, including the violation of taxpayers' rights and taxpayers' privacy, and the diminishment of confidence in the IRS).

[FN230]. See Gilles, supra note 2 (describing the Justice Department's initial review of qui tam actions as serving a vital quality control function).

[FN231]. For example, legislators might consider provisions requiring assignees who bring frivolous or harassing litigation to pay all costs and attorney's fees.

[FN232]. The Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 881 (1994), authorizes the forfeiture of the "illegal substance involved in the commission of an offense and all instrumentalities used in the manufacturing and distribution of the illegal substance." In 1978, the Act was amended to provide for the forfeiture of all the proceeds from an illegal drug transaction, and provided for an innocent owner defense. Pub. L. No. 95-633, 92 Stat. 3786, Title III; see also Eric Blumenson & Eva Nilsen, Policing for Profit: The Drug War's Hidden Economic Agenda, 65 U. Chi. L. Rev. 35 (1998) (discussing the development of civil forfeiture and asset distribution statutes aimed at deterring drug trafficking).

[FN233]. While the Court ruled in United States v. Austin, 509 U.S. 602, 619 (1993), that the Excessive Fines Clause governs certain federal civil forfeiture proceedings because they are, at least in part, punitive, it appeared

to overrule this aspect of Austin in United States v. Ursery, 518 U.S. 267 (1996). In Ursery, the Court found that Austin's line of reasoning defined "punitive" only for purposes of the Eighth Amendment's Excessive Fines Clause, but not for purposes of the Fifth Amendment's Double Jeopardy Clause. Id. at 286-88. Thus, the Ursery majority concluded that in rem civil forfeitures are not punitive for purposes of Double Jeopardy.

[FN234]. Indeed, the current civil forfeiture regime is itself problematic. The federal civil forfeiture statute, 21 U.S.C. § 881 (1994), allows agencies who seize drug-related assets to benefit directly from the forfeitures. When the government sells forfeited property, cash from the sale goes directly to the federal agency involved. That agency can, in turn, give part of the funds to state or local police in return for their help; in this way, forfeited property pays for law enforcement, as Congress intended. However, such a powerful financial incentive may have some unintended consequences. The federal government can "adopt" seizures performed by a nonfederal agency when the criminal conduct violated federal law and then kick back up to 80 percent of the seized assets to that agency. See Directive 90-5, The Attorney-General's Guidelines on Seized and Forfeited Property (July 1990), in Department of Justice Asset Forfeiture Manual B-541, B-545 (Prentice Hall 1994). Because this is far more than state agencies get using most state forfeiture statutes, state and local authorities have the incentive to complete a case, then federalize it to get a greater share of the money. This can be a large share indeed; local police departments can earn as much as 10 times their annual budgets by participating in a single operation. See Steve Stecklow, Big Money for a Tiny Police Force, Phila. Inq., Aug. 24, 1992, at A1.

   Most disturbingly, this system creates a powerful incentive for police to refrain from killing the goose that lays the golden egg, and to leech off the drug trade that now constitutes their primary funding. See generally Blumenson & Nilsen, supra note 232. For example, many police departments now favor the reverse-sting operation, an operation in which police pose as dealers to nab potential drug buyers, allegedly because it allows police "to gauge potential profit before investing a great deal of time and effort." J. Mitchell Miller & Lance H. Selva, Drug Enforcement's Double-Edged Sword: An Assessment of Asset Forfeiture Programs, 11 Just. Q. 313, 319 (1992). This kind of operation allows police to go after a buyer's valuable bankroll and car rather than a dealer's less valuable supply of drugs. Criminal defendants high in their organization's chain of command often have more assets to forfeit and can trade these in a civil case for leniency in the criminal one. Thus, the drug boss goes free, while the street-level dealer goes to prison.

   Given the problems and conflicts inherent in the current civil forfeiture regime, it may be difficult to justify authorizing private citizens to "rat" on one another for a piece of a drug-related pie already being divided by hungry federal and state law enforcement agencies.

[FN235]. See Fletcher, supra note 15, at 233 (arguing that the Article III limitations on congressional grants of standing "limit the power of Congress to define and protect against certain kinds of injury that the Court thinks it improper to protect against"); Harold Krent & Ethan Shenkman, Of Citizen Suits and Citizen Sunstein, 91 Mich. L. Rev. 1793, 1806-08 (1993) (explaining that just as Congress cannot delegate authority to individuals to regulate work place safety, it cannot confer upon private citizens standing to enforce statutes through citizen suit provisions); Sunstein, supra note 10, at 166 (stating that Article III appears to forbid Congress from granting standing to "citizens" qua citizens).

[FN236]. See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998); Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992).

[FN237]. Environmental citizen suit provisions generally authorize any "citizen," defined as "a person or persons having an interest which is or may be adversely affected," to commence suit to enforce statutory requirements against violators, or to require the government to perform a mandatory duty under the statute. Citizen suit

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

provisions were first included in the Clear Air Act Section 304, 42 U.S.C. § 7604 (1994). For a comprehensive listing of environmental citizen suit provisions, see Sunstein, supra note 10, at 165 n.11. "Person" is defined quite broadly in most citizen suit provisions. For example, the Clean Water Act definition of person includes "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." Federal Water Pollution Control Act § 502(5), 33 U.S.C. § 1362(5) (1994). These provisions confer jurisdiction on the district courts to entertain citizen suits without regard to diversity of citizenship or the amount in controversy. No citizen suit may be commenced unless sixty-days notice has been given to the violator, EPA, and other appropriate authorities, or where the EPA has commenced and is diligently prosecuting its own enforcement action. See, e.g., 33 U.S.C. § 1365(b)(1)(A), (B).

[FN238]. See, e.g., Clean Water Act, 33 U.S.C. § 1365(d); see also Michael D. Axline, Environmental Citizen Suits § 2.08, at 2-19 (1992).

[FN239]. E.g., 33 U.S.C.§ 1365; 42 U.S.C. § 7604.

[FN240]. E.g., Natalie Bussan, All Bark and No Bite: Citizen Suits After Steel Company v. CBE, 6 Wis. Envtl. L. J. 195 (1999) ("The townspeople have also been enlisted to enforce environmental laws. The environmental problems of the United States reached a crisis point in the early 1970's, and the Environmental Protection Agency didn't have enough 'marshals' to effectively enforce new environmental statutes. As a result, Congress enacted citizen suit provisions that 'deputized' citizens to bring suits against alleged violators to give bite to these new laws. The 'possies' [sic] Congress created are known as private attorney generals.").

[FN241]. The common law allows private individuals who suffer special damages to bring public nuisance actions. See John E. Bryson & Angus Macbeth, Public Nuisance, The Restatement (Second) of Torts, and Environmental Law, 2 Ecology L.Q. 241, 250-51 (1972); see also Taylor v. City of Cincinnati, 55 N.E.2d 724, 727-32 (Ohio 1944) (noting that water pollution is an absolute nuisance); Kepler v. Indus. Disposal Co., 85 N.E.2d 308, 310 (Ohio Ct. App. 1948) (holding that air pollution is an actionable nuisance based on injury alone).

[FN242]. See supra text accompanying notes 67-98 (discussing the constitutionalization of standing doctrine in cases such as Lujan and the impact of these heightened requirements on public law litigation); see also Nichol, supra note 93, at 1167-68 (reasoning that Justice Scalia's approach to standing threatens plaintiffs' ability to bring "public law litigation" generally and "threatens to constitutionalize an unbalanced scheme of regulatory review").

[FN243]. See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 568 (1992); see also Wald, supra note 95, at 239.

[FN244]. A House Report stated:

The argument that citizens' suits would interfere with an energetic and well organized cleanup program simply is not supported by the facts. A recent comprehensive study of citizens' suits brought under the major federal environmental laws which was conducted by the Environmental Law Institute at the request of EPA conclusively refutes the argument that such suits interfere with the agency's effective implementation of its statutory mandate. The study found that the number of citizens' suits filed under major national environmental laws increased in direct response to a decline in EPA's enforcement activities following massive cuts in the agency's budget during the early eighties. The study further found that such suits fulfilled Congressional intent in enacting such provisions by serving as both a goad and an alternative to the agency's own inadequate enforcement efforts. The study dismissed all allegations that such suits interfere with government enforcement programs or are

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

brought against insignificant violators of the law. Finally, the study indicated that the possibility of citizens' suits gives industry an added incentive to comply with the law.

H.R. Rep. No. 99-253, pt. 1, at 289-90 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 2964-65.

[FN245]. See Jeffrey G. Miller, Private Enforcement of Federal Pollution Control Laws, 13 Envtl. L. Rep. 10, 310 (1983) (noting that citizens have not been allowed to sue for personal damages, but only to redress statutory violations).

[FN246]. Actually, the attorneys representing citizen suit plaintiffs receive the fee. First introduced in the Clean Air Act, attorney's fee provisions are now included in virtually all environmental legislation. As some commentators have argued, attorney's fees are vital to the citizen suit structure because of the high costs associated with litigation. See, e.g., Michael D. Axline, Environmental Citizen Suits § 8.03, 8-2 (1995).

[FN247]. See, e.g., Frank Grad, Environmental Litigation and Some of its Ethical Problems, SE-55 ABA-ALI (noting that environmental citizen suit plaintiffs "carry very substantial responsibilities to the public, and overwhelmingly they represent major aspects of the public interest").

[FN248]. See, e.g., Bostrom v. Jennings, 40 N.W.2d 97, 102 (Mich. 1949) ("[W]hile the negligence of the agent is imputable to the principal making him liable to third parties, it is not imputable to him so as to bar his right to recover from the agent what he has been required to pay as compensation to such third parties."); see also John C. Coffee, Jr., Litigation and Corporate Governance: An Essay on Steering Between Scylla and Charybdis, 52 Geo. Wash. L. Rev. 789, 805 (1984) (discussing the effects, in the corporate context, of a corporation insuring itself against loss due to the negligent acts or omissions of its agents, rather than using the circular procedure of insuring its agents and then suing them for damages that only the insurance policy it purchased can cover).

[FN249]. See supra text accompanying notes 183-191 (discussing the implications of the Morrison executive control test on representational standing based on agency theory).

[FN250]. Currently, the federal executive appears relatively supportive of the citizen suit structure so long as it retains control over these private litigants. For example, in its amicus brief in support of citizen suit standing in Friends of the Earth v. Laidlaw, 120 S. Ct. 693 (2000), the government pointed out to the Court that, in those situations where the Executive Branch opposes a particular citizen suit, the citizen suit provisions allow the Administrator of the EPA to "intervene as a matter of right" and bring the Government's views to the attention of the court. Id. at 708 n.4.

[FN251]. One way in which the citizen-plaintiff's authority may be limited, so as to conform to the constitutional dictates of the agency model, would be to provide the EPA the authority to deny private actors the right to bring a citizen suit, where the agency determines that such a suit is not in the government's best interests, along with the authority to intervene in any such litigation for the purpose of dismissing or settling the action. Gilles, supra note 2, at 1423.

[FN252]. While the EPA is currently authorized to review citizen suits to determine whether it should intervene in the action, the implementation of the agency theory of representational standing would arguably require a more searching review into the interests to be vindicated by any proposed citizen suit action.

[FN253]. See supra text accompanying notes 169-176 (discussing the Morrison test of "executive control").

[FN254]. This latter objection is suspect where citizen suits against the federal government allege a failure to en-

force regulations against private (or state and local) entities. To the extent we are concerned with beefing up enforcement efforts against private entities, one might well argue that the resources of citizen-plaintiffs are more efficiently employed in suing the polluter, rather than hounding the overworked government agency charged with enforcement. If that is true, then the only values in retaining a private right of action against the government itself are (1) to restrain federal activities that adversely affect the environment; and (2) to ensure that the agency promulgates regulations in accordance with Congressional mandates. And there is no reason why those private rights of action could not be retained, wholly separate and apart from legislation that provides for representational standing to sue private (or state or local) entities on an agency theory.

[FN255]. Supra text accompanying notes 69-82 (discussing the equitable standing bar announced in Lyons).

[FN256]. 42 U.S.C. § 14141 (1994).

[FN257]. One measure of the ineffectiveness of the statute is the number of suits brought by the Justice Department to reform police "patterns or practices." While the Justice Department has purportedly investigated dozens of police departments over the past six years, it has only filed suit against three. The suits were brought against the Pittsburgh, Pennsylvania, Steubenville, Ohio and Columbus, Ohio police departments. See United States v. City of Pittsburgh, No. 97-0354 (W.D. Pa. consent decree entered Apr. 16, 1997); United States v. City of Steubenville, No. C2-97-966 (S.D. Ohio consent decree entered Sept. 3, 1997); Mark Ferenchik & Doug Caruso, Coleman Listens to Protesters' Concerns, Columbus Dispatch, Mar. 22, 2000, at 8E (reporting that the Justice Department has sued the Columbus Police Department over alleged civil rights abuses). Oddly, larger urban police departments with long histories of police problems have seemingly escaped federal intervention under Section 14141. This led Steubenville City Manager Gary Dufor to remark: "We're an awfully small community. You see all these problems that have come up at the police departments in Los Angeles and New York and New Orleans, and you've got to wonder, why us?" Eric Lichtblau, U.S. Low Profile in Big-City Police Probes Is Under Fire: Law Critics Say Justice Dept. Boldly Pursues Misconduct Cases in Smaller Towns But Goes Slow on Larger Inquiries, L.A. Times, Mar. 17, 2000, at A1 ("Indeed, while federal officials...have stepped up their four-year inquiry into broad patterns of misconduct at the Los Angeles Police Department, critics are left to wonder how the Justice Department missed warning signals leading up to the worst corruption scandal in LAPD history. And they question whether federal authorities have the resources-or the will-to move aggressively now in cleaning up the embattled force.").

[FN258]. Gilles, supra note 2, at 1384, 1388.

[FN259]. Id. at 36-37.

[FN260]. My model envisions that only actual victims of an unconstitutional police pattern or practice could petition the government. In other words, third parties and other concerned but uninjured citizens would not have a right to seek relief under this proposal. This parallels the requirement in qui tam provisions of the FCA which authorize only those individuals with "independent and original knowledge" of the alleged fraud to bring suit. 31 U.S.C. § 3730 (c) (3) (1) (1994). There is also an apt analogy in citizen suit provisions which authorize any "aggrieved person" to bring suit to remedy environmental injuries. See, e.g., Clean Air Act § 304, 42 U.S.C. § 7604 (1994).

[FN261]. Gilles, supra note 2, at 1417 (noting that "alleged victims of an unconstitutional police practice would file a petition with the Justice Department setting out the basis for their claims, alleging facts indicating the existence of an unconstitutional 'pattern or practice,' and delineating other damages claims under, for example, 42

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

U.S.C. § 1983").

[FN262]. In this scenario, the case would proceed in a fashion similar to cases brought in Pittsburgh and Steubenville, with federal officials negotiating with or litigating against particular police departments and municipalities to identify and remedy unconstitutional "patterns or practices." See supra note 257 (discussing the "pattern or practice" cases brought by the Justice Department against Pittsburgh and Steubenville police departments).

[FN263]. In this scenario, the victim of the allegedly unconstitutional police practice could go forward with any private civil suit for damages, but would have no right to seek injunctive relief. Neither would the private petitioner have a right to seek judicial review of the Justice Department's election to quash the petition. While this would result in a completely insulated and unaccountable decision-making process, it is likely that in at least some high-profile cases, sufficient media and public attention would attend Justice Department decisions to quash. Public attention in these cases would likely "open up" the decision-making processes.

[FN264]. Gilles, supra note 2, at 1408-12 (discussing the resource and political impediments to effective DOJ employment of Section 14141).

[FN265]. Political considerations in this particular area include the fear of alienating local law enforcement agencies and the reluctance of federal law enforcement officials to prosecute their municipal brethren. Private litigants are not hamstrung by these concerns. See Gilles, supra note 2, at 1410-11.
89 Cal. L. Rev. 315

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit 2

Westlaw

11 UPAJCL 781                                                                                                Page 1
11 U. Pa. J. Const. L. 781

c

University of Pennsylvania Journal of Constitutional Law
April, 2009

Article

**\*781** STANDING AS AN ARTICLE II NONDELEGATION DOCTRINE

Tara Leigh Grove [FNa1]

Copyright (c) 2009 The University of Pennsylvania Journal of Constitutional Law; Tara Leigh Grove

Table of Contents

| | |
|---|---|
| I. Introduction | 782 |
| II. A New Article II Theory of Standing | 785 |
| III. The Article III Standing of the Executive Branch | 792 |
| A. Standing to Enforce Federal Law | 792 |
| B. The Constitutional Foundation for the Executive Branch's Standing | 794 |
| C. The Executive Branch's Prosecutorial Discretion | 796 |
| 1. The Breadth of the Executive Branch's Prosecutorial Discretion | 796 |
| 2. Legal and Political Constraints on Executive Enforcement Discretion | 797 |
| IV. The Article III Standing of Private Plaintiffs | 802 |
| A. Private Parties Must Allege "Something More" than the "Common | 803 |

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page59 of 103

Concern for Obedience to Law"

B. Standing Doctrine Curtails Private Prosecutorial Discretion ........ 806

1. The Prosecutorial Discretion Conferred by "Abstract Concerns" ........ 807

2. Standing Limits Private Prosecutorial Discretion ........ 808

C. Policy Bases for Curtailing Private Prosecutorial Discretion ........ 813

1. A Hypothetical Private Attorney General ........ 814

2. The Lack of Constraints on Private Prosecutorial Discretion ........ 815

D. A Constitutional Foundation for Standing Doctrine ........ 820

1. An Article II Nondelegation Doctrine ........ 822

2. Standing Enforces the Article II Nondelegation Doctrine ........ 827

3. The Scope of the Constitutional Protection ........ 829

4. Standing as a Requirement of Articles II and III ........ 833

5. Is Article III Standing Doctrine the Only Answer? ........ 834

V. Conclusion ........ 837

**\*782** I. Introduction

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page60 of 103

Prosecutorial discretion is a tremendous power.  In both the criminal and the civil contexts, deciding to initiate enforcement actions is a considerable responsibility--one that should be exercised with care and consistency, but one that can be seriously abused.  Such discretion is thus perhaps not a power that we should hastily confer on every member of society.

This concept of prosecutorial discretion as an immense power, with considerable potential for abuse, offers a rationale for Article III standing doctrine that appears to have gone unnoticed in the academic literature.  Standing doctrine, in my view, curtails the prosecutorial discretion of private plaintiffs.  I arrive at this conclusion by comparing the broad Article III standing of the Executive Branch to the constraints placed on private parties.  I focus primarily on the following (apparent) anomaly: although Congress may, consistent with Article III, authorize the Executive Branch to assert the abstract "injury to the interest in seeing that the law is obeyed," [FN1] Congress may not confer similarly broad standing on private parties.

It is important to recognize that the authority to "see that federal law is obeyed" [FN2] gives the Executive Branch a considerable degree of discretionary enforcement authority. The Executive Branch may bring suit against any person, anywhere in the country, for any legal **\*783** violation. But it is not feasible to pursue every transgression of federal law. Accordingly, the Executive Branch must exercise prosecutorial discretion to decide which of these innumerable offenses to pursue in federal court.

The Executive Branch cannot avoid this discretionary enforcement responsibility.  The Take Care Clause of Article II, which provides that the Executive Branch "shall take care that the laws [are] faithfully executed," [FN3] requires it to "see that federal law is obeyed." The Take Care Clause therefore also requires it to exercise the considerable degree of prosecutorial discretion that is necessary to fulfill that law enforcement function. Moreover, the Executive Branch has a constitutional duty to exercise that obligation faithfully, with due regard for congressional mandates and constitutional constraints.

But the degree of discretionary enforcement authority exercised by the Executive Branch also creates a troubling potential for abuse.  Such discretion can be used to discriminate against, or otherwise unfairly target, certain individuals or groups.  For this reason, I assert that the Executive Branch's duties to "see that federal law is obeyed," and to exercise the accompanying prosecutorial discretion, are nondelegable. Given the potential for abuse, Article II prohibits Congress and the Executive Branch from delegating such discretionary enforcement authority to private parties, who are not subject to constitutional requirements or to the other legal and political checks that, to some degree, curtail executive enforcement discretion.

This Article II nondelegation doctrine provides a constitutional explanation for much of Article III standing doctrine.  Standing enforces this Article II nondelegation principle by curtailing private prosecutorial discretion.  Standing doctrine prohibits a private plaintiff from asserting abstract grievances, such as the "injury to the interest in seeing that the law is obeyed," that would allow her to sue any person, anywhere in the country, for any violation of law. A private party may bring suit only if she has suffered a more concrete "injury-in-fact." That injury, in turn, further limits the scope of her prosecutorial discretion, because she may sue only the person that caused her injury and may seek redress only for that harm.

Viewing standing in these Article II nondelegation terms has surprising implications for existing theories of standing doctrine.  Currently, most scholars and jurists who consider the foundations of standing doctrine fall into one of two camps.  Several prominent **\*784** judges, including Chief Justice John G. Roberts and Justice Antonin Scalia, contend that the Constitution requires that a plaintiff have a concrete injury in every case, and that Congress may not confer standing

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

on a broader class of citizens. [FN4] Conversely, most legal academics assert that standing doctrine lacks any constitutional foundation, and that Congress may confer standing as it sees fit. [FN5] But, interestingly, both sides do appear to agree on one thing: whatever its rationale, a central feature of standing doctrine is that it blocks private suits that might interfere with executive enforcement efforts. [FN6]

The Article II nondelegation doctrine offers an alternative account. I argue that standing doctrine does have a constitutional foundation: it enforces the Article II nondelegation principle by curtailing private prosecutorial discretion. And, under this constitutional analysis, standing doctrine's principal function is not to protect the Executive Branch. Instead, standing doctrine protects individual liberty by shielding private parties from arbitrary exercises of private prosecutorial discretion.

**\*785** This constitutional foundation for standing doctrine changes not only the focus but also the scope of the constitutional protection. Understood in Article II nondelegation terms, standing doctrine applies (as a constitutional mandate) only in cases that implicate private liberty. Such cases include all suits against private parties and all suits against the Executive Branch in which the real party-in-interest is a private individual or entity (i.e., suits demanding that the Executive Branch impose burdens on, or deny benefits to, specific private parties). But this Article II nondelegation theory leaves Congress otherwise free to authorize private suits against the federal government. The Article II nondelegation doctrine thus offers a constitutional justification for much of Article III standing doctrine, while also preserving some space for legislative action.

In Part II, I briefly contrast the theory presented here with prior Article II theories of standing. In Part III, I discuss the Executive Branch's broad Article III standing. I explain that the Executive Branch's Article II duty to "see that federal law is obeyed" requires it to exercise substantial prosecutorial discretion. In Part IV, I show that standing doctrine prevents private parties from exercising the same degree of prosecutorial discretion, and explain that this limitation can be seen in Article II nondelegation terms.

## II. A New Article II Theory of Standing

Standing doctrine has sustained great criticism in the academic commentary. [FN7] The three-part test that comprises the doctrine is easily summarized, but much less easily explained. The Supreme Court has stated that standing derives from the "case" or "controversy" requirement**\*786** of Article III. [FN8] In order to satisfy this "bedrock" requirement and bring suit in federal court, a plaintiff must demonstrate that she has suffered (or is likely to suffer) an "injury-in-fact" that was (or will be) caused by the defendant and that can be redressed by the plaintiff's requested relief. [FN9]

I am principally concerned with the following puzzle of standing doctrine: the dichotomy between Executive Branch and private party standing. The Supreme Court has held that Article III prohibits private suits asserting abstract grievances, such as the "injury to the interest in seeing that the law is obeyed." [FN10] But, as several commentators have observed, this constitutional limitation does not apply to the Executive Branch. [FN11] Instead, the Court has repeatedly found that the Executive Branch may file suit to "see that federal law is obeyed," at least if it has the blessing of Congress. [FN12] How can it be that Congress **\*787** may confer broad standing upon the Executive Branch, but not upon a private attorney general? [FN13]

This anomaly may suggest that standing doctrine depends, at least in part, on Article II. [FN14] Commentators have, however, generally assumed that any Article II theory of standing must take the following form [FN15]: Article II vests the President with "the executive power," [FN16] and further states that he "shall take care that the laws [are] faithfully

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page62 of 103

executed." [FN17] These provisions, the argument goes, give the Executive Branch a general power over law enforcement and private suits to "see that the law is obeyed" interfere with the Executive Branch's enforcement*788 prerogative. [FN18] Private parties may, for example, bring suits that the Executive Branch has explicitly decided to forgo, and thereby interfere with its overall enforcement strategy. Even more intrusively, a private party might bring suit directly against the Executive Branch to force it to change its overall enforcement policies or to urge it to bring an enforcement action against a third party. In sum, according to this argument, private actions are problematic under Article II because they interfere with the Executive Branch's enforcement discretion. [FN19]

There are several flaws in this approach, most of which have been noted before.  Most importantly, as Gene Nichol and Cass Sunstein have pointed out, the above analysis cannot possibly explain standing doctrine. [FN20]  This analysis provides no principled means of distinguishing between suits in which the plaintiff can show an injury-in-fact, and those in which she cannot.  Although it is true that a private suit to "see that the law is obeyed" may interfere with the Executive Branch's enforcement strategy, so might any other private enforcement action. [FN21] A party with an injury-in-fact is free to bring an enforcement action that the Executive Branch has declined to bring, and sometimes even to bring suit directly against the Executive Branch. Accordingly, the injury-in-fact requirement of standing doctrine does *789 not protect the Executive Branch from private interference with its so-called enforcement prerogative.

This failure to explain standing doctrine reflects, in my view, errors in the conceptual underpinnings of this Article II-based theory.  First, it conceives of the Executive Branch's law enforcement function as a power, rather than as a duty.  This conception leads commentators to focus excessively on ways in which private enforcement actions interfere with the Executive Branch's enforcement power.  And that leads to the second major problem with prior reliance on Article II.  It focuses on the wrong entity.  The focus should not be on the Executive Branch, but on the private plaintiff--the party to whom standing doctrine actually applies. [FN22]

I seek here to offer a constitutional analysis that avoids these conceptual problems. [FN23]  I believe, as Professor Sunstein and others have *790 asserted, that the Take Care Clause creates a "duty, not a license." [FN24] Indeed, that formulation is more in keeping with the text of the provision, which states that the Executive Branch "shall take Care that the Laws be faithfully executed." [FN25] Furthermore, my focus is not on how a private enforcement action might interfere with the Executive Branch's so-called enforcement power, but rather on how much enforcement power may be exercised by a private plaintiff.

This conceptual approach makes possible a more coherent understanding of standing doctrine.  The Take Care Clause imposes on the Executive Branch a duty to take appropriate measures, including filing suit in federal court, to "see that federal law is obeyed." The Take Care Clause thus also (as discussed in Part III) imposes a corollary responsibility. It requires the Executive Branch to exercise the substantial degree of prosecutorial discretion that is necessary to fulfill that law enforcement obligation. [FN26]

I argue here that these Article II duties are nondelegable.  As commentators critical of executive enforcement discretion have argued (and as discussed in Part IV), such discretion creates a troubling potential for abuse, even when it is exercised by a governmental entity that is subject to constitutional and other legal and political constraints.  Given this potential for abuse, the Constitution prohibits Congress and the Executive Branch from delegating such prosecutorial discretion to private parties, who are subject to no such requirements.

This Article II nondelegation principle offers a new rationale for Article III standing doctrine.  Standing enforces the Article II nondelegation doctrine by curtailing private prosecutorial discretion.  Standing doctrine prohibits a private plaintiff from asserting an abstract grievance (such as the "injury to the interest in seeing that the law is obeyed") that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

would allow her to sue any person for any legal violation. Furthermore, standing doctrine permits a court to identify **791** private enforcement actions that do not implicate the Executive Branch's nondelegable Article II responsibilities. When a private party has suffered an injury-in-fact, she cannot exercise substantial prosecutorial discretion. She may sue only the person that caused her injury and may seek redress only for that harm.

This Article II nondelegation concept of standing rests on normative premises that differ markedly from prior Article II theories. Under the Article II nondelegation principle, standing doctrine serves not to protect the Executive Branch, but instead to safeguard individual liberty against arbitrary exercises of private prosecutorial discretion. The constitutional protection therefore applies only in cases that implicate private liberty: all suits against private defendants and all suits against the Executive Branch in which the real party-in-interest is a private individual or entity. That latter category consists of (1) suits demanding that the Executive Branch impose burdens on particular private parties (by, for example, bringing an enforcement action against them); and (2) suits seeking to prevent the Executive Branch from conferring a benefit (such as a license, permit, or financial grant) on a specific private party. To bring any such action, a private plaintiff must demonstrate a concrete injury-in-fact.

This Article II nondelegation theory does not, of course, rationalize every facet of standing doctrine. The concept of standing as a limit on private prosecutorial discretion helps to explain and justify the prohibition on abstract grievances--the part of the injury-in-fact requirement that the Court has identified as constitutionally mandated. But I do not purport to defend every standing decision. It is indeed difficult, as many commentators have observed, to understand why the Court has recognized certain injuries-in-fact and not others, and why the Court has adopted a narrow view of causation and redressability in some cases and not others. [FN27]

**792** The Article II nondelegation principle does, however, help explain why--and when--a private plaintiff must assert a concrete injury that guides her prosecutorial discretion. This theory thus also carves out some space for congressional conferrals of standing. Although Congress may never permit a private party to bring suit against any person, anywhere in the country, for any violation of law, Congress does have some leeway to authorize any person to sue the Executive Branch. [FN28]

### III. The Article III Standing of the Executive Branch

In this Part, I examine the nature of and the basis for the Executive Branch's broad Article III standing. [FN29] This analysis reveals that the Executive Branch's duty to "see that federal law is obeyed" requires it to exercise a substantial degree of prosecutorial discretion.

### A. Standing to Enforce Federal Law

By the late nineteenth century, the Supreme Court made it clear that the Executive Branch had standing to assert injuries that would not suffice for a private plaintiff. For example, in United States v. American Bell Telephone Co., [FN30] an 1888 case involving a land patent, the Court observed that a private party (at that time) could challenge the validity of such a patent only if she had a "pecuniary interest" in the matter. [FN31] By contrast, the Executive Branch was not so constrained: "the right of the United States to interfere" in the action arose from its "obligation to protect the public." [FN32]

**793** Likewise, in In re Debs, [FN33] the Court stated that the federal government's "obligation[] . . . to promote the interest of all" and to "prevent . . . injury to the general welfare" can often be "sufficient to give [the United States] a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

standing in court." [FN34] Accordingly, the Court upheld the Executive Branch's standing to protect the public interest in the free flow of interstate commerce. [FN35] Federal courts followed suit in subsequent cases, raising no Article III concerns about law enforcement actions brought by the Executive Branch. [FN36]

United States v. Raines [FN37] constitutes perhaps the most explicit statement of Congress's authority to confer standing on the Executive Branch. In Raines, the federal government brought suit against local officials in Georgia, alleging that they had improperly interfered with voter registration efforts by African Americans. [FN38] The Civil Rights Act of 1957 expressly permitted such suits. [FN39] The local officials, however, argued that Congress lacked the power to "authorize the United States to bring this action in support of private constitutional rights." [FN40]

The Supreme Court rejected that contention, stating that "there is the highest public interest in the due observance of all the constitutional guarantees, including those that bear the most directly on private rights." [FN41] The Court found that it was "perfectly competent" for **794** Congress to authorize the Executive Branch "to be the guardian of that public interest." [FN42]

Notably, the Raines Court did not conclude that the Executive Branch had standing to assert the private parties' concrete interest in the right to vote. [FN43] Instead, the Court found that the Executive Branch was authorized to serve as the "guardian" of the abstract "public interest" in the "due observance of all the constitutional guarantees." [FN44] Few formulations come closer to stating that Congress may, consistent with Article III, authorize the Executive Branch to see that the law is obeyed.

B. The Constitutional Foundation for the Executive Branch's Standing

The Supreme Court has not sought to explain the constitutional basis for the Executive Branch's broad Article III standing, but the answer seems fairly self-evident. The Court does not interpret Article III in a vacuum, but instead construes Article III in conjunction with the Take Care Clause of Article II.

The Take Care Clause states that the President "shall take Care that the Laws be faithfully executed." [FN45] The provision thereby seems to direct the President to take appropriate measures to "see that federal law is obeyed." And, as the Supreme Court has observed, "[a] lawsuit is the ultimate remedy for a breach of the law." [FN46] Thus, the Constitution appears to direct the President, in appropriate cases, to file suit in federal court to enforce federal law.

Of course, we have long understood that this duty to "take Care that the Laws [are] faithfully executed" does not require the President to personally initiate federal court enforcement actions. [FN47] Instead, the President exercises his law enforcement responsibilities **795** through public officials in the Executive Branch. [FN48] Accordingly, I refer to the duty to "take care that the laws [are] faithfully executed" as an obligation of the Executive Branch.

The Executive Branch could not perform this constitutionally assigned duty if it lacked the authority to bring suit in federal court to see that federal law was obeyed. The federal courts accordingly construe such an executive enforcement action as a justiciable Article III case or controversy. Indeed, an interpretation that prevented the Executive Branch from performing this constitutional duty would contravene longstanding separation of powers principles. [FN49]

We should keep in mind, however, that this contextual analysis--interpreting Article III in light of Article II--has different implications for private enforcement actions. In contrast to the Executive Branch, a private party has no Article II duty to "see that federal law is obeyed." Accordingly, the constitutional structure does not suggest that such a private suit must qualify as an Article III "case" or "controversy." Instead, as discussed in Part IV, a contextual reading of Articles II

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page65 of 103

and III indicates precisely the opposite.

**\*796** C. The Executive Branch's Prosecutorial Discretion

The Executive Branch's Article II duty to "see that federal law is obeyed" encompasses a corollary responsibility. To fulfill that law enforcement function, the Executive Branch must exercise a considerable degree of prosecutorial discretion. This realization has significant implications for private enforcement actions. The Executive Branch's prosecutorial discretion provides a window into the degree of prosecutorial power that a private plaintiff would have, if she too could pursue the "injury to the interest in seeing that the law is obeyed." Indeed, private parties would have even greater prosecutorial discretion, because they are not subject to the legal and political checks that, to some degree, constrain executive enforcement officials. As discussed in Part IV, these distinctions seem to explain why our legal system accords a greater degree of discretionary enforcement authority to the Executive Branch. [FN50]

1. The Breadth of the Executive Branch's Prosecutorial Discretion

As many commentators have observed, the Executive Branch always exercises some discretion in interpreting and applying the law. [FN51]  Statutory and regulatory provisions supply only general guidelines for conduct.  The Executive Branch must apply those general proscriptions to specific scenarios. [FN52]  Moreover, there are countless transgressions of federal law, and the Executive Branch lacks the time and the financial resources to pursue each one, [FN53] even if it wished to. [FN54]  Accordingly,**\*797** the Executive Branch must pick and choose among these innumerable violations and determine which to pursue in federal court.

I am most interested in the breadth of the Executive Branch's prosecutorial discretion.  The Executive Branch's authority to "see that federal law is obeyed" allows it to pursue any transgression of federal law. Accordingly, the Executive Branch has the discretion to bring suit against any person, anywhere in the country, for any violation. The authority of a particular agency is only somewhat more limited. An agency may bring suit against any person, anywhere in the country, for any violation of a particular subset of federal law. In either case, that is an extraordinary discretionary power.

For the Executive Branch, it is also an extraordinary responsibility.  As discussed below, the Executive Branch is not (at least in principle) free to exercise its enforcement discretion as it pleases.  But that discussion should not distract us from this point: a considerable degree of prosecutorial discretion inevitably accompanies the authority to see that the law is obeyed.

2. Legal and Political Constraints on Executive Enforcement Discretion

The academic commentary on executive enforcement discretion suggests that there is much agreement on how the Executive Branch should exercise its prosecutorial discretion (although there is much disagreement over the extent to which it adheres to that ideal).  I draw upon this literature and relevant doctrine to identify certain essential elements of that normative standard: faithful interpretation, uniformity, and nondiscrimination.  I also note various ways in which our legal system can hold the Executive Branch accountable when it fails to comply with that standard.  Notably, I offer this account, not to suggest that the Executive Branch always (or even typically) abides by that normative standard, but instead to underscore (as discussed in Part IV) that private parties have no similar obligations and are subject to no such constraints.

**\*798** First, the Executive Branch should, in accordance with the very text of the Take Care Clause, interpret and ap-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page66 of 103

ply the law faithfully. Thus, the Executive Branch should not construe a legal provision narrowly, so as to render it essentially meaningless. Nor should the Executive Branch refuse to enforce a provision of law [FN55] simply because the current presidential administration disagrees with its underlying policies. [FN56]

The Executive Branch should also apply the law uniformly, [FN57] establishing national enforcement policies and priorities to guide its enforcement officials in exercising prosecutorial discretion. [FN58]  And, critically, these policies and priorities must be "nondiscriminatory." As used here, that term means that the Executive Branch may not use its prosecutorial discretion to favor or disfavor certain individuals or groups. Thus, the Executive Branch should not pursue individuals for nefarious reasons, such as personal animosity, [FN59] or because of their race or ideology. [FN60] Nor should administrative officials decline to **799** bring enforcement actions against regulated parties that have sought to "capture" the relevant agency. [FN61] Instead, the Executive Branch should apply the law in an evenhanded and consistent manner.

Recent history has, however, cast doubt on the Executive Branch's willingness or capacity to enforce the law in accordance with this nondiscrimination principle.  According to media reports, the Justice Department under Attorney General Alberto Gonzales was politically biased in exercising its prosecutorial discretion. [FN62]  Several U.S. Attorneys claimed that they were discharged, either because they brought criminal prosecutions against President George W. Bush's political supporters or because they failed to prosecute his political opponents.  This "U.S. Attorney Scandal," along with other complaints of improper management and low morale at the Justice Department, stirred congressional investigations into its enforcement policies and practices. [FN63] The mounting criticism ultimately led Gonzales to resign from his post as Attorney General. [FN64]

What can we take away from these events?  This recent history certainly illustrates the extent to which the Executive Branch's prosecutorial discretion is subject to abuse (a topic discussed further in Part IV). [FN65]  But I think we can take away a more positive message as well.  The U.S. Attorney Scandal was a "scandal" because we demand more from our federal enforcement officials. We expect them to enforce the law in a fair and evenhanded manner. We expect them to prosecute individuals for their conduct and not for their political beliefs. [FN66] **800** Most importantly, when the Executive Branch fails to properly perform this duty, we have mechanisms to hold it accountable. We can even force a recalcitrant Attorney General to resign.

Indeed, our legal system has crafted various methods to hold executive enforcement officials accountable for the discretionary decisions that they make in "seeing that federal law is obeyed." First, executive enforcement decisions are subject to a limited form of judicial review. Federal courts may examine whether the Executive Branch has violated the Constitution by selectively targeting persons of a particular ethnicity or ideology. [FN67] The courts can also review executive enforcement decisions that are out of step with a clear statutory mandate. [FN68]

Executive enforcement decisions are also subject to congressional oversight.  Congress may amend a statute to clarify the Executive Branch's duties, establishing enforcement priorities [FN69] or prescribing the remedies that the Executive Branch is permitted to seek for various statutory violations. [FN70]  Congress may also use its appropriations power [FN71] or hold congressional hearings to exert control over an agency's enforcement practices (as illustrated by the U.S. Attorney Scandal). [FN72]

Furthermore, the Executive Branch can itself take measures to cabin the prosecutorial discretion of individual enforcement officials.  It can, for example, provide its employees with manuals that set forth **801** its enforcement policies, [FN73] and then conduct internal reviews [FN74] or take other measures to prevent officials from bringing suits that are out of step with those policies. [FN75]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

I identify these compliance mechanisms to highlight (as discussed in Part IV) that no such constraints apply to private prosecutorial discretion. But I do not want to overstate the effectiveness of any of these forms of review. Judicial review is often an inadequate means of curtailing executive enforcement discretion. Federal courts rarely review individual nonenforcement decisions, [FN76] and selective prosecution claims are extremely difficult to prove. [FN77] Moreover, Congress may not have the time, the staff, or the political will to hold oversight hearings every time it disagrees with an executive enforcement policy, much less an individual enforcement decision. [FN78] Congress may be **\*802** even less inclined to correct executive enforcement decisions by statutory amendment, given the cumbersome nature of the legislative process (and the possibility of presidential veto). [FN79] The Executive Branch is likewise subject to budgetary and time constraints that may hinder its ability to oversee individual enforcement officials (assuming, of course, that it has the political will to conduct such oversight at all).

Ultimately, no amount of central executive supervision, congressional oversight, or federal court review will fully cabin prosecutorial discretion-- not when officials are charged with the abstract duty to ensure that "the law is obeyed." Thus, in the end, we must recognize--as former Attorney General (and Supreme Court Justice) Robert Jackson put it--that we grant our public officials this discretionary enforcement authority, not because we are confident that they will always exercise it perfectly, but "because it seems necessary that such a power to prosecute be lodged somewhere." [FN80] And the Constitution, via the Take Care Clause of Article II, has indicated where we should "lodge" the power to see that the law is obeyed. The Constitution has designated the Executive Branch as "the guardian of that public interest." [FN81]

### IV. The Article III Standing of Private Plaintiffs

It has been well-established for over a century that the Executive Branch has standing to bring suit in federal court to "see that federal law is obeyed." It is equally well-established that private plaintiffs may not assert such an abstract grievance. As described below, this restriction prevents private plaintiffs from exercising the same degree of prosecutorial discretion as the Executive Branch.

This concept of standing as a limit on private prosecutorial discretion provides both a principled explanation and a policy rationale for much of standing doctrine. This analysis also suggests a constitutional and normative justification for standing doctrine that has largely been overlooked by commentators: standing doctrine protects**\*803** individual liberty against arbitrary exercises of private prosecutorial discretion.

A. Private Parties Must Allege "Something More" Than the "Common Concern for Obedience to Law"

Fairchild v. Hughes [FN82] provides an early illustration of the Supreme Court's unwillingness to hear abstract private grievances. In Fairchild, the plaintiff challenged the validity of the Nineteenth Amendment (the amendment that gave women the right to vote). [FN83] The plaintiff claimed an interest in the case as a citizen and taxpayer and as a "member[] of the American Constitutional League," an association that sought to protect "the fundamental principles of the American Constitution, and especially that which gives to each state the right to determine for itself the question as to who should exercise the elective franchise therein." [FN84] The Court dismissed the suit, stating that the plaintiff asserted "only the right, possessed by every citizen, to require that the government be administered according to law." [FN85] This "general right," the Court declared, "[o]bviously . . . does not entitle a private citizen to institute" a suit in federal court. [FN86]

The Court later applied the same principles to a purely private dispute. In L. Singer & Sons v. Union Pacific Railroad Co., [FN87] the plaintiffs sought to prevent a railroad from taking action that would (allegedly) violate the Trans-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page68 of 103

portation Act of 1920. [FN88]  The Court held that, to bring the action, the plaintiffs had to allege "something more than a common concern for obedience to law." [FN89]

Lujan v. Defenders of Wildlife [FN90] confirmed that this limitation on private party standing has constitutional underpinnings.  In Lujan, certain environmental organizations filed suit against the Department of Interior, challenging its regulatory interpretation of the Endangered **\*804** Species Act. [FN91] After concluding that the plaintiffs failed to allege a cognizable injury, [FN92] the Court held that the statute's "citizen-suit" provision did not provide an alternative basis for standing. [FN93]

The citizen-suit provision stated that "any person may commence a civil suit on his own behalf . . . to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of" any provision of the Endangered Species Act or its implementing regulations. [FN94] The Lujan Court found that Congress could not, consistent with Article III, confer "upon all persons" this "abstract, self-contained, noninstrumental 'right'" to enforce federal law. [FN95] The Court declared that a plaintiff asserting only an injury "to his and every citizen's interest in proper application of the Constitution and laws . . . does not state an Article III case or controversy." [FN96]

**\*805** The Supreme Court has thus repeatedly found that a private plaintiff must allege "something more" [FN97] than an interest in "seeing that the law is obeyed." But this "something more" cannot simply be an ideological interest in a particular area of law. In Fairchild v. Hughes, for example, the Court indicated that the plaintiff could not challenge the Nineteenth Amendment simply by asserting a special interest in protecting each State's alleged "right to determine for itself the question as to who should exercise the elective franchise therein." [FN98]

The Court made this point more explicit in Sierra Club v. Morton. [FN99]  In Morton, a private interest group brought suit against the Department of Interior to enjoin it from issuing permits for a development in a wilderness area. [FN100]  The organization asserted that it should have standing to bring the action in light of its "special interest in the conservation and the sound maintenance of the national parks, game refuges and forests of the country." [FN101]

The Supreme Court rejected that claim. [FN102]  The organization's "special interest" in environmental protection did not constitute a judicially cognizable interest. The Court stated that, if "a mere interest in a problem" sufficed for standing, then "any individual citizen" with a "bona fide special interest" in a particular legal issue could file suit. [FN103]

**\*806** B. Standing Doctrine Curtails Private Prosecutorial Discretion

The Supreme Court has never clearly identified the basis for the prohibition on abstract private grievances.  But the Court's analysis in Valley Forge Christian College v. Americans United for Separation of Church & State, Inc. [FN104] suggests one concern that may be animating the Court: a concern that certain classes of injuries could give private individuals an unlimited amount of prosecutorial discretion. [FN105]

In Valley Forge, a private interest group that advocates the separation of church and state, along with several of its employees, filed suit, challenging the federal government's decision to convey federal property to a religious institution. [FN106]  The Supreme Court held that the plaintiffs lacked standing because they failed to assert an injury-in-fact. [FN107]  The plaintiffs could not simply claim that "the Constitution has been violated." [FN108] Nor could they rely on a "special interest" in the Establishment Clause. The Court concluded, as it had in Sierra Club v. Morton, that the plaintiffs' "firm[] commit[ment] to the constitutional principle of separation of church and State" was not in and of itself

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

sufficient for standing. [FN109]

Notably, the Court in Valley Forge seemed particularly disturbed by the fact that the plaintiffs were from the Washington, D.C. area and were challenging the conveyance of property located in Pennsylvania. [FN110] The Court emphasized that the plaintiffs only knew of the allegedly unconstitutional transfer of property because of a "news release." [FN111] The Court found that the plaintiffs had no cognizable interest**807** in this distant conduct: they could not, simply by alleging a constitutional violation, confer upon themselves "a special license to roam the country in search of governmental wrongdoing" and "reveal their discoveries in federal court." [FN112]

1. The Prosecutorial Discretion Conferred by "Abstract Concerns"

The Court's analysis in Valley Forge suggests the missing link in much of standing doctrine. The Court indicated that a private plaintiff may not assert an injury that would allow her to "roam the country in search of" legal violations and initiate an enforcement action against the violator of her choice. Put another way, a private plaintiff should not be permitted to file suit against any person, anywhere in the country, for any violation of law. The Court thus suggested that a private plaintiff should not have standing to assert an injury that would give her an unlimited amount of prosecutorial discretion.

What kinds of injuries would confer on a private plaintiff substantial prosecutorial discretion? One such injury appears to be the "injury to the interest in seeing that the law is obeyed." As we have seen, the Executive Branch, in pursuing that law enforcement interest, has precisely the degree of prosecutorial discretion that the Court found impermissible for a private party. The Executive Branch may "roam the country in search of" legal violations and bring suit against any person for any transgression. There are certain legal and political constraints on executive enforcement discretion, but (as discussed below) virtually none of those limitations apply to private parties. Accordingly, if a private party could assert the "interest in seeing that the law [was] obeyed," she would have almost unlimited power to "roam the country in search of" legal violations and pursue the violator of her choice.

But that is not the only abstract grievance that would give a private plaintiff such expansive prosecutorial discretion. Other abstract interests would give private plaintiffs a similar degree of discretionary enforcement authority. As discussed, the Court in Sierra Club v. Morton and Valley Forge held that private parties lack standing to assert a "special interest" in--or a "firm [] commit[ment]" to--the enforcement of a particular area of law. The Supreme Court applied these **808** principles in Diamond v. Charles, [FN113] when it held that a litigant could not simply allege a "conscientious objection to abortion." [FN114] Such an "abstract concern," the Court declared, "does not substitute for the concrete injury required by Art. III." [FN115]

If a plaintiff had Article III standing to assert a "conscientious objection" to particular conduct (or a "special interest" in a particular area of law), there would seem to be no Article III means of limiting her discretion to file suit in federal court. It does not appear that a federal court would ever have an "objective basis" for rejecting a would-be plaintiff's assertion that she had a "bona fide" "special interest" in a particular matter. [FN116]

Thus, if a private plaintiff had standing to file suit, based solely on her own asserted "special interest," she could become a self-appointed enforcer of any area of federal law. And she would have an extraordinary degree of prosecutorial discretion. Her asserted "special interest" would allow her to bring suit against any person, anywhere in the country, for any violation of her chosen field of federal law.

2. Standing Limits Private Prosecutorial Discretion

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page70 of 103

We will soon explore why it may make sense to prevent private parties from exercising substantial prosecutorial discretion. But we should first examine how standing doctrine curtails private prosecutorial discretion. A private individual generally cannot file suit unless **\*809** she has suffered a concrete injury-in-fact. [FN117] That injury further cabins her prosecutorial discretion by defining which defendants she can hale into court. She can sue only the party (or parties) that caused the legally cognizable harm. [FN118] And she can seek redress (in the form of damages or injunctive relief) only for the harm that she suffered and/or to prevent that harm from occurring or recurring. [FN119] The injury-in-fact requirement of standing doctrine thus, to a large extent, determines the scope of a plaintiff's prosecutorial discretion.

Let's examine how the Supreme Court has managed to curtail private prosecutorial discretion, even as it has relaxed the standing requirements for private plaintiffs. As noted, a private plaintiff may bring suit only when she suffers an injury-in-fact. Accordingly, when the Court recognizes new injuries as judicially cognizable, that increases the likelihood that a private party can file suit. And, over the past several decades, the Court has expanded the realm of injuries to encompass vote dilution, [FN120] racial gerrymandering, [FN121] an aesthetic interest in a wilderness area, [FN122] and an interest in the preservation of a species of wildlife. [FN123]

But, even as the Court has recognized new injuries-in-fact, it has (albeit imperfectly [FN124]) consistently defined the relevant injury in a way that cabins private prosecutorial discretion. The Court, as an initial matter, defines the injury in a manner that limits the pool of potential prosecutors. Often, the parameters established by the Court are **\*810** geographic. In the racial gerrymandering context, for example, the plaintiff must reside in one of the (allegedly poorly drawn) majority-minority districts. [FN125] Likewise, in the vote dilution context, the plaintiff must reside in the area where her votes will (allegedly) be accorded less weight. [FN126]

The definition of the relevant injury-in-fact then determines the scope of each potential plaintiff's prosecutorial discretion. A plaintiff who brings a vote dilution claim has the discretion to file suit only against the governmental entity that drew the (allegedly unlawful) district lines. And she can challenge--and seek redress for--only the alleged vote dilution. She lacks standing to see that all aspects of election law are obeyed.

Along similar lines, in environmental cases, the Court has defined each injury in a way that limits both the pool of potential prosecutors, and cabins each potential plaintiff's prosecutorial discretion. To some extent, as in the voting rights context, the parameters established by the Court are geographic. An individual can generally file an enforcement action if she resides near a facility that has allegedly polluted the surrounding air or water, claiming that the pollution has adversely affected her health or negatively impacted the value of her property. [FN127] The Court has also focused on "actual use," i.e., whether a complaining individual regularly spends time in a particular wilderness area or views a particular endangered species. [FN128]

The definition of the relevant injury then, in turn, determines the prosecutorial discretion of any would-be plaintiff. The affected individual can bring suit against only the particular defendant (or defendants)**\*811** whose conduct has harmed (or threatens to harm) her health; the value of her property; the wilderness area that she uses; or the species that she enjoys viewing. She lacks standing to "roam the country in search of" other violations of environmental laws--even other violations by the same defendant-- and "reveal [her] discoveries in federal court."

This analysis helps to explain the Court's willingness to consider certain establishment clause challenges on the merits, even as it denied standing to the plaintiffs in Valley Forge. [FN129] The Court has, for example, ruled on allegations that local government crèche and Ten Commandments displays violate the Establishment Clause--without so much as mentioning standing. [FN130] Significantly, the plaintiffs who brought these suits had more than just an abstract interest in preventing government endorsement of religion. Each suit was brought in part by local residents who lived near and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

actually observed the challenged religious displays. [FN131] The plaintiffs thus had the discretion to contest only the particular display in their community and to seek redress only for that harm. These plaintiffs were not given the more general authority to "see that [the Establishment Clause] is obeyed." [FN132]

   **\*812** Private organizations do tend to have a larger degree of prosecutorial discretion than an individual plaintiff. A private interest group may bring an enforcement action against any defendant whose conduct has injured one of the organization's members, as long as the lawsuit is germane to its purposes. [FN133] An organization with a nationwide membership will often be able to satisfy this requirement, and will therefore retain the prosecutorial discretion to pursue a number of offenses (and/or offenders). For example, in Sierra Club v. Morton, the Supreme Court found that the plaintiff organization lacked standing to challenge a recreational development near a wilderness area, based solely on its "special interest" in environmental protection. [FN134] But, the Court indicated, the organization could have brought the identical suit if it had alleged that one of its members would be harmed by the development (perhaps because that person lived near the wilderness area and hiked there). [FN135]

   The prosecutorial discretion of such a private interest group is still, however, not coextensive with that of the Executive Branch. A private organization is limited to filing suits against defendants whose conduct harms the interests of the organization's members. Thus, like an individual plaintiff, a private organization lacks Article III standing to "roam the country in search of" any violation of federal law (or even a particular subset of federal law) and "reveal [its] discoveries in federal court."

## **\*813** C. Policy Bases for Curtailing Private Prosecutorial Discretion

   But why would we place these limitations on private enforcement actions? After all, private attorneys general often perform a valuable law enforcement function. Private actions (when they proceed to the merits) can and plainly do help serve the public interest in "seeing that the law is obeyed," whether it be in the civil rights context; [FN136] the environmental context; [FN137] or the commercial context (especially with respect to antitrust [FN138] and securities law). [FN139]

   Moreover, it seems quite possible that conferring standing on an unlimited number of private prosecutors to "see that the law is obeyed" would be a way to solve some of the law enforcement difficulties faced by the Executive Branch. As noted above, the Executive Branch lacks sufficient financial resources to pursue every violation of federal law; millions of private attorneys general should be able to pick up much of the slack. Indeed, private plaintiffs that are able to satisfy the requirements of current standing law often perform that very function. [FN140]

   But we should keep in mind that private attorneys general do not constitute (and should not have to constitute) a cohesive group, working together in pursuit of a common public goal. Thus, in evaluating the prosecutorial capacities of private attorneys general, each must be considered a separate and distinct entity. And, once we look at would-be private plaintiffs on this individual basis, we can see policy reasons for preventing every private party in the country from exercising**\*814** the same degree of prosecutorial discretion as the Executive Branch.

   ### 1. A Hypothetical Private Attorney General

   Let's examine whether a private plaintiff, who brings an enforcement action, means to serve as a "representative of the [entire] public." [FN141] Assume for a moment that we have conferred upon a private attorney general Article III standing to see that an area of federal law is obeyed. We will use bankruptcy law as a paradigm. Assume that our private attorney general (a private nonprofit organization) chose this field because of its "special interest" in protecting lower-

level employees who are adversely affected by corporate reorganizations. To facilitate our private attorney general's "special interest," we will allow it to "roam the country in search of" violations of the Bankruptcy Code and "reveal [its] discoveries in federal court." [FN142]

But, of course, like the Executive Branch, our private attorney general will have only a finite amount of resources to pursue these legal violations. Thus, like the Executive Branch, the private attorney general must choose which statutory violations to pursue. Presumably, it will focus on the violations that relate to its "special interest": protecting the employees of corporate debtors. Accordingly, our private attorney general will be motivated to bring suit against any corporate debtor that fails to comply with the statutory provisions protecting employees' collective bargaining agreements [FN143] and retirement benefits. [FN144]

But our private attorney general may not spend its limited resources enforcing statutory provisions that do not further its "special interest." For example, the Bankruptcy Code requires a corporate debtor to pay its post-petition contractors before paying virtually any other creditor. [FN145] This is clearly an important requirement of the **815** Code. The debtor could not reorganize if it could not obtain the goods and services to conduct its business; and, without such a promise of payment, other companies would be disinclined to do business with a debtor in bankruptcy. [FN146] But the payment of such expenses reduces the amount available to other creditors, including the employees and former employees of the debtor corporation. Thus, if a debtor fails to pay one of its post-petition contractors, our private attorney general is unlikely to pursue that statutory violation, which does not serve--and, in fact, tends to undermine--its "special interest."

The Bankruptcy Code, like most federal law, reflects a wide range of interests, not all of which are consistent with--or even particularly relevant to--our private attorney general's own "special interest." Our private attorney general has no interest in using its scarce resources to see that every provision of the Bankruptcy Code is obeyed.

This reasoning is not limited to the bankruptcy context. We likewise do not expect an organization focused on environmental protection to pursue just "any" violation of federal environmental law. Such an organization is not likely to file suit on behalf of a corporation whose request for a permit to discharge pollutants under the Clean Water Act may have been improperly denied. [FN147] Such an improper denial would constitute "any" violation of federal environmental law and, indeed, it may be a violation that Congress would want pursued. Nevertheless, a permit denial is not a transgression that we expect to trigger a lawsuit by a private conservation group. On the contrary, we expect--indeed, many of us hope--that such a group will bring enforcement actions to further its "special interest in the conservation and the sound maintenance of the national parks, game refuges and forests of the country." [FN148]

2. The Lack of Constraints on Private Prosecutorial Discretion

The above discussion suggests some important differences between the Executive Branch and private parties, which help explain **816** why our legal system places greater limitations on private prosecutorial discretion. First, in contrast to the Executive Branch, a private party has no constitutional obligation to "faithfully" execute the laws. Accordingly, a private party is free to ignore certain provisions of law and refuse to enforce them when they do not comport with its "special interest." Likewise, a private party has no duty to adopt nationally uniform enforcement policies. A private party is free to focus on tobacco litigation in Virginia or immigration rights in Arizona, and need not consider how those actions will affect overall enforcement efforts.

Nor do we expect a private party to abide by what I have described as the "nondiscrimination" principle. Certainly, no one complains that a private organization might be "captured" by a special interest or that it may bring suits to advance only certain ideological goals. Indeed, those are the defining features of a private interest group. But private parties are also free to ignore the other half of the nondiscrimination principle articulated above. Although the Constitu-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page73 of 103

tion prohibits the Executive Branch from targeting ideological opponents or individuals of a particular ethnicity, these restrictions do not apply to private prosecutorial discretion. [FN149] In Federal Election Commission v. Akins, [FN150] for example, a group of plaintiff voters brought suit against the FEC, urging it to require the American Israel Public Affairs Committee ("AIPAC") to make certain disclosures about its political activities. [FN151] As the Court observed, the plaintiffs sought the information about AIPAC because they "often opposed" the political positions taken by AIPAC. [FN152] The Court did not suggest that there was anything unlawful about a private enforcement action motivated by the plaintiffs' ideological opposition to a particular group.

Private parties' freedom from these constitutional restrictions would raise troubling possibilities if they had the authority to see that any area of federal law was obeyed. A private group might, for example, assert a "conscientious objection" to undocumented workers, and therefore declare a "special interest" in enforcing federal immigration law. Like the private attorneys general discussed above, this self-**817** appointed watchdog of immigration law would have only a finite amount of resources, and would thus focus only on the parts of immigration law that furthered its "special interest." Accordingly, the interest group would likely concentrate on the statutory provisions requiring removal of certain aliens, [FN153] and would be less concerned about the laws permitting other immigrants to remain in the country as refugees. [FN154]

Alternatively, as in Diamond v. Charles, a private plaintiff might assert a "conscientious objection to abortions," [FN155] and therefore claim a "special interest" in enforcing restrictions on federal funding of abortions. [FN156] Conversely, a private interest group might assert a "conscientious objection" to persons who interfere with family planning services, and thus claim a "special interest" in enforcing the Freedom of Access to Clinics Entrances Act. [FN157] Such a private attorney general might be inclined to use its finite resources to enforce this law against members of pro-life interest groups, because--analogous to Federal Election Commission v. Akins-- its views are "often opposed" to such groups. There do not appear to be any legal constraints on such ideologically motivated private enforcement actions. [FN158]

And that leads us to the final distinction between the Executive Branch and private parties: accountability. I do not dispute that it is difficult to hold the Executive Branch accountable for its discretionary enforcement decisions. But, as challenging as it is to hold the Executive**818** Branch accountable, it would be far more difficult to constrain the prosecutorial discretion of a private party, if she too could bring suit to see that the law was obeyed.

Virtually none of the checks on executive enforcement discretion apply to private parties. Private enforcement decisions are not subject to judicial review for the simple reason that there are no constitutional or other legal restrictions to enforce. [FN159] Nor are there political constraints. Private parties clearly need not abide by any enforcement guidelines issued by the Executive Branch. Nor are they subject to the congressional appropriations process. [FN160] In fact, the only constraint that would seem to apply to both the Executive Branch and private parties is a change in the law. Given the time-consuming nature of the legislative process, it seems doubtful that Congress would narrow a statute solely to curtail private prosecutorial discretion. But, even in the (unlikely) event that Congress took that step, it would have only a limited effect. A private party would still have the authority to sue any person for any violation of the (somewhat narrowed) provision. Indeed, the other checks on the Executive Branch's enforcement discretion are critical precisely because statutes themselves do not significantly limit that discretion.

Some may argue that private enforcement actions can themselves serve as a check on executive enforcement discretion. [FN161] Private parties may bring suit against private entities that have gone unnoticed by (or, worse, have captured) the relevant administrative agency. Alternatively, private parties might bring suit directly against an agency, urging it to change its enforcement policies or to do a better job of enforcing certain provisions of law. Private actions can

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

thereby serve not only to supplement, but to compensate for, lax executive enforcement efforts. This is undoubtedly a strong argument in favor of private enforcement of the law. But it is not an argument for private prosecutorial discretion. Indeed, this argument seems to presume **\*819** that the Executive Branch will abuse its immense enforcement discretion--that it will favor certain groups, while disfavoring others, or enforce certain laws, while neglecting others--and that such abuse is a bad thing. Such an argument, which rests on concerns about the abuse of prosecutorial discretion, does not seem to justify giving every private individual and organization the same degree of prosecutorial discretion.

Some commentary suggests that Congress could pass legislation to curtail private prosecutorial discretion. [FN162] But it may be difficult for Congress to require private parties to adhere to the same requirements as the Executive Branch, without running afoul of other constitutional constraints. For example, the First Amendment protects private parties' interest in selectively enforcing the law, bringing suits solely to advance their ideological "special interests." [FN163] Accordingly, Congress could not easily restrict private parties' authority to pick and choose among the laws that they enforce. The First Amendment may also limit Congress's power to regulate ideologically motivated lawsuits; it is doubtful that a statute reading "no suit may be brought against a plaintiff's ideological opponent" would pass constitutional muster. In any event, as one commentator observes, it seems unlikely that Congress would enact any such restrictions on private prosecutorial discretion. [FN164] Given the lack of alternative constraints, standing doctrine seems to serve a useful purpose by curtailing private prosecutorial discretion.

Notably, the problem to be addressed is not private enforcement of the law. Private parties who demonstrate an injury-in-fact often serve the public interest in seeing that the law is obeyed, and such lawsuits should be encouraged. But it does not seem that every private individual and organization in the country should have the discretion to sue any person for any legal violation. Standing doctrine (correctly, in my view) permits the former but prohibits the latter. It may **\*820** be troubling that the Executive Branch exercises considerable prosecutorial discretion in fulfilling its constitutional duty to enforce federal law. But at least the Executive Branch is subject to a degree of judicial and congressional oversight. It seems unwise to transfer such discretionary enforcement authority to a private party that is "unencumbered by the legal and practical checks" that constrain "public enforcement agencies." [FN165]

### D. A Constitutional Foundation for Standing Doctrine

To state the policy rationale for standing doctrine is also to suggest its constitutional justification. Much of our constitutional structure is designed "to preclude the exercise of arbitrary power." [FN166] The term "arbitrary," as used here, refers to the improper exercise of discretionary power, i.e., random, uneven, or discriminatory decisionmaking. The Constitution in various respects prohibits the government itself from acting arbitrarily: Several provisions of the Bill of Rights are enforced by prophylactic rules that constrain administrative discretion, and thereby seek to prevent arbitrary exercises of discretion. [FN167]

**\*821** The Constitution also proscribes arbitrary action in another way. It prohibits the government from delegating certain discretionary functions to nongovernmental actors. Various constitutional rules--ranging from the Article I nondelegation doctrine [FN168] to the due process and establishment clause contexts [FN169]--prohibit the government (at least in theory [FN170]) from delegating broad discretionary power to private parties.

I assert that similar principles apply to the Take Care Clause of Article II, at least insofar as it requires the Executive Branch to exercise the broad prosecutorial discretion to "see that federal law is obeyed." [FN171] Such discretion creates a significant potential for abuse, even when it is exercised by a governmental entity that is subject to constitutional and other legal and political constraints. Such concerns would only be heightened in the context of private prosecutorial discretion, because private parties are subject to virtually none of those restrictions. Accordingly, the Constitution does not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

permit the delegation of such expansive discretionary enforcement authority to private parties.

This Article II nondelegation principle provides a constitutional explanation for much of Article III standing doctrine. Standing ensures that private parties cannot exercise the broad prosecutorial discretion that the Executive Branch exercises when it enforces federal law. Standing doctrine, in short, enforces the Article II nondelegation doctrine by curtailing private prosecutorial discretion.

**\*822** 1. An Article II Nondelegation Doctrine

The Take Care Clause imposes a duty upon the Executive Branch to see that federal law is obeyed. That provision thus also requires the Executive Branch to exercise the degree of prosecutorial discretion necessary to fulfill that law enforcement function. That is an immense responsibility. The authority to "see that federal law is obeyed" allows the Executive Branch to sue any person, anywhere in the country, for any legal violation. To have even a semblance of a coherent enforcement system, the Executive Branch must translate that broad authority into more concrete enforcement policies. Then each individual executive enforcement official must apply those policies in particular cases. Throughout this process, executive enforcement officials must make discretionary judgment calls as they determine which of the innumerable violations of federal law to pursue in federal court.

The Take Care Clause not only imposes this discretionary law enforcement responsibility on the Executive Branch. It also prohibits Congress and the Executive Branch from delegating that authority to private parties. Private parties may not exercise the broad prosecutorial discretion that inevitably accompanies the authority to see that federal law is obeyed.

This Article II nondelegation doctrine is rooted in a central premise of our constitutional order: the need for structural checks against the exercise of arbitrary power. As the commentary on executive enforcement discretion makes clear, the degree of prosecutorial discretion involved in seeing that federal law is obeyed creates a serious potential for abuse. Justice Jackson aptly observed that "[l]aw enforcement is not automatic. It isn't blind." [FN172] Instead, it depends on the judgments of individual enforcement officials, who have tremendous leeway to choose the targets of their enforcement actions. And, although executive enforcement officials are supposed to exercise their discretion in an evenhanded and nondiscriminatory manner, the authority to sue any person for any violation of federal law allows them to act in a far less reputable fashion:

If the prosecutor is obliged to choose his cases, it follows that he can choose his defendants. Therein is the most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather than pick cases that need to be prosecuted. With the law books filled with a great assortment of crimes, a prosecutor stands a fair chance of **\*823** finding at least a technical violation of some act on the part of almost anyone. . . . It is in this realm-- in which the prosecutor picks some person whom he dislikes or desires to embarrass, or selects some group of unpopular persons and then looks for an offense, that the greatest danger of abuse of prosecuting power lies. It is here that law enforcement becomes personal, and the real crime becomes that of being unpopular with the predominant or governing group, being attached to the wrong political views, or being personally obnoxious to or in the way of the prosecutor himself. [FN173] Justice Jackson was not alone in recognizing that the immense prosecutorial discretion exercised by the Executive Branch carries with it this potential for abuse. Other commentators have raised similar concerns about the arbitrary exercise of executive enforcement discretion. [FN174] Given these concerns, there may be, as Justice Jackson suggested, only one reason to allow anyone to exercise such broad discretionary enforcement authority: "[I]t seems necessary that such a power to prosecute be lodged somewhere." [FN175] So the Take Care Clause lodges that power in a governmental entity that is subject to constitutional re-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

quirements, congressional oversight, and judicial review. Those legal and political checks, we hope, will prevent most abuses of executive enforcement discretion.

The concerns about executive enforcement discretion suggest why, as a constitutional matter, such prosecutorial discretion may not be delegated to private parties. If a private plaintiff had the discretion to sue any person, anywhere in the country, for any violation of law, she too would have the "most dangerous power of the prosecutor"--the power to target the defendants of her choice. And, as Gillian **824** Metzger has observed, "[p]rivate delegates' exemption" from the legal and political checks on the Executive Branch "means that they can wield [such] government powers in ways that raise serious abuse of power concerns." [FN176] Private parties not only could bring suit against any person for any legal violation, but also would have far greater freedom than the Executive Branch to target ideological opponents, persons of a particular ethnicity, or individuals that they found "personally obnoxious." The Article II nondelegation doctrine prohibits private entities from exercising this "most dangerous power" and thereby serves as a prophylactic barrier against the arbitrary exercise of private prosecutorial discretion.

This Article II nondelegation principle appears to be a logical extension of other constitutional rules that seek to protect private liberty against arbitrary encroachment. [FN177] The void-for-vagueness doctrine, for example, is specifically designed to prevent the "arbitrary enforcement" of federal and state law. [FN178] Thus, in Kolender v. Lawson, [FN179] the Court invalidated a statute that permitted police officers to detain any individual who failed to provide what was, in a particular officer's view, "credible and reliable" identification. [FN180] The Court emphasized that, by giving each officer "virtually complete discretion" to detain individuals, [FN181] the provision "furnishe[d] a convenient tool for harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure." [FN182]

Likewise, the "basic purpose" of the Fourth Amendment's prohibition on unreasonable searches and seizures "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." [FN183] Thus, in Delaware v. Prouse, [FN184] the Court held that police officers may not randomly stop vehicles on the highway, but **825** must have at least a reasonable suspicion of a traffic violation. [FN185] The Court declared that the government's asserted safety concerns did not "justify subjecting every occupant of every vehicle on the road[] to a seizure . . . at the unbridled discretion of law enforcement officials." [FN186] And, in Marshall v. Barlow's, Inc., [FN187] the Court invalidated the Occupational Health and Safety Act, insofar as it authorized warrantless inspections of employment facilities. [FN188] Such laws "devolve[] almost unbridled discretion upon executive and administrative officers . . . as to when to search and whom to search" [FN189] and impermissibly leave the liberty of private citizens "to the discretion of the officer in the field." [FN190]

Similar concerns about arbitrary interference with private liberty have led the Court to invalidate delegations to private parties. For example, in Fuentes v. Shevin, [FN191] the Court struck down two state laws that allowed creditors to "unilaterally invoke state power to replevy goods" from debtors, without giving the debtor a pre-deprivation hearing. [FN192] The Court emphasized that the hearing would help protect a debtor's property rights "from arbitrary encroachment . . . a danger that is especially great when the State seizes goods simply upon the application of and for the benefit of a private party." [FN193] And, in Washington ex rel. Seattle Title Trust Co. v. Roberge, [FN194] the Court struck down a local ordinance that gave private parties the authority to veto the construction of an old-age home. [FN195] The Court found this "delegation of power" "repugnant" because the ordinance established **826** no "standard or rule" to guide the parties' discretion, and thus left them "free to withhold consent for selfish reasons or arbitrarily." [FN196]

The Article II nondelegation doctrine rests on similar premises. Under this theory, Congress may not confer on private parties the unbridled discretion as to when and whom to sue. The Article II nondelegation principle thus helps ensure that private liberty is not "subject to the discretion of [every would-be plaintiff] in the [nation]." [FN197]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page77 of 103

This Article II nondelegation theory also finds support in separation of powers doctrine. In Buckley v. Valeo, [FN198] the Court invalidated the Federal Election Campaign Act of 1971, in part because it delegated too much discretionary enforcement authority outside the Executive Branch. The statute in Buckley authorized the Federal Election Commission to bring enforcement actions against "any acts or practices which constitute or will constitute a violation of this Act." [FN199] The statute, in other words, permitted the FEC to see that federal election law was obeyed. As we have seen, the Supreme Court has repeatedly upheld such conferrals of standing on the Executive Branch. But the FEC was not, as originally constituted, under the control of the Executive Branch. Four of the six voting members of the Commission were appointed by Congress; only two were selected by the President. [FN200] The Court held that, absent additional executive oversight, the FEC could not exercise its "wide ranging" [FN201] "discretionary power to seek judicial relief." [FN202]

**\*827** But what are the boundaries of this Article II nondelegation doctrine? Surely no one (not even those most committed to unitary executive theory) [FN203] would seriously argue that private parties can never exercise any prosecutorial discretion. Such a rule would prohibit all private enforcement of the law. Every private plaintiff, even one who has suffered a concrete injury-in-fact, has some discretionary enforcement authority. The injured party has, at a minimum, the discretion to decide whether or not to bring suit. A private organization may exercise even more prosecutorial discretion: it can choose to bring suit against any person that has injured one of its members, as long as the suit is germane to the organization's purposes.

I do not claim that the Article II nondelegation doctrine prohibits all such exercises of private prosecutorial discretion. Instead, it prohibits the delegation of the Executive Branch's duty to see that federal law or an area of federal law is obeyed. That was the line drawn by Buckley, which invalidated a delegation of "discretionary power" to see that federal election law was obeyed. And that prohibition goes a long way toward preventing arbitrary exercises of private prosecutorial discretion, while at the same time allowing for private enforcement of the law. As the commentary on executive enforcement discretion suggests, it is that degree of "discretionary power" that seems most susceptible to abuse. It may be true, as Justice Jackson suggested, that "such a power to prosecute [must] be lodged somewhere." [FN204] But the Article II nondelegation doctrine instructs that such a power to prosecute, and the accompanying prosecutorial discretion, may not be lodged everywhere.

2. Standing Enforces the Article II Nondelegation Doctrine

Once we identify the Article II principle at stake, the enforcement of that principle is fairly straightforward. Standing doctrine helps ensure that private parties do not exercise the "discretionary power" **\*828** that inevitably accompanies the authority to see that federal law or an area of federal law is obeyed.

First, standing doctrine prohibits private plaintiffs from asserting abstract grievances that would give them a virtually unlimited amount of prosecutorial discretion. Such grievances include the "injury to the interest in seeing that the law is obeyed" as well as other abstract concerns, such as a "special interest" in a particular area of law or a "conscientious objection" to particular conduct. As we have seen, if a private plaintiff had standing to see that the law was obeyed, she could bring suit against any person, anywhere in the country, for any violation. In a similar vein, if she sought to enforce a particular area of law that aroused her "special interests" or "conscientious objections," she could sue any person, anywhere in the country, for any violation of that area of law. Standing doctrine prevents private parties from exercising such discretionary power to seek judicial relief.

Moreover, Article III standing doctrine allows a court to identify private enforcement actions that do not implicate the Executive Branch's nondelegable Article II responsibilities. A plaintiff who can demonstrate an Article III injury-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page78 of 103

in-fact does not have wide-ranging discretionary power to bring suit. She may sue only the person that caused her injury, and may seek redress only for that harm. The Court may therefore allow such actions to go forward, without Article II nondelegation concerns. [FN205]

**\*829** This Article II nondelegation theory suggests normative foundations for Article III standing doctrine that have been largely overlooked by commentators. Many scholars and jurists have assumed that standing doctrine serves principally to prevent private interference with executive enforcement efforts. [FN206] But the Article II nondelegation rationale for standing is built on far different premises. Under this theory, standing doctrine does not safeguard the Executive Branch, but instead helps to shield individual liberty from arbitrary exercises of private prosecutorial discretion.

### 3. The Scope of the Constitutional Protection

The Article II nondelegation doctrine not only offers a different normative foundation for standing doctrine, but also suggests a new scope for the constitutional protection. Standing doctrine applies (as a constitutional mandate) only in cases that implicate the liberty interests of particular private individuals.

This constitutional theory thus clearly encompasses all suits against private parties, when a plaintiff might target the defendant for nefarious reasons, such as ideological or racial animosity. But suits against the Executive Branch can also implicate the liberty interests of particular private parties. For example, in Federal Election Commission v. Akins, the plaintiffs urged the government to enforce certain reporting requirements against the American Israel Public Affairs Committee, because of the plaintiffs' ideological opposition to that private group. [FN207] And, in Sierra Club v. Morton and Valley Forge, the plaintiffs sought to prevent the Executive Branch from conferring a **\*830** benefit on a specific private entity (in Morton, the corporation seeking development permits, and in Valley Forge, the religious institution). [FN208]

The Article II nondelegation principle applies in all cases that implicate the liberty interests of particular private individuals and entities. The theory thus encompasses all suits against private parties and all suits against the government in which a private person is the real party-in-interest. Accordingly, under the Article II nondelegation doctrine, a plaintiff must demonstrate a concrete injury when (1) she demands (as in Akins) that the Executive Branch impose a burden on a specific private third party; [FN209] or (2) she attempts (as in Morton and Valley Forge) to prevent the Executive Branch from conferring a benefit on another private party. [FN210]

But this Article II theory does not require a showing of injury-in-fact in other suits against the federal government. Many such actions do not implicate the liberty interests of particular private individuals. That is true, for example, when a plaintiff challenges the constitutionality of a federal statute or the validity of a federal regulation. Courts may have strong prudential and institutional reasons for dismissing such suits on standing grounds. As we have seen, private parties--in contrast to the Executive Branch--need not enforce the law **\*831** in a uniform or consistent manner. [FN211] They have no obligation to faithfully execute every provision of law, but may instead concentrate only on those provisions that arouse their "special interests." A private organization could thus bring multiple lawsuits against an agency, forcing it to focus on that group's "special interests," and distracting it from other statutory responsibilities. Courts may quite reasonably conclude that Congress is better equipped to decide when the benefits of private enforcement outweigh such costs. Moreover, courts have traditionally been in the business of settling disputes brought by plaintiffs with a direct and concrete interest in a case. Accordingly, courts could decide, as a prudential matter, to adjudicate challenges to statutes and regulations only when they are brought by injured parties.

Such broad-based suits against the government do not, however, raise the liberty or the arbitrariness concerns at the heart of the Article II nondelegation principle. Accordingly, this theory does not prohibit Congress from conferring

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

standing on "any person" to bring such suits against the Executive Branch. [FN212] Indeed, under this constitutional approach, Congress may authorize any private suit against the federal government, as long as the plaintiff does not ask the government to impose burdens on, or deny benefits to, specific private parties.

But this conclusion raises some questions about the Court's refusal to recognize the congressional conferral of standing in Lujan v. Defenders of Wildlife. The plaintiffs in Lujan brought suit against the Department of Interior, claiming that one of its regulations was inconsistent with the Endangered Species Act. [FN213] Such a broad attack on federal law does not seem to implicate the constitutional analysis here.

The citizen-suit provision in Lujan was not, however, confined to such challenges to federal government action. Instead, the provision **832** authorized "any person" to bring suit against "any person"--public or private--alleging any violation of the Endangered Species Act or its implementing regulations. [FN214] The provision thus delegated to private parties the Executive Branch's duty to see that an area of federal law is obeyed. The Article II nondelegation doctrine prohibits such delegations--not because of the way a particular plaintiff exercises such discretion in a particular case, but because granting such authority to every private party in the country raises a serious potential for arbitrary exercises of private prosecutorial discretion. It is thus the very breadth of the grant, and not its application, that is the nub of the constitutional infirmity. Accordingly, this Article II theory would support a decision striking down the citizen-suit provision on its face as an unconstitutional delegation of prosecutorial discretion. [FN215]

The Article II nondelegation doctrine leaves Congress with some leeway to authorize private suits against the federal government. Congress may permit "any person" to bring enforcement actions that **833** do not implicate the liberty interests of particular private parties, such as suits challenging the constitutionality of federal statutes or the validity of federal regulations. But Congress may not confer standing via citizen-suit provisions that transfer to private parties the Executive Branch's duty to "see that federal law is obeyed." [FN216]

4. Standing as a Requirement of Articles II and III

Some may wonder whether resort to Article III is necessary. If standing protects an Article II nondelegation principle, then why not analyze the issue solely in terms of Article II? [FN217] That is certainly plausible. I have myself largely characterized the constitutional issue that way.

But, even if standing may be conceived in Article II nondelegation terms, federal courts would not necessarily be wrong to characterize it as a "bedrock" requirement of Article III. Article III does, after all, "defin[e] the role assigned to the [federal] judiciary in a tripartite allocation**834** of power" [FN218] to ensure that "federal courts will not intrude into areas committed to the other branches of government." [FN219] Federal courts would intrude into an area committed to the Executive Branch, if they adjudicated private actions brought to see that the law was obeyed. Accordingly, the issue may not be whether standing doctrine derives from Article II or Article III. It could be said to derive from both provisions, interpreted in context. [FN220]

The addition of Article II does, however, have significant implications in one context: state court actions. [FN221] While Article III requirements apply only in federal court, [FN222] the Article II nondelegation doctrine would apply in both federal and state court. Accordingly, this theory would require state courts to identify some way of curtailing private prosecutorial discretion, perhaps by applying standing doctrine. Although full consideration of this issue is beyond the scope of this Article, I wanted to note this implication of adding Article II to the equation. [FN223]

5. Is Article III Standing Doctrine the Only Answer?

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF Document150 Filed08/25/10 Page80 of 103

Some may doubt that Article III standing doctrine is the only way to enforce the Article II nondelegation principle. That may be true, but I am not aware of any approach that would work as effectively.

Some commentary suggests that Congress could cure any delegation problems by giving the Executive Branch the tools to supervise private enforcement actions brought to "see that federal law is obeyed." **835** [FN224] The argument seems to rely on Morrison v. Olson. [FN225] In Morrison, the Court upheld a statute authorizing the creation of an Independent Counsel to "investigate and, if appropriate, prosecute certain high-ranking Government officials for violations of federal criminal laws." [FN226] The statute gave the Independent Counsel considerable discretion to "initiat[e] and conduct [] prosecutions" in federal court. [FN227] But the Court upheld this delegation of prosecutorial discretion because the statute (in the Court's view) gave the Executive Branch sufficient statutory mechanisms to "supervis[e] or control[]" [FN228] the initiation, [FN229] scope, [FN230] and duration [FN231] of an Independent Counsel's activities.

There are, however, reasons to doubt that such a statutory scheme would effectively curtail private prosecutorial discretion. We should keep in mind that, in Morrison, the Court upheld a statute that would allow a single public prosecutor (whose employment would commence**836** only at the request of the Executive Branch) [FN232] to exercise prosecutorial discretion. It seems at least plausible that the Executive Branch could have both the means and the incentive to keep track of the actions of this high-profile official charged with "prosecut[ing] certain high-ranking Government officials for violations of federal criminal laws." [FN233]

But the same cannot be said of private enforcement actions. That is in part because, in attempting to carry out this oversight function, the Executive Branch would be subject to the same budgetary and time constraints that prevent it from pursuing every violation of federal law. The Executive Branch simply lacks the resources to supervise every private lawsuit brought to see that an area of federal law is obeyed.

Furthermore, even if it were feasible, the Executive Branch might still be disinclined to use such statutory tools to control private prosecutorial discretion. As Daryl Levinson has argued, the pervasive assumption that each branch of government aims at all times to maintain and increase its stranglehold on power is largely overstated. [FN234] In government today, there are many instances of governmental abdication. [FN235] Although Professor Levinson does not apply this theory to enforcement actions, his thesis fits quite aptly in this context. The Executive Branch may often be tempted to allow private enforcement actions to go forward absent executive supervision (and thereby avoid any political fallout from those enforcement efforts). [FN236]

Standing doctrine does not depend on the Executive Branch's willingness or capacity to oversee private suits. It therefore appears to be a more reliable means of enforcing the Article II nondelegation principle than a statute akin to that in Morrison.

Standing doctrine may also be preferable to alternative mechanisms for enforcing the Article II nondelegation doctrine, because it **837** is not a static legal formula. As our society and laws have changed, the Supreme Court has expanded the injury-in-fact concept to cover new injuries, including vote dilution and the inability to view a species of wildlife. [FN237] Under the Article II theory articulated here, the Court can continue to recognize novel injuries-in-fact, as long as it defines those injuries in a way that curtails private prosecutorial discretion. [FN238]

In presenting this defense of standing doctrine, I do not mean to suggest that the outcomes of the Supreme Court's standing decisions are entirely defensible. It is often difficult to comprehend why the Court recognizes certain injuries and not others, or adopts a narrow view of causation and redressability in some cases and not others. I assert here only that standing doctrine serves a useful purpose in ensuring that private parties do not exercise a law enforcement function that the Constitution has assigned exclusively to the Executive Branch.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page81 of 103

<center>V. Conclusion</center>

Private enforcement actions clearly perform a valuable law enforcement function. The Supreme Court can facilitate this private enforcement role by recognizing new injuries-in-fact, and thereby expanding the realm of potential private prosecutors. But there appears to be a policy and a constitutional rationale for preventing private parties from asserting abstract grievances, such as the "injury to the interest in seeing that the law is obeyed." [FN239] If a private plaintiff had such prosecutorial authority, she could exercise the accompanying prosecutorial discretion to pursue the violators of her choice, "unencumbered by the legal and practical checks" that constrain "public enforcement agencies." [FN240]

That may be why the Constitution imposes the duty to "take care that the laws [are] faithfully executed" upon the Executive Branch. [FN241] As Justice Jackson observed, "it seems necessary that [the] power to **838** prosecute" violations of federal law, and the accompanying prosecutorial discretion, "be lodged somewhere." [FN242] Such authority should be "lodged" solely in a governmental entity that is expected--and constitutionally required--to be "the guardian of [the] public interest." [FN243]


[FNa1]. Climenko Fellow, Harvard Law School; Assistant Professor of Law, Florida State University College of Law (beginning June 2009). Many thanks, for helpful comments and suggestions, to Richard Fallon, David Landau, John Manning, Scott McIntosh, Dan Meltzer, Eric Miller, Henry Monaghan, Robert Pushaw, Michael Raab, David Shapiro, Elizabeth Warren, and Lewis Yelin.

[FN1]. FEC v. Akins, 524 U.S. 11, 24 (1998).

[FN2]. See id.

[FN3]. U.S. Const. art. II, §3.

[FN4]. See John G. Roberts, Jr., Article III Limits on Statutory Standing, 42 Duke L.J. 1219, 1219-21, 1226, 1231-32 (1993); Antonin Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 881-82, 894-99 (1983).

[FN5]. See, e.g., Richard H. Fallon, Jr., Of Justiciability, Remedies, and Public Law Litigation: Notes on the Jurisprudence of Lyons, 59 N.Y.U. L. Rev. 1, 54 (1984) (suggesting that courts should not "hold[] unconstitutional an act of Congress" conferring standing on private plaintiffs); Henry P. Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L.J. 1363, 1371, 1397 (1973) (stating that "at least when Congress so authorizes the Court may properly render...pronouncements [about the meaning of the Constitution] whether or not recognizable private interests are involved"); Gene R. Nichol, Jr., Justice Scalia, Standing, and Public Law Litigation, 42 Duke L. J. 1141, 1154-60 (1993) (arguing that the injury-in-fact inquiry should not be used to limit Congress's power to confer standing); Cass R. Sunstein, What's Standing After Lujan? Of Citizen Suits, 'Injuries,' and Article III, 91 Mich. L. Rev. 163, 235 (1992) (asserting that "Congress can create standing as it chooses and, in general, can deny standing when it likes"); see also William A. Fletcher, The Structure of Standing, 98 Yale L.J. 221, 223-24 (1988) (making the more nuanced claim that Congress should have "essentially unlimited power to define the class of persons entitled to enforce [a statutory] duty," while Congress should have only "some, but not unlimited, power to grant standing to enforce constitutional rights"); infra note 7.

[FN6]. See, e.g., Gene R. Nichol, Jr., Standing for Privilege: The Failure of Injury Analysis, 82 B.U. L. Rev. 301, 334 (2002) ("The Court has enlisted the injury concept to provide a bulwark against intrusions on executive power, a task that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the concept simply cannot carry out."); Roberts, supra note 4, at 1230 (asserting that the injury-in-fact requirement "ensures that the court is carrying out its function of deciding a case or controversy, rather than fulfilling the executive's responsibility of taking care that the laws be faithfully executed"); Sunstein, supra note 5, at 194-95 (observing that many "key cases" in which the Court denied standing "have involved attempts by some plaintiff to require the executive branch to fulfill its statutory responsibilities by enforcing the law more vigorously"); see also infra notes 15-22 and accompanying text.

[FN7]. See e.g., Evan Caminker, The Constitutionality of Qui Tam Actions, 99 Yale L.J. 341, 381 (1989) (arguing that "modern standing doctrine lacks a coherent conceptual foundation"); Richard A. Epstein, Standing and Spending--The Role of Legal and Equitable Principles, 4 Chap. L. Rev. 1, 4 (2001) (urging that "the American doctrine of standing is in a sad state of disrepair"); Fletcher, supra note 5, at 221 ("The root of the problem is...that the intellectual structure of standing law is ill-matched to the task it is asked to perform."); Nichol, supra note 6, at 304 (claiming that "as a body of law, the standing doctrine has failed"); Robert J. Pushaw, Jr., Justiciability and Separation of Powers: A Neo-Federalist Approach, 81 Cornell L. Rev. 393, 480 (1996) (arguing that standing doctrine is "theoretically incoherent"); Jonathan R. Siegel, A Theory of Justiciability, 86 Tex. L. Rev. 73, 129 (2007) (asserting that current justiciability doctrines, including standing, "serve little or no useful purpose"); Cass R. Sunstein, Informational Regulation and Informational Standing: Akins and Beyond, 147 U. Pa. L. Rev. 613, 639-40 (1999) (arguing that the injury-in-fact test is incoherent); supra notes 5-6 and infra note 27. For rare defenses of standing doctrine, see infra note 105.

[FN8]. See McConnell v. FEC, 540 U.S. 93, 225 (2003). The case-or-controversy requirement is found in U.S. Const. art. III, §2, cl. 1.

[FN9]. McConnell, 540 U.S. at 225-26; Whitmore v. Arkansas, 495 U.S. 149, 155 (1990).

[FN10]. FEC v. Akins, 524 U.S. 11, 23-24 (1998) (stating that a plaintiff may not assert a "generalized grievance" "where the harm at issue is not only widely shared, but is also of an abstract and indefinite nature," such as "harm to the 'common concern for obedience to law'" or the "injury to the interest in seeing that the law is obeyed" (quoting L. Singer & Sons v. Union Pac. R.R. Co., 311 U.S. 295, 303 (1940)); see Lance v. Coffman, 549 U.S. 437, 442 (2007) ("The only injury plaintiffs allege is that the law...has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance...that we have refused to countenance in the past."); Lujan v. Defenders of Wildlife, 504 U.S. 555, 573-74 (1992) ("[A] plaintiff raising only a generally available grievance about government--claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large--does not state an Article III case or controversy.").

[FN11]. See Richard H. Fallon, Jr., The Linkage Between Justiciability and Remedies --And Their Connections to Substantive Rights, 92 Va. L. Rev. 633, 667 (2006) ("Congress...possesses undoubted power to authorize enforcement actions by the government. In suits by the government, courts characteristically make no inquiry into injury."); Edward A. Hartnett, The Standing of the United States: How Criminal Prosecutions Show That Standing Doctrine Is Looking for Answers in All the Wrong Places, 97 Mich. L. Rev. 2239, 2245 (1999) (observing that, when the federal government initiates a federal criminal prosecution, it asserts "an 'abstract...injury to the interest in seeing that the law is obeyed'" (quoting Akins, 524 U.S. at 24)); Trevor W. Morrison, Private Attorneys General and the First Amendment, 103 Mich. L. Rev. 589, 627 (2005) ("Federal courts regularly adjudicate government enforcement actions that would lack 'injury in fact' if brought by private plaintiffs."); Jonathan R. Siegel, Congress's Power to Authorize Suits Against States, 68 Geo. Wash. L. Rev. 44, 67-68 (1999) ("The courts do not require the government, as they would a private party, to demonstrate that it has suffered an injury in fact.").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN12]. See, e.g., United States v. Raines, 362 U.S. 17, 27 (1960) (concluding that it is "perfectly competent for Congress to authorize the [Attorney General] to be the guardian of [the] public interest" in the "due observance of all the constitutional guarantees"); L. Singer & Sons, 311 U.S. at 303-04 ("[A] suit [to enforce a statute] cannot be instituted by an individual unless he possesses something more than a common concern for obedience to law. The general or common interest finds protection in the permission to sue granted to public authorities." (internal quotation marks omitted)); In re Debs, 158 U.S. 564, 586 (1895) ("[W]henever the wrongs complained of are such as affect the public at large...the mere fact that the government has no pecuniary interest in the controversy is not sufficient to exclude it from the courts...."); United States v. Am. Bell Tel. Co., 128 U.S. 315, 367 (1888) ("The essence of the right of the United States to interfere in the present case is its obligation to protect the public...."); see also Newman v. United States ex rel. Frizzell, 238 U.S. 537, 547 (1915) ("[E]very citizen and every taxpayer is interested in the enforcement of law....But that general interest is not a private but a public interest. Being such, it is to be represented by the Attorney General or the District Attorney....").

[FN13]. The Supreme Court recently indicated that state governments are subject to less restrictive standing requirements than private parties. See Massachusetts v. EPA, 549 U.S. 497, 518 (2007). This Article focuses on the contrast between Executive Branch and private party standing and does not address the distinct issue of state standing.

[FN14]. See Hartnett, supra note 11, at 2256 (asserting that, given the differences between Executive Branch and private party standing, the question of "'Who can constitutionally be empowered to represent...public interests in court?'" must be "a question of the proper interpretation, not of Article III or Article I, but of Article II"). The scholarly interest in Article II also stems from references to the Take Care Clause in a few central standing decisions. See Lujan, 504 U.S. at 577 ("To permit Congress to convert the undifferentiated public interest in executive officers' compliance with the law into an 'individual right' vindicable in the courts is to permit Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed'" (quoting U.S. Const. art. II, §3)); Allen v. Wright, 468 U.S. 737, 756-57, 761 (1984) ("The Constitution...assigns to the Executive Branch, and not to the Judicial Branch, the duty to 'take Care that the Laws be faithfully executed.'").

[FN15]. This Article II theory appears to underlie Chief Justice Roberts's and Justice Scalia's approach to standing doctrine. See Roberts, supra note 4, at 1230 (asserting that the injury-in-fact requirement "ensures that the court is carrying out its function of deciding a case or controversy, rather than fulfilling the executive's responsibility of taking care that the laws be faithfully executed"); Scalia, supra note 4, at 894 (arguing that standing "excludes [courts] from the...undemocratic role of prescribing how the other two branches should function").

[FN16]. U.S. Const. art. II, §1 ("The executive Power shall be vested in a President of the United States of America.").

[FN17]. U.S. Const. art. II, §3 ("[The President] shall take Care that the Laws be faithfully executed....").

[FN18]. See David M. Driesen, Standing for Nothing: The Paradox of Demanding Concrete Context for Formalist Adjudication, 89 Cornell L. Rev. 808, 874 (2004) ("The Article II theory begins with the premise that the Executive's power to 'take Care that the Laws be faithfully executed' limits other parties' capacity to sue."); Christopher S. Elmendorf, Note, State Courts, Citizen Suits, and the Enforcement of Federal Environmental Law by Non-Article III Plaintiffs, 110 Yale L.J. 1003, 1028 (2001) (characterizing this theory to mean that "[w]ere Congress positioned to empower 'any citizen' to enforce its laws, Congress could usurp a central element of the executive's Article II prerogatives"); Sunstein, supra note 5, at 211 (interpreting Lujan and other cases to assert that "standing limitations...protect against intrusions on the President's power under the Take Care Clause").

[FN19]. See, e.g., Steven L. Winter, What if Justice Scalia Took History and the Rule of Law Seriously?, 12 Duke Envtl.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

L. & Pol'y F. 155, 158 (2001) (asserting that the typical Article II-based theory "invokes the separation of powers concern...that the Executive Branch must be allowed its prosecutorial discretion").

[FN20]. See Nichol, supra note 5, at 1164-65; Sunstein, supra note 5, at 211-14.

[FN21]. Thus, as a few commentators have observed, this Article II-based theory, taken to its logical conclusion, would require the invalidation of much existing law. See William W. Buzbee, Standing and the Statutory Universe, 11 Duke Envtl. L. & Pol'y F. 247, 283 (2001) (stating that the logical conclusion of this theory would be that "citizens can never enforce statutory law"); Driesen, supra note 18, at 875 (similarly noting that "[a]n exclusive executive enforcement power would....require disallowance of all private, state, tribal, and territorial actions litigating federal public law questions, including actions brought by seriously injured parties").

[FN22]. The focus on executive enforcement power has led some commentators to suggest that standing doctrine applies only when a private party brings suit against the Executive Branch. See Harold J. Krent & Ethan G. Shenkman, Of Citizen Suits and Citizen Sunstein, 91 Mich. L. Rev. 1793, 1793 n.5 (1993) (asserting that suits against private parties "do[] not rise to the level of a constitutional concern"); Winter, supra note 19, at 159. The Court has, however, applied standing requirements in suits against private parties as well as state and local governments. See infra note 96.

Harold Krent and Ethan Shenkman have offered perhaps the most cogent Article II analysis to date. Relying on the theory of the "unitary executive," Krent and Shenkman assert that Article II prevents private parties that lack an "individuated" interest (an interest that appears to be analogous to an Article III injury-in-fact) from bringing enforcement actions in federal court. See Krent & Shenkman, supra, at 1794-96. The authors argue that the principle of political accountability underlying the notion of the unitary executive requires that the President be in charge of law enforcement efforts involving the "unindividuated" interests of the public at large. Id. at 1794-96, 1804-08. Krent and Shenkman offer many persuasive policy arguments as to why the President should be in charge of certain law enforcement activities. But they do not clearly explain why there is any constitutional distinction between cases involving individuated and unindividuated interests. See Cass R. Sunstein, Correspondence, Article II Revisionism, 92 Mich. L. Rev. 131, 137 (1993) (stating, in response to the Krent & Shenkman article, that "[t]he unanswered question remains why [the] distinction [between individuated and unindividuated interests] is crucial for purposes of Article II"). Furthermore, Krent and Shenkman suggest that their constitutional analysis is limited to suits against the Executive Branch. See Krent & Shenkman, supra, at 1793 n.5.

[FN23]. For purposes of this constitutional analysis, I bracket questions about the historical foundations of standing doctrine. For historical arguments that standing must not be a constitutional requirement, because courts at the Founding did not require private parties to demonstrate an injury-in-fact, see Raoul Berger, Standing to Sue in Public Actions: Is It a Constitutional Requirement?, 78 Yale L.J. 816, 819-27 (1969); Steven L. Winter, The Metaphor of Standing and the Problem of Self-Governance, 40 Stan. L. Rev. 1371, 1396-99 (1988). For a contrary position, see Bradley S. Clanton, Standing and the English Prerogative Writs: The Original Understanding, 63 Brook. L. Rev. 1001 (1997); Ann Woolhandler & Caleb Nelson, Does History Defeat Standing Doctrine?, 102 Mich. L. Rev. 689, 691, 694-724 (2004) (asserting, based on their comprehensive survey of early American law, that "history does not defeat standing doctrine" (emphasis omitted)).

[FN24]. Cass R. Sunstein, Reviewing Agency Inaction After Heckler v. Chaney, 52 U. Chi. L. Rev. 653, 670 (1985); see Caminker, supra note 7, at 377 ("[T]he take care clause is better understood as a directive that the President must execute the law consistently with Congress' will, rather than as a grant of exogenously defined power....").

[FN25]. U.S. Const. art. II, §3 (emphasis added).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page85 of 103

[FN26]. The term "prosecutorial discretion," as used here, refers to the authority to decide whether to pursue a violation of law by bringing an enforcement action in federal court. The term applies to enforcement actions (including civil suits) brought by both the Executive Branch and private parties.

[FN27]. See supra notes 5-7. The Court itself has acknowledged that standing doctrine has flaws. See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 475 (1982) ("We need not mince words when we say that the concept of 'Art. III standing' has not been defined with complete consistency in all of the various cases decided by this Court...."). For just a few of the insightful critiques of the Court's standing jurisprudence, see Fallon, supra note 5, at 22-30, 43-47 (contending that, once a plaintiff has demonstrated an injury-in-fact, the Court should not substantially restrict the remedies that she may pursue to redress that injury); Fletcher, supra note 5, at 229-39 (asserting that the Court should abandon the "injury-in-fact" inquiry altogether and focus on whether the relevant statutory or constitutional provision confers a legal right on the plaintiff); Samuel Issacharoff & Pamela S. Karlan, Standing and Misunderstanding in Voting Rights Law, 111 Harv. L. Rev. 2276, 2280-88 (1998) (asserting that neither precedent nor any identifiable theory explains the manner in which the Court has defined an injury-in-fact in the racial gerrymandering context); Nichol, supra note 5, at 1154-60 (arguing that the Court's injury-in-fact inquiry is malleable and essentially value-laden); Sunstein, supra note 5, at 183-92 (asserting that the proper inquiry is whether the relevant provision creates a cause of action for the plaintiff); Mark V. Tushnet, The New Law of Standing: A Plea for Abandonment, 62 Cornell L. Rev. 663, 680-84 (1977) (asserting that the Court's standing inquiry often amounts to a determination on the merits of the plaintiff's claim).

[FN28]. For purposes of this analysis, I bracket questions of Congress's power to confer standing in suits against the States. Such cases could raise federalism concerns that are beyond the scope of this Article.

[FN29]. I focus on Congress's authority to confer standing on the Executive Branch, not on whether the Executive Branch has inherent power to file suit absent congressional authorization. For insightful discussions of the latter issue, see Henry P. Monaghan, The Protective Power of the Presidency, 93 Colum. L. Rev. 1 (1993); Larry W. Yackle, A Worthy Champion for Fourteenth Amendment Rights: The United States in Parens Patriae, 92 Nw. U. L. Rev. 111 (1997).

[FN30]. 128 U.S. 315 (1888).

[FN31]. See id. at 366-67.

[FN32]. Id.

[FN33]. 158 U.S. 564 (1895).

[FN34]. Id. at 584.

[FN35]. See id. at 599.

[FN36]. See supra notes 11-12. Courts have doubted the Executive Branch's standing to bring suit only when it lacked express congressional approval. See, e.g., United States v. City of Philadelphia, 644 F.2d 187, 201 (3d Cir. 1980) (holding that "the United States may not sue [a local police department] to enjoin violations of individuals' fourteenth amendment rights without specific statutory authority"); United States v. Mattson, 600 F.2d 1295, 1297 (9th Cir. 1979) (concluding that, absent statutory authorization, the Executive Branch may not sue a state to protect the constitutional rights of the mentally retarded confined in state hospitals); United States v. Solomon, 563 F.2d 1121, 1123-24 (4th Cir.

1977) (same). But the courts' analyses also indicated that, once Congress authorized the lawsuits, there would be no Article III barrier. See City of Philadelphia, 644 F.2d at 201 & n.22; Mattson, 600 F.2d at 1297 (stating that the Executive Branch could "easily" establish standing if it had "specific statutory authority"); Solomon, 563 F.2d at 1125, 1128 (declining to hold that the Executive Branch could sue "in the absence of specific authority," even though the court had "no doubt that the United States has an interest...in the subject matter of the suit").

[FN37]. 362 U.S. 17 (1960).

[FN38]. Id. at 19.

[FN39]. Id. at 19-20; see also Civil Rights Act of 1957, 71 Stat. 637 (codified at 42 U.S.C. §1971(a), (c) (2000)).

[FN40]. Raines, 362 U.S. at 27.

[FN41]. Id.

[FN42]. Id.

[FN43]. Nor could the Executive Branch assert such private interests under the Court's traditional standing jurisprudence. To have third-party standing, a litigant must demonstrate an injury-in-fact, a close relationship with the third party whose rights are at issue, and that the third party is unable to protect her own interests. Powers v. Ohio, 499 U.S. 400, 411 (1991). The Executive Branch could not satisfy that first requirement, absent special standing rules.

[FN44]. Raines, 362 U.S. at 27.

[FN45]. U.S. Const. art. II, §3.

[FN46]. Buckley v. Valeo, 424 U.S. 1, 138 (1976).

[FN47]. See id. at 135 ("'[T]he President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates.'" (quoting Myers v. United States, 272 U.S. 52, 117 (1926))); In re Neagle, 135 U.S. 1, 63-64 (1890) (stating that the President may fulfill his constitutional obligation to ensure that the laws are "faithfully executed" by delegating to, inter alia, executive departments).

[FN48]. As used here, the term "Executive Branch" encompasses both independent and executive agencies. (A federal agency is typically considered "independent" if the President lacks the authority to remove the agency's leaders "at will." See Cass R. Sunstein, Constitutionalism After the New Deal, 101 Harv. L. Rev. 421, 492 (1987)). Although in some contexts it may be appropriate to distinguish these two types of agencies, no such distinctions need be made here. The Department of Justice (an executive agency) supervises virtually all litigation by the United States and represents both independent and executive agencies in federal court. See 28 U.S.C. §§516, 519 (2006) (authorizing the Attorney General to represent the interests of the United States in court); Peter L. Strauss, The Place of Agencies in Government: Separation of Powers and the Fourth Branch, 84 Colum. L. Rev. 573, 587 (1984) ("The Department of Justice, to varying degrees, represents [the] interests [of both types of agencies] in court...."). Accordingly, as other commentators have observed, independent and executive agencies are largely indistinguishable, at least insofar as they bring suit to see that federal law is obeyed. See, e.g., Michael Herz, United States v. United States: When Can the Federal Government Sue Itself?, 32 Wm. & Mary L. Rev. 893, 954 (1991) ( "[A]t least in regard to litigation, viewing independent agencies as different from executive agencies is a mistake.").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN49]. See Clinton v. Jones, 520 U.S. 681, 701 (1997) ("'[T]he separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties.'" (quoting Loving v. United States, 517 U.S. 748, 757 (1996))); see also Mistretta v. United States, 488 U.S. 361, 383 (1989) (stating that the "separation-of-powers inquiry" often "focus[es] 'on the extent to which [a provision of law] prevents the Executive Branch from accomplishing its constitutionally assigned functions'" (quoting Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 443 (1977)) (second alteration in original)).

[FN50]. In discussing prosecutorial discretion, I draw upon analyses from both the criminal and the civil enforcement contexts, which raise analogous concerns. See Marshall v. Jerrico, Inc., 446 U.S. 238, 248 (1980) ("Our legal system has traditionally accorded wide discretion to criminal prosecutors in the enforcement process, and similar considerations have been found applicable to administrative prosecutors...." (citations omitted)); see also Heckler v. Chaney, 470 U.S. 821, 832 (1985) (recognizing that "an agency's refusal to institute [civil enforcement] proceedings shares to some extent the characteristics of the decision of a [criminal] prosecutor in the Executive Branch not to indict").

[FN51]. See, e.g., Gary Lawson, Delegation and Original Meaning, 88 Va. L. Rev. 327, 373 (2002) ("Very few rules are entirely opaque; most leave some room for interpretation and discretion in application.").

[FN52]. See John F. Manning, Textualism as a Nondelegation Doctrine, 97 Colum. L. Rev. 673, 725 (1997) ("Every statute confers some degree of discretion on those who implement it. No legislator, however prescient, can predict all the twists and turns that lie ahead for his or her handiwork.").

[FN53]. See, e.g., Matthew C. Stephenson, Public Regulation of Private Enforcement: The Case for Expanding the Role of Administrative Agencies, 91 Va. L. Rev. 93, 107 (2005) ("The budget and manpower of federal regulatory agencies are generally quite limited, and many agencies simply lack the capacity to enforce the law adequately.").

[FN54]. Various commentators have observed that full enforcement of the law might be unwise, even if it were feasible, because it could discourage lawful and socially beneficial conduct. See Richard A. Bierschbach & Alex Stein, Overenforcement, 93 Geo. L.J. 1743, 1749 n.14 (2005) (observing that overenforcement "is detrimental to society...when it chills socially beneficial conduct"); Deborah Platt Majoras, Recognizing the Significance of Prosecutorial Discretion in a Multi-Layered Antitrust Enforcement World, 11 Geo. Mason L. Rev. 121, 123-24 (2002) (noting that overenforcement may cause parties to "avoid[] legitimate behavior").

[FN55]. See Steven G. Calabresi & Saikrishna B. Prakash, The President's Power to Execute the Laws, 104 Yale L.J. 541, 583-84 (1994) (stating that the Take Care Clause "mak[es] clear that the President has no royal prerogative to suspend statutes"); Sunstein, supra note 24, at 670 ("[T]he 'take Care' clause does not authorize the executive to fail to enforce those laws of which it disapproves."). Justice Scalia has, however, expressed a contrary view. See Scalia, supra note 4, at 897 (arguing that executive officials should not enforce laws that have outlived their usefulness).

[FN56]. See, e.g., Elena Kagan, Presidential Administration, 114 Harv. L. Rev. 2245, 2347 (2001) (noting the "risk that a presidential administration might displace the preferences of a prior...Congress by interpreting statutes inconsistently with their drafters' objectives"). One exception may be when the Executive Branch considers a statute to be unconstitutional. Because the Constitution is the supreme law that the Executive Branch is charged with faithfully executing, it should perhaps decline to enforce seemingly unconstitutional provisions. See Arthur S. Miller, The President and Faithful Execution of the Laws, 40 Vand. L. Rev. 389, 397 (1987) (noting this possibility, but arguing that the President should enforce the law even in this context).

[FN57]. See Griffin B. Bell, The Attorney General: The Federal Government's Chief Lawyer and Chief Litigator, or One

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Among Many?, 46 Fordham L. Rev. 1049, 1068 (1978) (asserting that the Executive Branch should adopt a "coherent, consistent interpretation of the law, to the extent that it is administratively possible to do so").

[FN58]. See, e.g., Richard M. Thomas, Prosecutorial Discretion and Agency Self-Regulation: CNI v. Young and the Aflatoxin Dance, 44 Admin. L. Rev. 131, 152 (1992) (asserting that agencies should adopt enforcement guidelines).

[FN59]. See Robert H. Jackson, The Federal Prosecutor, 31 Am. Inst. Crim. L. & Criminology 3, 5 (1940) (stating that "the most dangerous power of the prosecutor" is "that he will pick people that he thinks he should get, rather than pick cases that need to be prosecuted").

[FN60]. See Wayte v. United States, 470 U.S. 598, 608 (1985) (stating that the Executive Branch may not bring an enforcement action to punish an individual for "exercis[ing]...protected statutory and constitutional rights"); Yick Wo v. Hopkins, 118 U.S. 356, 373-74 (1886) (holding that administrative officials violated the Fourteenth Amendment when they discriminated on the basis of race in applying a local ordinance); see also Marshall v. Jerrico, Inc., 446 U.S. 238, 249 (1980) ("In appropriate circumstances the Court has made clear that traditions of prosecutorial discretion do not immunize from judicial scrutiny cases in which the enforcement decisions of an administrator were motivated by improper factors or were otherwise contrary to law.").

[FN61]. See, e.g., Richard B. Stewart, The Reformation of American Administrative Law, 88 Harv. L. Rev. 1667, 1713 (1975) ("It has become widely accepted...that the comparative overrepresentation of regulated or client interests in the process of agency decision results in a persistent policy bias in favor of these interests." (footnotes omitted)). Some commentators, however, have voiced doubts about the validity of agency "capture" theory. See, e.g., Mark Seidenfeld, A Civic Republican Justification for the Bureaucratic State, 105 Harv. L. Rev. 1511, 1566 (1992) (asserting that commentators may "overstate the susceptibility of agencies to capture").

[FN62]. See Dan Eggen, Ex-Attorney General Says Politics Drove Federal Prosecution, Wash. Post, Oct. 24, 2007, at A3.

[FN63]. For a thoughtful discussion of these events, see Bruce A. Green & Fred C. Zacharias, "The U.S. Attorneys Scandal" and the Allocation of Prosecutorial Power, 69 Ohio St. L.J. 187 (2008).

[FN64]. See Dan Eggen & Michael A. Fletcher, Embattled Gonzales Resigns: Attorney General Was Criticized for Terrorism Policy, Prosecutor Firings, Wash. Post, Aug. 28, 2007, at A1.

[FN65]. See infra notes 172-75 and accompanying text.

[FN66]. Cf. Lara Jakes Jordan, Mukasey Sworn in as Attorney General, Assoc. Press, Nov. 9, 2007 (observing that the newly appointed Attorney General Michael Mukasey "made clear to senators" during his confirmation hearings that he would not "tolerate politics influencing decisions about prosecuting cases or hiring career attorneys").

[FN67]. See supra note 60.

[FN68]. An agency's decision not to take a particular enforcement action is "presumptively unreviewable." Heckler v. Chaney, 470 U.S. 821, 832 (1985). But this presumption "may be rebutted" when a congressional statute "has provided guidelines for the agency to follow in exercising its enforcement powers." See id. at 832-33. Furthermore, federal courts can review enforcement decisions that are based on (allegedly incorrect) statutory interpretations, such as an agency's conclusion that it lacks jurisdiction to exercise its enforcement authority. See FEC v. Akins, 524 U.S. 11, 25 (1998).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page89 of 103

[FN69]. See Heckler, 470 U.S. at 833.

[FN70]. For example, in the civil regulatory context, Congress sometimes establishes parameters for the assessment of civil monetary penalties. See 29 U.S.C. §666(a)-(d) (2006); 12 U.S.C. §1818(i)(2)(A)-(C) (2006).

[FN71]. See, e.g., Cass R. Sunstein, Section 1983 and the Private Enforcement of Federal Law, 49 U. Chi. L. Rev. 394, 418 (1982) ("Congress...may use the appropriations process...to ensure that [an] agency does not overenforce a statute, or to indicate that certain...illegalities...are the intended object of the statutory standard.").

[FN72]. See Daniel C. Richman, Federal Criminal Law, Congressional Delegation, and Enforcement Discretion, 46 UCLA L. Rev. 757, 791 (1999) ( "Oversight hearings...give legislators in the relevant committees the chance to impose costs if enforcers are insufficiently attentive to their concerns.").

[FN73]. See Bruce A. Green & Fred C. Zacharias, Prosecutorial Neutrality, 2004 Wis. L. Rev. 837, 843 (2004) ("Prosecutors' offices, especially those that deal with a large volume of similar cases, often adopt policies in order to promote consistency and administrative efficiency."). This method of restraint does, however, rely on the Executive Branch's willingness and capacity to constrain individual enforcement officials. The publication of such guidelines does not give rise to any individual rights and, accordingly, defendants cannot rely on those guidelines to challenge individual enforcement decisions in court. See In re Grand Jury Subpoena, Judith Miller, 438 F.3d 1141, 1153 (D.C. Cir. 2006) ("[T]he guidelines provide no enforceable rights to any individuals, but merely guide the discretion of the prosecutors."); United States v. Paternostro, 966 F.2d 907, 912 (5th Cir. 1992).

[FN74]. See Michael A. Simons, Prosecutorial Discretion and Prosecution Guidelines: A Case Study in Controlling Federalization, 75 N.Y.U. L. Rev. 893, 960 n.303 (2000) (observing that the Executive Office of U.S. Attorneys conducts reviews every few years to ensure that field offices "comply[] with Department policies and procedures").

[FN75]. Notably, the federal government has a centralized system for determining which cases should be appealed to the courts of appeals and ultimately to the Supreme Court. See United States Department of Justice, Functions of the Office of the Solicitor General, http:// www.usdoj.gov/osg/aboutosg/function.html (noting that the Solicitor General's Office "review[s] all cases decided adversely to the government in the lower courts to determine whether they should be appealed and, if so, what position should be taken"). The Solicitor General can use this authority over the appellate process to ensure, to some degree, consistency in government enforcement efforts. For example, on two occasions, the Solicitor General successfully moved in the Supreme Court to dismiss criminal prosecutions that were out of step with the federal government's overall enforcement policies. See Redmond v. United States, 384 U.S. 264, 264-65 (1966); Petite v. United States, 361 U.S. 529, 530-31 (1960).

[FN76]. See Heckler v. Chaney, 470 U.S. 821, 832 (1985) (holding that an agency's decision not to take a particular enforcement action is "presumptively unreviewable").

[FN77]. See United States v. Armstrong, 517 U.S. 456, 464-65 (1996) (stating that enforcement decisions are entitled to a "presumption of regularity" and that, in order to "dispel [that] presumption," a person must provide "clear evidence" that the decision was improperly motivated).

[FN78]. See Lisa Schultz Bressman, Schechter Poultry at the Millennium: A Delegation Doctrine for the Administrative State, 109 Yale L.J. 1399, 1424 (2000) ("Traditionally, Congress has used [oversight] hearings sparingly and for matters of some prominence.").

[FN79]. See Kagan, supra note 56, at 2259 ("[A]ll the claims of legislative control [over administrative action] inadequately acknowledge the limits on Congress's ability to impose harsh sanctions. Statutory (including most budgetary) punishments require the action of the full Congress--action which is costly and difficult to accomplish.").

[FN80]. Jackson, supra note 59, at 3.

[FN81]. United States v. Raines, 362 U.S. 17, 27 (1960).

[FN82]. 258 U.S. 126 (1922).

[FN83]. See id. at 127; see also U.S. Const. amend. XIX, §1 ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex.").

[FN84]. Fairchild, 258 U.S. at 127 (internal quotation marks omitted).

[FN85]. Id. at 129.

[FN86]. Id. at 129-30.

[FN87]. 311 U.S. 295 (1940).

[FN88]. See id. at 297.

[FN89]. Id. at 303.

[FN90]. 504 U.S. 555 (1992).

[FN91]. Id. at 557-59. The statutory provision at issue requires each federal agency, in consultation with the Secretary of the Interior, to ensure that any action "authorized, funded, or carried out by [the] agency...is not likely to jeopardize the continued existence of any endangered species." Id. at 558 (quoting 16 U.S.C. §1536(a)(2) (1988)). The plaintiffs in Lujan objected to a regulation stating that this consultation requirement did not apply to agency action in foreign countries. See id. at 558-59.

[FN92]. See id. at 562-67. The plaintiff organizations' claim for standing rested in part on affidavits from two members. See id. at 563-64. Each member stated that she had previously observed an endangered species in a foreign country and that the existence of the species was now threatened by a project that received federal funds. See id. at 563. Each member also asserted that she planned to return to the location to view the species again. See id. at 563-64. The Supreme Court held that the affidavits did not establish an injury-in-fact, because they failed to show that the affiants would "imminent[ly]" be harmed by the threat to the species. See id. at 564 (internal quotation marks omitted). According to the Court, the plaintiffs needed to have "concrete plans," not simply "'some day' intentions," to return to the foreign countries in order to demonstrate "'actual or imminent' injury." Id.

[FN93]. See id. at 571-73.

[FN94]. Id. at 571-72 (quoting 16 U.S.C. §1540(g) (1988)).

[FN95]. See id. at 573.

[FN96]. Id. at 573-74. Lujan did not announce a constitutional rule solely for cases against the federal government (or,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page91 of 103

more specifically, against the Executive Branch). The Supreme Court and the courts of appeals have applied similar principles in lawsuits against non-federal defendants. See Lance v. Coffman, 549 U.S. 437, 442 (2007) (rejecting a challenge to a Colorado law for lack of standing); L. Singer & Sons v. Union Pac. R.R. Co., 311 U.S. 295, 303-04 (1940) (holding that the plaintiffs could not challenge the railroad's conduct based solely on their interest in ensuring compliance with federal law); W. Pac. Cal. R.R. Co. v. S. Pac. Co., 284 U.S. 47, 51-52 (1931) (stating that to be a party-in-interest, the complainant must have some definite legal right that is seriously threatened); Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n, 389 F.3d 536, 542, 546-47 (6th Cir. 2004) (finding a concrete and particularized injury sufficient to confer Article III standing); Crist v. Comm'n on Presidential Debates, 262 F.3d 193, 195 (2d Cir. 2001) (finding no particularized harm to allow standing against the Commission on Presidential Debates).

[FN97]. L. Singer & Sons, 311 U.S. at 303-04.

[FN98]. 258 U.S. 126, 127 (1922).

[FN99]. 405 U.S. 727 (1972).

[FN100]. See id. at 730.

[FN101]. Id.

[FN102]. See id. at 738-41.

[FN103]. Id. at 739-40 (internal quotation marks omitted). The Court purported to adhere to these limitations on private party standing in Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765 (2000). Stevens involved the False Claims Act, which prohibits any person from making a fraudulent claim for payment to the federal government, and allows private qui tam relators to enforce the provision by filing suit against an alleged violator. See 31 U.S.C. §§3729(a)(1), 3730(b)(1) (2000); Stevens, 529 U.S. at 768, 771-78. The Court found that relators could (consistent with Article III) bring these suits, because they asserted the government's "proprietary injury resulting from the alleged fraud," rather than its abstract "sovereign[]" interest in law enforcement. Id. at 771, 773 (noting that the statute "can reasonably be regarded as effecting a partial assignment of the Government's damages claim" (emphasis added)). I do not claim that this distinction between "sovereign" and "proprietary" interests is necessarily coherent. I note only that the Court's analysis is superficially consistent with the cases holding that private parties lack standing to see that the law is obeyed. A more extensive discussion of Stevens and the False Claims Act is beyond the scope of this Article.

[FN104]. 454 U.S. 464 (1982).

[FN105]. Standing doctrine may, of course, also serve other values. For insightful discussions, see Lea Brilmayer, The Jurisprudence of Article III: Perspectives on the "Case or Controversy" Requirement, 93 Harv. L. Rev. 297, 306-15 (1979) (arguing that standing protects the values of representation and self-determination); Eugene Kontorovich, What Standing Is Good for, 93 Va. L. Rev. 1663, 1664 (2007) (contending that standing helps "prevent the inefficient disposition of constitutional entitlements"); and Maxwell L. Stearns, Constitutional Process: A Social Choice Analysis of Supreme Court Decision Making 159 (2000) (asserting that standing helps prevent litigants "from strategically timing cases...to manipulate the substantive evolution of constitutional doctrine").

[FN106]. 454 U.S. at 469.

[FN107]. See id. at 482-87.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN108]. Id. at 485.

[FN109]. Id. at 486 ("It is evident that [the plaintiffs] are firmly committed to the constitutional principle of separation of church and State, but standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy.").

[FN110]. See id. at 486-87.

[FN111]. See id. at 469 (observing that the plaintiffs "learned of the conveyance through a news release"); id. at 486-87 ("[The plaintiffs] complain of a transfer of property located in Chester County, Pa. The named plaintiffs reside in Maryland and Virginia; their organizational headquarters are located in Washington, D.C. They learned of the transfer through a news release." (footnote omitted)).

[FN112]. Id. at 487.

[FN113]. 476 U.S. 54 (1986).

[FN114]. Id. at 67.

[FN115]. Id. (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 40 (1976)). Diamond grew out of a constitutional challenge to a restrictive Illinois abortion statute. See id. at 57-58. A physician (Diamond) intervened in the litigation, asserting that he had an interest in defending the statute because of his "conscientious objection to abortions." Id. The lower courts later enjoined the enforcement of certain provisions of the state law and Illinois declined to further defend the statute. See id. at 61. Only Diamond sought review in the Supreme Court. Id. The Court held that, when a private intervenor such as Diamond is the sole party to appeal, he must satisfy the standing requirements of Article III. See id. at 68. And, as noted in the text, the Court found that Diamond lacked standing because he suffered no judicially cognizable injury. See id. at 71.

[FN116]. Sierra Club v. Morton, 405 U.S. 727, 739-40 (1972) ("[I]f a 'special interest' in [environmental protection] were enough to entitle the Sierra Club to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide 'special interest' organization, however small or short-lived. And if any group with a bona fide 'special interest' could initiate such litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so.").

[FN117]. See McConnell v. FEC, 540 U.S. 93, 225 (2003).

[FN118]. See, e.g., Simon, 426 U.S. at 40-44 (holding that indigent plaintiffs, who were denied treatment at certain tax-exempt hospitals, lacked standing to sue the Internal Revenue Service, because their injury--the denial of care--was caused by the hospital rather than by the IRS); Linda R.S. v. Richard D., 410 U.S. 614, 617-18 (1973) (holding that a mother could not bring suit against a state prosecutor for failing to enforce the child support laws on behalf of children born out-of-wedlock, because the mother "made no showing that her failure to secure support payments [from her own child's father] result[ed] from the nonenforcement").

[FN119]. See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 185 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought."). I do not mean to dispute that, once a private plaintiff demonstrates an injury-in-fact, she may seek "broad injunctive relief" or other remedies that are "not necessarily coterminous with" her personal injury. See Morrison, supra note 11, at 603-04. But she must nevertheless target the particular illegal conduct that injured her. See infra text accompanying notes 124-35.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page93 of 103

[FN120]. See Baker v. Carr, 369 U.S. 186, 207-08 (1962).

[FN121]. See Shaw v. Reno, 509 U.S. 630, 658 (1993).

[FN122]. See Laidlaw, 528 U.S. at 183; Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 73-74, 74 n.18 (1978).

[FN123]. See Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 n.4 (1986).

[FN124]. For insightful critiques of the Court's standing jurisprudence, see supra notes 5-7, 27.

[FN125]. See Sinkfield v. Kelley, 531 U.S. 28, 29-31 (2000); United States v. Hays, 515 U.S. 737, 744-45 (1995).

[FN126]. See Dep't of Commerce v. U.S. House of Representatives, 525 U.S. 316, 330-34 (1999); Baker v. Carr, 369 U.S. 186, 207-08 (1962).

[FN127]. See Laidlaw., 528 U.S. at 182-84 (holding that an environmental organization had standing, in part because a member of the organization lived near the defendant hazardous waste facility and alleged that the pollution caused by the facility reduced the value of her property); Duke Power, 438 U.S. at 67, 73-74 (concluding that the plaintiffs--"40 individuals who live within close proximity to the planned [nuclear power] facilities"--alleged a cognizable injury, given that the emissions from such facilities can cause adverse "health and genetic consequences").

[FN128]. See, e.g., Laidlaw, 528 U.S. at 183 ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." (quoting Sierra Club v. Morton, 405 U.S. 727, 735 (1972))); Japan Whaling, 478 U.S. at 230 n.4 (noting that the plaintiffs "undoubtedly have alleged a sufficient 'injury in fact' in that the whale watching and studying of their members will be adversely affected by continued whale harvesting").

[FN129]. Many thanks to Richard Fallon for suggesting this application of the standing theory presented here.

[FN130]. See McCreary County v. ACLU, 545 U.S. 844, 850, 881 (2005) (holding that a Ten Commandments display on a county courthouse violates the Establishment Clause); Van Orden v. Perry, 545 U.S. 677, 691-92 (2005) (holding that a Ten Commandments display on state capitol grounds does not violate the Establishment Clause); County of Allegheny v. ACLU, 492 U.S. 573, 621 (1989) (holding that a crèche display at a county courthouse is unconstitutional); Lynch v. Donnelly, 465 U.S. 668, 687 (1984) (holding that a city's crèche display is constitutional).

[FN131]. See Van Orden, 545 U.S. at 682; Allegheny, 492 U.S. at 587-88; Lynch, 465 U.S. at 671-72; ACLU v. McCreary County, 96 F. Supp. 2d 679, 682 (E.D. Ky. 2000) ("[T]he plaintiffs here have standing because they must come into contact with the display of the Ten Commandments whenever they enter the courthouse to conduct business.").

[FN132]. I do not separately discuss establishment clause challenges based on taxpayer standing, which are governed by distinct rules. The general rule is that private parties lack standing to challenge government conduct based solely on their status as federal taxpayers. See Frothingham v. Mellon, 262 U.S. 447, 487 (1923). Although the Court in Flast v. Cohen, 392 U.S. 83 (1968), carved out an exception to this rule for establishment clause challenges to federal expenditures, the Court has gradually narrowed the Flast exception so that it covers only challenges to certain exercises of congressional power under the Spending Clause. See Hein v. Freedom from Religion Found., Inc., 127 S. Ct. 2553, 2568 (2007) (holding that federal taxpayers may challenge only government expenditures that are "expressly authorized or mandated by a[] specific congressional enactment"). A full discussion of taxpayer standing is beyond the scope of this Article. But,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

as noted below, the constitutional analysis here may offer an alternative rationale for the Court's decision to grant standing in Flast and deny it in Valley Forge. See infra note 210.

[FN133]. See Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977) ("[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."); see also United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 556-57 (1996) (concluding that the third prong of this test is not a constitutional requirement). Notably, the standard for "germaneness" is not a particularly exacting one. See Nat'l Lime Ass'n v. EPA, 233 F.3d 625, 636 (D.C. Cir. 2000).

[FN134]. 405 U.S. 727, 738-40 (1972).

[FN135]. See id. at 735 ("Nowhere in the pleadings or affidavits did the [Sierra] Club state that its members use [the wilderness area]."); id. at 735 n.8 (noting that the plaintiff could seek leave to amend its complaint to allege such an injury). Indeed, it appears that the plaintiff in Morton could have satisfied the requirements for organizational standing. According to an amicus brief, the plaintiff organization did have members that used the wilderness area at issue. See id. The organization, however, declined to rely on the interests of its members. See id.

[FN136]. See Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 209 (1972); Newman v. Piggie Park Enters., Inc., 390 U.S. 400, 401 (1968) ("When the Civil Rights Act of 1964 was passed, it was evident that...the Nation would have to rely in part upon private litigation as a means of securing broad compliance with the law.").

[FN137]. See Sandra B. Zellmer, The Virtues of 'Command and Control' Regulation: Barring Exotic Species from Aquatic Ecosystems, 2000 U. Ill. L. Rev. 1233, 1267 (noting the importance of private enforcement of environmental laws).

[FN138]. See Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp., 456 U.S. 556, 572 n.10 (1982) ("[P]rivate suits are an important element of the Nation's antitrust enforcement effort: ...'[They] provide a significant supplement to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations.'" (quoting Reiter v. Sonotone Corp., 442 U.S. 330, 344 (1979))); 15 U.S.C. §15 (2006) (authorizing private antitrust actions).

[FN139]. See Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 310 (1985) ("[I]mplied private actions provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [Securities & Exchange] Commission action'" (quoting J.I. Case Co. v. Borak, 377 U.S. 426, 432 (1964))).

[FN140]. See supra notes 136-39; Stephenson, supra note 53, at 107-08.

[FN141]. Sierra Club v. Morton, 405 U.S. 727, 736 (1972).

[FN142]. Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 487 (1982).

[FN143]. See 11 U.S.C. §1113 (b)(1)(A) (2006) (stating that a debtor may modify a collective bargaining agreement only as "necessary to permit... reorganization" and must ensure that "all of the affected parties are treated fairly and equitably").

[FN144]. See 11 U.S.C. §1114(e)(1) (2006) (requiring that the debtor "timely pay and...not modify" retirement benefits except by agreement of the parties or by court order).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN145]. See 11 U.S.C. §§503(b), 507(a)(2) (stating that such expenses are "administrative expenses," which are given high priority under the Code); Chao v. Hosp. Staffing Servs., Inc., 270 F.3d 374, 383 (6th Cir. 2001). Such "administrative expenses" also include the post-petition wages of a debtor corporation's employees. See 11 U.S.C. §503(b)(1)(A)(i). Our private attorney general would be inclined to ensure that a debtor made those payments.

[FN146]. See In re FBI Distrib. Corp., 330 F.3d 36, 41 (1st Cir. 2003).

[FN147]. Under the Clean Water Act, a person that plans to discharge pollutants into the nation's waters must apply to the Environmental Protection Agency for a "national pollution discharge elimination system" ("NPDES") permit. See 33 U.S.C. §§1311(a), 1342 (2000). An applicant may seek review of an adverse decision. See id. §1369(b)(1)(F).

[FN148]. Sierra Club v. Morton, 405 U.S. 727, 730 (1972).

[FN149]. The Constitution, with a few exceptions (such as the Thirteenth Amendment), restricts only the actions of governmental entities. See Edmonson v. Leesville Concrete Co., 500 U.S. 614, 619 (1991). The conduct of private parties "violates the Constitution only when it may be attributed to state action." Id.; see Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 171-73, 177 (1972).

[FN150]. 524 U.S. 11 (1998).

[FN151]. See id. at 13-16.

[FN152]. Id. at 15-16.

[FN153]. See 8 U.S.C. §1227(a) (2000) (setting forth the classes of deportable aliens).

[FN154]. See 8 U.S.C. §§1101(a)(42), 1158(b)(1)(A) (2006) (providing that an individual who qualifies as a "refugee" may be granted asylum).

[FN155]. 476 U.S. 54, 57-58 (1986).

[FN156]. Since 1976, Congress has, via either an appropriations measure or a joint resolution, prohibited the use of federal Medicaid funds for abortions. This restriction is commonly known as the "Hyde Amendment." See Pub. L. No. 108-99, §§508, 509, 118 Stat. 277 (2004) (prohibiting the use of federal Medicaid funds for abortion except in cases of rape, incest, and when the mother's life would be endangered by the pregnancy); Harris v. McRae, 448 U.S. 297, 302 (1980); see also id. at 326-27 (rejecting a constitutional challenge to the funding restriction).

[FN157]. 18 U.S.C. §248 (2006). The statute prohibits the "intentional [] ...intimidat[ion]" of persons "obtaining or providing reproductive health services." Id. §248(a)(1).

[FN158]. Other commentators have raised similar concerns. See Gillian E. Metzger, Privatization as Delegation, 103 Colum. L. Rev. 1367, 1445 (2003) ( "Private delegates' exemption from constitutional constraints means that they can wield these government powers in ways that raise serious abuse of power concerns. Imagine, for example, an individual who commences a meritless suit for civil penalties against a company out of spite or because its owners are African American."); see also Woolhandler & Nelson, supra note 23, at 731 (observing, with respect to qui tam actions, that "there are obvious dangers in a system that permits prosecutorial discretion to reside in each of 250 million autonomous decisionmakers who are self-appointed and out for their own financial gain").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN159]. See Harold J. Krent, Fragmenting the Unitary Executive: Congressional Delegations of Administrative Authority Outside the Federal Government, 85 Nw. U. L. Rev. 62, 104 (1990) ("Delegations to private attorneys general...are immune from most external supervision--judicial oversight does not extend to their motives or strategy.").

[FN160]. See William M. Landes & Richard A. Posner, The Private Enforcement of Law, 4 J. Legal Stud. 1, 39-40 (1975) (observing that, although "the annual appropriations hearing affords the legislature an opportunity to assure that [an] agency has not strayed too far," "[t]here is no corresponding check in private enforcement").

[FN161]. See Sunstein, supra note 7, at 647 (arguing that Congress may authorize private enforcement actions because it has "concluded that the agency (or private defendant) is not entirely reliable on its own and that relevant people should have access to the courts in order to ensure that the... law is enforced").

[FN162]. See, e.g., Jody Freeman, The Private Role in Public Governance, 75 N.Y.U. L. Rev. 543, 587 (2000) ("Congress could extend the procedural requirements of the [Administrative Procedure Act]--or any other good-government statute--to private actors.").

[FN163]. See NAACP v. Button, 371 U.S. 415, 429-30 (1963) (concluding that a lawsuit can itself be "a form of political expression" protected by the First Amendment and "may well be the sole practicable avenue open to a minority to petition for redress of grievances"); see also Buckley v. Valeo, 424 U.S. 1, 15 (1976) (observing that the First Amendment's Free Speech Clause protects the "freedom to associate with others for the common advancement of political beliefs and ideas").

[FN164]. See Freeman, supra note 162, at 591 ("Congress and the states will likely balk at excessively proceduralizing private institutions. In short, private actors will escape most traditional constraints most of the time.").

[FN165]. Nike, Inc. v. Kasky, 539 U.S. 654, 678, 679-80 (2003) (Breyer, J., dissenting from the denial of certiorari) (observing that, under California law, private parties may bring certain suits "even though they themselves have suffered no harm," and expressing concern that such plaintiffs "potentially constitute a large and hostile crowd freely able to bring prosecutions designed to vindicate their beliefs, and to do so unencumbered by the legal and practical checks" on "public enforcement agencies"); see also Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 504 (1985) (Marshall, J., dissenting) (observing that, in private suits under the Racketeer Influenced and Corrupt Organizations Act, "the restraining influence of [public] prosecutors is completely absent").

[FN166]. Myers v. United States, 272 U.S. 52, 293 (1926) (Brandeis, J., dissenting).

[FN167]. Arbitrary exercises of discretion are prohibited by the First Amendment's Free Speech Clause, see City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 757, 772 (1988) (invalidating a licensing scheme that gave the mayor "unfettered discretion" to deny permit applications for news racks); the Fourth Amendment's protection against unreasonable searches and seizures, see Delaware v. Prouse, 440 U.S. 648, 653-54 (1979) (stating that the Fourth Amendment "impose[s] a standard of reasonableness upon the exercise of discretion by government officials...to safeguard the privacy and security of individuals against arbitrary invasions" (internal quotation marks and footnote omitted)); the Due Process Clause, see City of Chicago v. Morales, 527 U.S. 41, 56, 60-64 (1999) (invalidating a local ordinance that failed to "establish minimal guidelines to govern law enforcement" and thereby created a significant "potential for arbitrary enforcement"); and the Equal Protection Clause, see Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (stating that the Equal Protection Clause protects against "intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN168]. See A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 521-22, 537 (1935) (invalidating the National Industrial Recovery Act, which permitted private trade and industrial associations to create codes of fair competition for much of the economy); see also Yakus v. United States, 321 U.S. 414, 424 (1944) (stating that the problem in Schechter was that "[t]he function of formulating the codes was delegated, not to a public official responsible to Congress or the Executive, but to private individuals engaged in the industries to be regulated").

[FN169]. See Larkin v. Grendel's Den, Inc., 459 U.S. 116, 117, 125-27 (1982) (invalidating on Establishment Clause grounds a state law that permitted churches to veto applications for liquor licenses, and stating that "important, discretionary governmental powers" may not be "delegated to or shared with religious institutions"); Carter v. Carter Coal Co., 298 U.S. 238, 310-11 (1936) (invalidating on due process grounds the Bituminous Coal Conservation Act, which delegated rulemaking authority to coal producers and miners).

[FN170]. The Article I nondelegation doctrine serves largely as a "theoretical" prohibition because, as many commentators have observed, courts have not found a judicially manageable standard for enforcing it. See, e.g., John F. Manning, The Nondelegation Doctrine as a Canon of Avoidance, 2000 Sup. Ct. Rev. 223, 241-42 (2000) (noting that there is no "reliable metric" for determining when "a statute confers too much discretion").

[FN171]. I do not argue that other Article II functions are nondelegable. Such a claim is beyond the scope of this Article.

[FN172]. Jackson, supra note 59, at 5.

[FN173]. Id.

[FN174]. See, e.g., Lisa Schultz Bressman, Judicial Review of Agency Inaction: An Arbitrariness Approach, 79 N.Y.U. L. Rev. 1657, 1686-97 (2004) (arguing that courts should conduct more searching review of enforcement decisions to "prevent[] ... arbitrary agency decisionmaking"); Angela J. Davis, Prosecution and Race: The Power and Privilege of Discretion, 67 Fordham L. Rev. 13, 20 (1998) ("The deficiency of prosecutorial discretion lies not in its existence, but in the randomness and arbitrariness of its application."); Kenneth Culp Davis, Administrative Powers of Supervising, Prosecuting, Advising, Declaring and Informally Adjudicating, 63 Harv. L. Rev. 193, 218-25 (1949) (arguing that administrative agencies' enforcement discretion creates the potential for "[a]dministrative arbitrariness"); James Vorenberg, Decent Restraint of Prosecutorial Power, 94 Harv. L. Rev. 1521, 1553 (1981) (noting "the potential for arbitrariness and discrimination that such discretion creates"); see also Thomas, supra note 58, at 152 (asserting that agencies should adopt enforcement guidelines to "eliminat[e] the randomness and arbitrariness of individual enforcement decisions by individual agency personnel").

[FN175]. Jackson, supra note 59, at 3 ("These powers have been granted to our law-enforcement agencies because it seems necessary that such a power to prosecute be lodged somewhere.").

[FN176]. Metzger, supra note 158, at 1145.

[FN177]. See supra notes 167-69.

[FN178]. Kolender v. Lawson, 461 U.S. 352, 357-58 (1983) (stating that the "principal element" of the void-for-vagueness doctrine is "'the requirement that a legislature establish minimal guidelines'" to prevent "arbitrary enforcement" by law enforcement officials (quoting Smith v. Goguen, 415 U.S. 566, 574 (1974))); see Gonzales v. Carhart, 127 S. Ct. 1610, 1628 (2007).

[FN179]. 461 U.S. 352.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN180]. See id. at 353-54, 361-62.

[FN181]. Id. at 358.

[FN182]. Id. at 360 (internal quotation marks omitted).

[FN183]. Camara v. Mun. Ct., 387 U.S. 523, 528 (1967).

[FN184]. 440 U.S. 648 (1979).

[FN185]. Id. at 663 ("[W]e hold that except in those situations in which there is at least articulable and reasonable suspicion" of a particular traffic violation, "stopping an automobile and detaining the driver...[is] unreasonable under the Fourth Amendment.").

[FN186]. Id. at 661.

[FN187]. 436 U.S. 307 (1978).

[FN188]. Id. at 325 ("We hold that...the Act is unconstitutional insofar as it purports to authorize inspections without warrant or its equivalent....").

[FN189]. Id. at 323.

[FN190]. See v. City of Seattle, 387 U.S. 541, 550 (1967); Camara v. Mun. Court, 387 U.S. 523, 532 (1967); see id. at 534, 540 (applying the warrant requirement to local health inspections).

[FN191]. 407 U.S. 67 (1972).

[FN192]. Id. at 93, 96.

[FN193]. Id. at 80-81; id. at 93 (stating that the statutes impermissibly "abdicate[d] effective state control over state power").

[FN194]. 278 U.S. 116 (1928).

[FN195]. Id. at 118, 122-23 (finding that "the attempted delegation of power cannot be sustained, and the restriction thereby sought...is arbitrary and repugnant to the due process clause").

[FN196]. Id. at 122.

[FN197]. Camara v. Mun. Court, 387 U.S. 523, 532 (1967).

[FN198]. 424 U.S. 1 (1976).

[FN199]. Id. at 111 (quoting 2 U.S.C. §437g(a)(5) (1970)).

[FN200]. See id. at 113 (describing the appointment process for the Commission).

[FN201]. Id. at 111.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN202]. Id. at 113, 137-41. The Court found that the Commission members were principal "Officers of the United States," who must be appointed by the President (with the advice and consent of the Senate) under the Appointments Clause. See id. at 132; see also U.S. Const. art. II, §2, cl. 2. My reliance on Buckley may seem to echo themes commonly associated with unitary executive theory. Indeed, as Harold Krent has suggested, much of unitary executive theory can be understood in Article II nondelegation terms. See, e.g., Krent, supra note 159, at 90 ("Congress' many decisions to create private attorneys general represent substantial delegations of administrative authority."). But unitary executive theory may not serve as the most useful analytical tool in this context. Unitarians assert that any person who exercises a discretionary executive function must be subject to the control and supervision of the President. See Steven G. Calebresi & Kevin H. Rhodes, The Structural Constitution: Unitary Executive, Plural Judiciary, 105 Harv. L. Rev. 1153, 1165 (1992) ("Unitary executive theorists...conclude that the President alone possesses all of the executive power and that he therefore can direct, control, and supervise inferior officers or agencies who seek to exercise discretionary executive power." (footnote omitted)). This theory could be interpreted to mean that Article II prohibits any delegation of discretionary enforcement power, and accordingly that any private enforcement action is invalid. (Every private enforcement action, after all, involves some discretion. The plaintiff has, at a minimum, the discretion to decide whether to bring suit.) That is clearly not the law, and I doubt many Unitarians would advocate such a position. But unitary executive theory does not seem to offer any principled means of distinguishing between enforcement actions that require presidential supervision and those that do not.

[FN203]. See supra note 202.

[FN204]. Jackson, supra note 59, at 3.

[FN205]. This Article II nondelegation theory of standing may help explain the decisions recognizing standing in suits under the Freedom of Information Act ("FOIA"). FOIA permits any person to request any type of information from a federal agency (including records about a specific private individual or entity), without demonstrating any distinct interest in or particular need for the material. See 5 U.S.C. §552 (2006); Pub. Citizen v. U.S. Dep't of Justice, 491 U.S. 440, 449 (1989); Burka v. U.S. Dep't of Health & Human Servs., 142 F.3d 1286, 1290-91 (D.C. Cir. 1998) (noting that a FOIA request can be made by "'any person'" and that the requesting person is "not required" to demonstrate "any particular need for the information"); McDonnell v. United States, 4 F.3d 1227, 1237-38 (3d Cir. 1993) ("A person seeking information under the FOIA ... need not have a personal stake in the information sought."). If the agency declines to provide the requested material (perhaps because it concludes that the material is exempt from disclosure, see 5 U.S.C. §552(b) (setting forth the statutory exemptions)), the individual may file suit, alleging an "informational injury." See Pub. Citizen, 491 U.S. at 449 (stating that refusing to permit an individual to review requested records "constitutes a sufficiently distinct injury to provide standing to sue"); Burka, 142 F.3d at 1290-91 (finding standing to bring suit where a FOIA request was denied).

   Scholars have suggested that FOIA is hard to reconcile with the Court's Article III standing jurisprudence.  See Richard J. Pierce, Jr., Lujan v. Defenders of Wildlife: Standing as a Judicially Imposed Limit on Legislative Power, 42 Duke L.J. 1170, 1189 (1993) (arguing that the Court's reasoning in Lujan "could easily support a holding that FOIA's 'any person' standard is unconstitutional"); Sunstein, supra note 7, at 633 (urging that certain standing decisions appear to be on a "collision course with a number of statutes, including FOIA"); Winter, supra note 23, at 1496 (noting similarly that FOIA appears to be in tension with aspects of the Court's standing jurisprudence). But FOIA does not constitute an impermissible delegation of prosecutorial discretion. The statute does not give "any person" the right to sue any person for any statutory violation. Instead, the statute allows "any person" to seek a concrete benefit--information--from a federal agency. If the agency provides the benefit (by producing the requested material), the requester suffers no harm and cannot bring suit. An individual suffers an injury and can file suit--and thereby become a prosecutor--only if the agency declines to produce all or part of the requested information. But, at that point, her prosecutorial discretion is limited. She

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF Document150 Filed08/25/10 Page100 of 103

may sue only the agency that declined to produce the requested material, and may seek only the information that the agency declined to disclose. Accordingly, FOIA does not delegate to "any person" the degree of prosecutorial discretion exercised by the Executive Branch. FOIA provides breadth of discretion with respect to the underlying right to seek information, but not with respect to the right to sue per se.

[FN206]. See supra notes 6, 15-22, and accompanying text.

[FN207]. See 524 U.S. 11, 15-16, 21-25 (1998). For further discussion of Akins, see infra note 209.

[FN208]. See Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, 454 U.S. 464, 469, 482 (1982) (holding that the plaintiffs lacked standing, as federal taxpayers, to challenge the conveyance of property to a religious organization); Sierra Club v. Morton, 405 U.S. 727, 729-30, 738-41 (1972) (concluding that the plaintiff lacked standing, based solely on its "special interest" in environmental protection, to prevent the Department of Interior from issuing permits for the corporation's proposed development plan).

[FN209]. The Akins Court found that the plaintiffs had standing because they alleged a concrete "informational injury." See 524 U.S. at 12, 21 (observing that, under its cases, "a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute"). The Court's analysis resembled its approach in Freedom of Information Act cases. See supra note 205.

[FN210]. Notably, public officials also have private liberty interests. The Article II nondelegation principle thus provides a constitutional foundation for the denials of standing in Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 210-11, 216-27 (1974) (alleging that the Incompatibility Clause prohibits members of Congress from serving in the Armed Forces Reserve, and urging the Reserve to discharge all legislators and to seek back pay from any legislator who served), and Ex parte Levitt, 302 U.S. 633, 636 (1937) (claiming that Justice Hugo Black's appointment violated the Incompatibility Clause, and urging the Court to remove him). This Article II theory may also provide an alternative rationale for the seemingly inconsistent holdings in Flast v. Cohen, 392 U.S. 83, 85-88 (1968) (finding standing in a suit challenging, on establishment clause grounds, the statutory criteria by which the government disbursed funds to elementary and secondary schools), and Valley Forge, 454 U.S. at 469, 482-87 (denying standing in a suit challenging, on establishment clause grounds, the transfer of property to a religious institution). In contrast to Valley Forge, Flast did not implicate the liberty interests of any specific private parties.

[FN211]. See supra notes 141-49 and accompanying text.

[FN212]. Thus, under this theory, Congress could have conferred standing in United States v. Richardson, 418 U.S. 166, 176-77, 179-80 (1974) (denying standing in a suit alleging that the Central Intelligence Agency Act of 1949 violated the Constitution's Statement and Account Clause), and Fairchild v. Hughes, 258 U.S. 126, 127 (1922) (denying standing in a suit challenging the validity of the Nineteenth Amendment). And the Court probably should have found standing in Raines v. Byrd, 521 U.S. 811, 815-16, 829-30 (1997) (holding that members of Congress lacked standing to challenge the constitutionality of the Line-Item Veto Act, even though the statute expressly authorized the suit). In each case, however, the Court may have had other reasons to dismiss the suit as nonjusticiable.

[FN213]. 504 U.S. at 557-59.

[FN214]. 16 U.S.C. §1540(g) (1988) (stating that "any person may commence a civil suit on his own behalf...to enjoin any person, including the United States and any other governmental instrumentality or agency...who is alleged to be in violation of" any provision of the Endangered Species Act or its implementing regulations). Other citizen-suit provisions

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

are similar. See, e.g., Clean Air Act, 42 U.S.C. §7604(a)(1) (2000) (providing that "any person" may sue "any person (including...the United States...) who is alleged to have violated...an emission standard or limitation"); Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §9659(a) (2000) (stating that "any person" may sue "any person (including the United States...)" alleging a violation of "any standard, regulation, condition, requirement, or order" issued pursuant to the statute).

[FN215]. The Court in Lujan never stated whether it held the citizen-suit provision unconstitutional on its face or as applied. Several commentators have assumed that the Court invalidated the provision as applied. See Nichol, supra note 6, at 317 ("[T]he Court [in Lujan] held that the Endangered Species Act's broad citizen standing provision, as applied, violated the Constitution."); Richard J. Pierce, Jr., Is Standing Law or Politics?, 77 N.C. L. Rev. 1741, 1751-52 (1999) (same); Sunstein, supra note 5, at 200 (same). It is unclear why they make this assumption. They may be suggesting that the Court sought to sever the unconstitutional applications of the citizen-suit provision. But, on that theory, to ensure that the provision complied with the constitutional analysis here, the Court effectively would have had to rewrite it--to exclude not only all suits against private parties but also all suits demanding that the Executive Branch impose burdens on, or deny benefits to, specific private parties. There are reasons to doubt that Congress would have enacted such a narrow "citizen-suit" provision. See supra note 214 (noting that other citizen-suit provisions are as broad as the provision in Lujan). Accordingly, severance may not have been a viable option. See Reno v. ACLU, 521 U.S. 844, 884-85 & nn.49-50 (1997) (noting that the severability doctrine does not allow the Court to rewrite a statute to let it stand); Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 686-87 (1987) (observing that severability analysis depends on congressional intent). For these reasons, regardless of what the Court intended to do, I believe it had reason to invalidate the citizen-suit provision on its face as an unconstitutional delegation of prosecutorial discretion.

[FN216]. See supra note 214 (listing several citizen-suit provisions). The Article II nondelegation doctrine may also leave room for congressional conferrals of standing in suits that implicate private liberty (i.e., suits against private parties and suits demanding that the Executive Branch impose burdens on, or deny benefits to, specific private parties). In that context, to comply with the Article II nondelegation principle, Congress might be able to enact statutes that curtail private prosecutorial discretion. Thus, perhaps Congress could define new statutory injuries in a way that, like current standing doctrine, limits both the pool of potential prosecutors and constrains each potential plaintiff's prosecutorial discretion. See supra notes 124-28 and accompanying text (explaining how standing doctrine places such constraints on private prosecutorial discretion); supra note 205 (noting that the Freedom of Information Act does not delegate substantial prosecutorial discretion). Such an approach resonates with Justice Kennedy's view that Congress may confer standing on private parties, but "must at the very least identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit." Lujan, 504 U.S. at 580 (Kennedy, J., concurring). But, for purposes of this Article, I bracket questions about the precise boundaries of Congress's authority to confer standing by creating new statutory injuries. I note that, because the concept of a cognizable injury has itself changed over time as our society has evolved, see supra notes 120-23; infra note 237 and accompanying text, it may be difficult for courts to develop ex ante a workable standard for assessing the limits of Congress's authority. Cf. Whitman v. Am. Trucking Ass'n., 531 U.S. 457, 474-75 (2001) (observing that, in the Article I nondelegation context, the Court has "'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law'" (quoting Mistretta v. United States, 488 U.S. 361, 416 (1989) (Scalia, J., dissenting))).

[FN217]. See Hartnett, supra note 11, at 2256 (asserting that, given the differences between Executive Branch and private party standing, the question of "Who can constitutionally be empowered to represent...public interests in court?" must be "a question of the proper interpretation, not of Article III or Article I, but of Article II"); supra notes 15-22 and accompanying text.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case5:10-cv-02994-JF   Document150   Filed08/25/10   Page102 of 103

[FN218]. Spencer v. Kemna, 523 U.S. 1, 11 (1998) (internal quotation marks omitted).

[FN219]. Franks v. Bowman Transp. Co., Inc., 424 U.S. 747, 755 (1976) (internal quotation marks omitted).

[FN220]. Cf. Laurence H. Tribe, Taking Text and Structure Seriously: Reflections on Free-Form Method in Constitutional Interpretation, 108 Harv. L. Rev. 1221, 1278 (1995) (urging that invoking a single provision "without regard to the structural relationships among various constitutional provisions is an inadequate mode of constitutional interpretation").

[FN221]. Many thanks to Henry Monaghan for pointing out this implication of the Article II theory articulated here.

[FN222]. See ASARCO Inc. v. Kadish, 490 U.S. 605, 617 (1989) (observing that "the constraints of Article III do not apply to state courts...even when they address issues of federal law").

[FN223]. The addition of Article II to the analysis could solve a separate problem. The Supreme Court generally refuses to hear appeals from state court decisions when the underlying state court plaintiff lacked Article III standing. If state courts applied standing doctrine to enforce the Article II nondelegation principle, the Court could review more state court interpretations of federal law. See William A. Fletcher, The "Case or Controversy" Requirement in State Court Adjudication of Federal Questions, 78 Cal. L. Rev. 263, 265 (1990) (urging that, to ensure Supreme Court review of state court decisions, "[s]tate courts should be required to adhere to article III 'case or controversy' requirements whenever they adjudicate questions of federal law").

[FN224]. See, e.g., Myriam E. Gilles, Representational Standing: U.S. ex rel. Stevens and the Future of Public Law Litigation, 89 Cal. L. Rev. 315, 355, 361-67 (2001) (asserting that Congress could, consistent with Article II, designate private citizens as the "agents" of the federal government and allow them to bring suit to enforce federal law, as long as Congress gave the Executive Branch the tools to oversee the private agents); Stephen M. Johnson, Private Plaintiffs, Public Rights: Article II and Environmental Citizen Suits, 49 U. Kan. L. Rev. 383, 397-402 (2001) (arguing that federal environmental laws authorizing citizen suits do not violate Article II, because they give the Executive Branch various means of overseeing such suits); see also Krent, supra note 159, at 95 ("Congressional delegations of executive-type authority outside the federal government might be accommodated with article II if the Executive retains at least some practical control over the delegated authority.").

[FN225]. 487 U.S. 654 (1988).

[FN226]. Id. at 660.

[FN227]. Id. at 662 (quoting 28 U.S.C. §594(a)(9) (1982)).

[FN228]. Id. at 696.

[FN229]. The statute required the Attorney General to request that a special court appoint an Independent Counsel if he concluded that "there [were] 'reasonable grounds'" for such an independent inquiry. Id. at 661 (quoting 28 U.S.C. §592(c)(1)(A)). The Court reasoned that the Attorney General could therefore also decline to recommend the appointment of an Independent Counsel. See id. at 696 ("[T]he Attorney General's decision not to request appointment if he finds 'no reasonable grounds to believe that further investigation is warranted' is committed to his unreviewable discretion.").

[FN230]. The Court noted that, in requesting the appointment of an independent counsel, the Attorney General was required to provide the special court with "sufficient information to...defin[e] [the] independent counsel's prosecutorial jur-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

isdiction." Id. at 661 (quoting 28 U.S.C. §592(d)). This obligation, the Court concluded, gave the Attorney General some authority over the scope of the Independent Counsel's jurisdiction. See id. at 696 ("The Act thus gives the Executive a degree of control over the power to initiate an investigation by the independent counsel.").

[FN231]. The Court emphasized that the Attorney General could remove an independent counsel for "good cause." Id. at 686.

[FN232]. See supra note 229.

[FN233]. Morrison, 487 U.S. at 660.

[FN234]. See Daryl J. Levinson, Empire-Building Government in Constitutional Law, 118 Harv. L. Rev. 915, 917, 920 (2005) (observing that an "enduring and pervasive assumption in constitutional law and theory is that much government behavior is driven by self-aggrandizing motives toward empire-building," but asserting that it is today doubtful that "government pervasively seeks to build empire of either the imperialistic or avaricious variety").

[FN235]. See id. at 953-55 (discussing instances in which Congress leaves domestic and foreign policy decisionmaking up to the Executive Branch).

[FN236]. See Simons, supra note 74, at 931 n.169 ("[J]ust as Congress delegates broad enforcement authority to prosecutors as a strategy to avoid political responsibility for the hard choices prosecutors must make about whom to prosecute, prosecutors have a similar incentive to resist that authority and the political responsibility it brings.").

[FN237]. See supra notes 120-23 and accompanying text.

[FN238]. Under this formulation, the injury-in-fact requirement need not be confined to those injuries that were recognized at common law. Cf. Cass R. Sunstein, Standing Injuries, 1993 Sup. Ct. Rev. 37, 55-57 (1993) (suggesting that such a limitation would harm regulatory beneficiaries who often do not suffer traditional common law injuries).

[FN239]. FEC v. Akins, 524 U.S. 11, 24 (1998).

[FN240]. Nike, Inc. v. Kasky, 539 U.S. 654, 680 (2003) (Breyer, J., dissenting from the denial of certiorari).

[FN241]. U.S. Const. art. II, §3.

[FN242]. Jackson, supra note 59, at 3.

[FN243]. United States v. Raines, 362 U.S. 17, 27 (1960).

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.